# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ▮▮▮▮▮▮▮▮▮▮, ) )<br>  )<br>  )<br>Plaintiff, ) | Civil No.: |
| v. ) ) | |
| ▮▮▮▮▮▮▮▮▮▮▮▮▮, )<br>▮▮▮▮▮▮▮, and the ) | |
| UNITED STATES OF AMERICA, ) | April 26, 2013 |
| Defendants. ) ) | |

## **COMPLAINT**

Since childhood, ▮▮▮▮▮▮▮▮ dreamed of serving in the U.S. military. Her father had served in the ▮▮▮▮▮▮▮▮▮, and she hoped to follow in his footsteps defending her country. On ▮▮▮▮▮▮, Ms. ▮▮▮ signed her Oath of Allegiance and enrolled at the United States Military Academy ("West Point").  For two years, she thrived there, rising to rank ▮▮▮ in her class of more than ▮▮▮ cadets by the beginning of her second year. But Ms. ▮▮▮ achieved this success in spite of, not because of, the culture she found at West Point.

Ever since West Point was forced to admit women students in 1976, the school has failed to take necessary steps to protect women cadets from a pervasive and well-known culture of sexual violence. West Point and its leaders have fostered an aggressive and misogynistic environment, failed to punish rapists and other sexual assailants, and set school policies that did not protect women victims. These actions have communicated to male cadets that West Point

1

leaders tolerate sexual violence. The U.S. Department of Defense, Government Accountability Office, Congress, and others have documented the epidemic of sexual assaults at West Point and at the other military service academies. Yet responsible West Point officials during the time Ms. ███ was enrolled there, including Defendants ███████████████ and ███████████████, continued to foster a sexually aggressive and hostile culture.

   Ms. ███ suffered the full consequence of these senseless policies on or about ███ ███, when she was raped by ███████, a fellow cadet and once a trusted friend. Ms. ███ sought immediate medical care, including emergency contraception and testing for sexually transmitted diseases. Days after the rape, she filed a report that led to no disciplinary consequences for ███ and no extra support for her physical and emotional injuries. That year, Ms. ███ was one of ███ women at a military service academy to report a sexual assault; according to the Department of Defense, a far larger number of sexual assault victims did not report the attacks they suffered.

   Three months later, ███████████████, Ms. ███ resigned from West Point. She brings this suit seeking declaratory relief and monetary damages for the rape she suffered, based on the Defendants' violations of her constitutional, statutory, and common law rights. Ms. ███ hopes that by this action she might deter Defendants and their successors from perpetuating the practices that caused her suffering, protect future female cadets at West Point, and better ensure that the U.S. Military Academy lives up to the noble ideals it represents.

## JURISDICTION AND VENUE

   1.   This Court has jurisdiction under 28 U.S.C. § 1331. This action arises under the U.S. Constitution; the Little Tucker Act, 28 U.S.C. § 1491; Federal Torts Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671 *et seq*.; and the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02.

2.     Venue lies in this district pursuant to 28 U.S.C. § 1391(b) in that all events complained of and giving rise to Plaintiff's claims arose in this district.

## PARTIES

3.     Plaintiff ███████████ is a former West Point cadet.  She is a citizen of the United States and currently resides in ████████████.

4.     Defendant ███████████████████ is sued in his personal capacity. ███ ███████████ was the Superintendent of West Point from ████████████ ██████████████████████████████████████████████ ████████████████████████████████████

5.     Defendant ██████████████████ is sued in his personal capacity. ████████████ was Commandant of Cadets at West Point from ████████. ███ ████████████████████████████████

6.     Defendant United States of America is sued under the Federal Tort Claims Act for the tortious acts of its agents or employees and under the Little Tucker Act for breach of contractual obligations.

## FACTS AND PROCEEDINGS

7.     Ms. █████ grew up in a military family in ████████. ████████████ ██████████████████████████████████████████████ ████████████████████

8.     During her sophomore year of high school, Ms. █████ received a mailing from the United States Military Academy.  The pamphlet showed women in uniform demonstrating leadership, honor, and dignity. Inspired by her father's service and prompted by the mailing, Ms. █████ began to imagine studying at West Point.

9.      During high school, Ms. ▇▇▇ worked three jobs to help provide for her family.
She would often work on weekdays after school and on weekends from 4:00 a.m. to 1:00 p.m.
During softball season, she would work from 4 a.m. to 7:00 a.m. on weekends and go directly to
softball practice after work.

10.     Even with a grueling work schedule, Ms. ▇▇▇ was a highly motivated student
who excelled in five sports, leadership positions, and academics.

11.     In her senior year of high school, Ms. ▇▇▇ decided to pursue her dream and
apply to study at West Point. After years of balancing extracurricular opportunities, study time,
and jobs to help support her family, Ms. ▇▇▇ hoped she might have the opportunity to take
advantage of West Point's offerings without incurring the burden of student debt that attendance
at another college or university would have imposed.

12.     Ms. ▇▇▇ was convinced that West Point would provide the academic, physical,
and mental rigor that she desired. ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇

13.     Ms. ▇▇▇ also viewed West Point was an honorable and meritocratic institution
where she would have an opportunity to excel based on her abilities and hard work.

14.     Ms. ▇▇▇ completed her application to West Point and received a nomination
from her congressman, Representative ▇▇▇▇▇. Senator ▇▇▇▇▇
identified her as the top candidate in her state, though she did not receive a nomination from his
office because she had already secured one from Rep. ▇▇▇.

15.     West Point's admissions report rated Ms. ▇▇▇ as ▇▇▇▇▇▇▇
▇▇▇▇▇▇ Her admissions interviewer described her as the ▇▇▇▇▇▇

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

16.     Ms. ████ was thrilled when she learned that she had been offered admission to West Point.

17.     Ms. ████ graduated from ████████████ in early June ████ in the top three percent of her class, earning honors and a ██ GPA.

18.     She accepted West Point's offer of admission and enrolled. On ████████, she signed an Oath of Allegiance, an educational services contract with the United States, which committed Ms. ████ to serving in the Army for eight years, including five on active duty.

19.     In consideration for this promise of service, Ms. ████ was to receive her tuition, room, and board from West Point without charge.

20.     The oath explained that if Ms. ████ failed to complete her contractual military service, she would be required to "reimburse the United States in an amount that bears the same ratio to the total cost of advanced education provided me as the unserved portion of active duty bears to the total period of active duty I have agreed to serve."

21.     Ms. ████ contract with the Army allowed her to take advantage of the numerous educational opportunities available at West Point's campus, located on approximately 16,000 acres at a strategic bend in the Hudson River. At the time she enrolled, there were approximately ████ cadets and ███ faculty members at West Point. Approximately three-quarters of the faculty were miltary personnel and one-quarter were civilian employees.

22.     Cadets live in on-campus dormitories ("barracks") for all four years, eat in the dining hall ("mess hall"), and receive a monthly stipend.

23.     The curriculum at West Point is designed to train "officer-leaders of character to serve the Army and the Nation." Cadets may choose from thirty-six majors, ranging from American Politics to Systems Management.  Cadets also participate in the Physical Education Program, which includes military movement, swimming, combatives, and boxing.

24.     West Point offers a number of extracurricular activities, including athletics, Cadet Honor Societies, academic and applied research, and academic competitions. West Point's athletic program includes twenty-four National Collegiate Athletic Association (NCAA) Division I teams (fifteen men's and nine women's teams) and twenty-one club sports.  Musical activities include the West Point Band, Concert Band, Jazz Knights, Marching Band, and Hellcats (comprised of buglers and drummers).  Cadets may also apply for merit-based scholarships, including grants for two years of foreign language graduate study or other educational experiences in foreign countries.

25.     Upon graduation, West Point graduates earn a Bachelor of Science and become commissioned as second lieutenants in the U.S. Army.

26.     At West Point, Ms. ███ flourished in every respect. ███████████
███████, she ranked ████ in her class of more than ████ cadets, when evaluated on academic performance, physical fitness, and military leadership.  A representative faculty evaluation stated, ████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
██████████████████████████

27.     First year cadets were allowed only one off-campus pass, and upper class cadets had to request off-campus passes to leave on weekends.  While her friends would often request

weekend leave, Ms. ████ preferred to stay on campus and pursue her studies and her own independent research projects.

28.      Ms. ████ thrived academically. She declared a ████ major and ████ ████████████████████████████████. Her presentations were well received, and her supervisor arranged for Ms. ████████████████.

29.      Ms. ████ embraced the extracurricular opportunities available at West Point. She played on the ████ and ████ teams, the latter of which ████████████ ██. She was also ████████████████████████████.

30.      Despite these successes, Ms. ████ experienced difficulties as a female cadet. Only about ██ of the approximately ██ cadets in her entering class were women.  She was often ████████████████████████, and often felt isolated as a result.

31.      Upon information and belief, West Point has been unwilling to increase the number of female cadets in each entering class, despite having enough qualified candidates to do so. Through this policy and practice, West Point leaders seek to preserve the male culture of West Point and the military leadership for future generations.

32.      To date, there has never been a female Superintendent or Commandant of Cadets at West Point. The faculty is overwhelmingly male. The underrepresentation of women in the school administration causes female cadets to feel even more marginalized.

33.      In their ████████ Plan for Sexual Assault and Harassment Prevention, Defendants state that one of their priorities is the ████████████████████ ████████████████████████████████████ Defendants have failed to achieve this goal, despite acknowledging its importance in abating the culture of sexual violence at West Point.

34.     The male cadets, teachers, and supervisors constantly made Ms. ███ aware of her gender at West Point. Ms. ███ and other female cadets felt immense pressure to match the men's physical capabilities and to align themselves with their male colleagues socially and psychologically. Only women who associated themselves with men received top leadership positions and respect; cadets perceived women who were allied with other women as weak.

35.     Ms. ███ observed her cadet classmates making misogynistic and sexually aggressive comments on a daily basis. The West Point administration frequently ignored and sometimes condoned these comments.

36.     During team-building exercises, for instance, cadets would march and sing a song that began, "I wish that all the ladies / were bricks in a pile / and I was a mason / I'd lay them all in style." Later verses stated, "I wish that all the ladies / were holes in the road / and I was a dump truck / I'd fill'em with my load" and "I wish that all the ladies / were statues of Venus/ and I was a sculptor / I'd break'em with my penis."

37.     Another popular song among cadets was based on a steamroller, cautioning bystanders to avoid its path. Male cadets created versions of this song such as "I'm a cream puff, baby, and I'm going to cream all over you," or "I'm a skeet shooter, and I'm going to skeet all over you," referencing male ejaculation.

38.     West Point officials knew about the sexual, misogynistic chants and did not stop them. The cadets sang these chants as they marched around campus, in view and earshot of faculty and administrators.

39.     Cadets often used derogatory terms to describe women. Cadets turned the word "trou," a term based on the unflattering pants that Defendants required female cadets to wear,

into a slur for an unattractive or worthless female cadet.  For example, cadets referred to pints of Ben & Jerry's ice cream as "trou buckets" and disparaged exercise bikes as "trou chariots."

40.    Male cadets frequently made contemptuous comments about female civilians' appearance and weight. Cadets used the term "whale-watching" to describe collectively making fun of a fat woman.

41.    In addition to ignoring or endorsing the cadets' misogynistic and sexually aggressive comments, West Point officials openly joked with male cadets about sexual exploits. Male cadets believed that opportunities to have sex at West Point were scarce because of the gender imbalance among the cadets. Many faculty members and officers—the vast majority of whom are male—are also West Point alumni, from a time when there were few or no women at the school. The male faculty routinely expressed sympathy with male cadets over the perceived lack of sexual opportunities. Faculty communicated to the male cadets that they should seize any chance to have sex they could.

42.    Some faculty members communicated to male cadets that heavy drinking was an understandable response to the lack of sexual opportunities. Cadets often engaged in irresponsible drinking as a means of exploring other social outlets. Male cadets joked about getting female cadets or other women drunk enough that they would have sex.

43.    The administration endorsed inappropriate or sexually aggressive comments even in some formal West Point events. ███████████████████████, a guest speaker ███

████████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████████████████████

9

44.     West Point's training on sexual assault and harassment was inadequate and did little to combat the overwhelmingly misogynistic culture of the school.

45.     During the ███████ academic year, the highest-ranking officers in the West Point sexual harassment program were Defendants ████████ and ███. Superintendent ███████ implemented new sexual assault policies.

46.     Under Defendants ████████ and █████ policies, West Point officials failed to punish cadet perpetrators of sexual assault and approved egregiously inadequate punishment.

47.     In the academic year of ████████, West Point received █████ official reports of sexual assault.  These █████ reports were a mere fraction of the number of assaults that occurred at West Point that year. A ████ Department of Defense ("DoD") survey found that cadets did not report approximately █████ percent of sexual assaults. An appalling █████ percent of female cadets and ████ percent of male cadets reported that they had experienced sexual assault.

48.     Of these █████ reports at West Point, ████ were "unrestricted" (informing the perpetrator's superiors and initiating an investigation) and ████ were "restricted" (meaning no action was to be taken). Defendants ████████ and ████████████████████████ ████████████████████████████████████████████████████.

49.     Defendants' punishment of perpetrators of sexual harassment was also grossly inadequate. ████████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████ Defendants ████████ and ████ did not punish or dismiss ████████████████████████.

10

50.     By failing adequately to punish perpetrators of sexual violence, Defendants

████████ and ████ sent the message to male cadets that they would tolerate sexual violence at

West Point. They created a system in which male cadets understood that they could sexually

assault their female colleagues with near impunity, while at the same time teaching female cadets

that they risked their own reputations and military careers by reporting assault and that little or

no action would be taken against their assailants.

51.     In addition, Defendants ████████ and ████ implemented harmful training and

education on sexual assault and harassment, which further engrained a "blame the victim"

mentality in the cadet student body.

52.     At West Point, sexual assault and harassment training is part of Defendants'

"Respect Program." Respect program officers simply informed cadets of the definitions of sexual

harassment and assault, the reporting options, and points of contact for reporting. Fourth Class

(freshman) and Third Class (sophomore) cadets received ████████████████ of Respect

training in the ████████ academic year, only some of which pertained directly to sexual assault.

53.     West Point officials offered ████████, a training program on the meaning of

consent, only to Second Class (junior) cadets.

54.     The trainings that cadets did receive communicated the message that sexual

assault prevention was the woman's responsibility. The Respect program officers explicitly told

Ms. ████ and her fellow female cadets that it was their job to say "no," when faced with

inevitable advances from their male colleagues.

55.     West Point officials also required mandatory annual sexually transmitted disease

(STD) testing for female cadets, but not for male cadets.  During Ms. ████████████████,

West Point officials and health administrators from Mologne Cadet Health Clinic convened a

11

briefing for the female cadets.  In the briefing, they admitted that the policy was unfair, but communicated that it was the Army's opinion that STDs harmed women more than men and that it was the women's responsibility to prevent the spread of STDs.

56.    The school's Physical Education Program reinforced the message that men should develop their natural aggression, while women should focus on protecting themselves. During Ms. ███████████ at West Point, Defendants required all of the male cadets to take boxing. They required female cadets to take self-defense classes instead. Apart from this single distinction, first-year cadets otherwise followed the same curriculum.

57.    Defendants ██████ and ████ knew or should have known that their policies were inadequate to protect women and discourage sexual violence on campus.  In ███, the DoD found that West Point was only ████████████████████████████████████ ████. DoD's report found that West Point's prevention training was ███████████████ ████████████████████████████████████████████ ███████████████████████████.

58.    The ████ Report also found that West Point failed to comply with DoD directives intended to reduce rape and sexual assault, including but not limited to DoD Directives ██████ ████████████████████████████████████████████.

59.    The DoD █████████ Annual Report on Sexual Harassment and Violence at Military Service Academies found that some alarming trends at West Point grew worse during the time that ███████████ served as Superintendent and █████████ served as Commandant of Cadets. These trends included increasing unwanted sexual contact experienced by female cadets. The █████████ Annual Report found that the number of incidents involving multiple offenders ███████████████████████████████████████

███████████████████████████████████████████████████

████████████████████

60.     Total reports of sexual assault at West Point have also increased since ████.

61.     Defendants ████████ and ████ received all of these annual reports from DoD.

They knew of the pervasive threats facing the female cadets at West Point and that their policies

exacerbated these dangers. Nevertheless, they failed to act or acted with deliberate indifference

to the evidence of pervasive sexual assault and harassment.

62.     █████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████

63.     █████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

64.     Throughout her time at West Point, Ms. ████ experienced the effects of

Defendants' policies first-hand. She coped with regular harassment from male cadets. One cadet

came by her room frequently to ask her on dates, and when Ms. ████ refused, ████████████

████████████████████████.

████████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████

66.    It was impossible for Ms. ████ to escape from these male cadets' harassment
due to strict rules requiring cadets to stay on campus at nearly all times. To go further than the
nearest town—to which West Point officials permitted visits only on weekends—cadets had to
obtain a pass several days in advance. First-year cadets were entitled to only a few weekend
passes per year, and even more senior cadets could only obtain a limited number of passes.

67.    The atmosphere at West Point created significant stress for Ms. ████. ████████

████████████████████████████████████████████████

68.    ██████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████

69.    On or about ████████, Ms. ████ began to consider transferring out of West
Point because of the hostile sexual culture ████████████████████████████████

████████████████████████████████████████. Nonetheless, Ms. ████
commitment to the military and her desire to pursue a career in the Army motivated her to try to
complete her studies at West Point.

70.    On or about the evening of ████████, Ms. ████ ████████ as she was
preparing for bed.  Around 1:00 a.m. that night, ██████████ came to her bedroom and
asked if she wanted to go for a walk.

71.   ███████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████.

72.   Mr. ████ had previously told Ms. ████ that he ██████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████.

73.   While alcohol was technically prohibited, West Point officials and upperclassmen

widely tolerated its consumption ██████████████.

74.   Ms. █████ considered Mr. ████ a trusted friend.  Mr. ████████████████

███████████████████████████████████████████████.

75.   In turn, Ms. █████ had confided ███████████████████, as well as her own

thoughts of leaving West Point. Ms. █████ knew that Mr. ████ had a girlfriend, another cadet.

Ms. █████ believed that there was nothing romantic or sexual about his friendship with her.

76.   Because of their friendship, Ms. █████ accepted Mr. ████ request that they go

for a walk, even though it was a violation of West Point rules to be out of the dorm after Taps.

77.   Ms. █████ and Mr. ████ entered one of the academic buildings. She believed

they were celebrating █████████████ and saying good-bye for the summer.

78.   Mr. ████ began drinking liquor that he had brought with him.  He offered Ms.

█████ a few sips, which she accepted. As the alcohol ████████████, Ms. █████ began to

lose awareness of her surroundings.

79.   At some point that night, Mr. █████ attacked Ms. █████ and had forcible, non-

consensual intercourse with her. Ms. █████ had never had intercourse with a man before.

80. Ms. ████ remembers lying on the concrete floor of a boiler room, not understanding what was going on. She does not remember the details of the attack or the rest of the evening.

81. Ms. ████ woke up a few hours later in her bed, on or about the morning of ████ ████, with dirt on her clothes and hair, bruises on her lower back, and blood between her legs.

82. Ms. ████ was confused and alarmed. She confided in a friend, who advised her to obtain emergency contraception.

83. The next day, on or about ████████, Ms. ████ confronted Mr. ████. With a happy, satisfied look on his face, he said that they had slept together. Mr. ████ said he believed it was consensual, but Ms. ████ felt horrified and violated. She told Mr. ████ that he had taken advantage of her. Mr. ████ apologized and said that he was a "creep." He said that he had had no control of his actions because of the alcohol.

84. After this conversation, Ms. ████ went to the Mologne Cadet Health Clinic and Center for Personal Development. She requested and received emergency contraception.

85. On or about ████████, Ms. ████ returned to the Mologne Clinic to seek medical treatment for her injuries and for the possible consequences of unprotected sex. She requested and received tests for STDs. A West Point "Patient Lab Inquiry" states that on ████ ████, the clinic tested Ms. ████ for HIV, syphilis, chlamydia, and gonorrhea.

86. At the health clinic, the nurse treating Ms. ████ performed a vaginal exam and informed her that she had signs of vaginal tearing, which suggested that she might have been raped. The clinic did not perform any forensic collection or preservation of evidence of the sexual assault, nor did it refer Ms. ████ to a sexual assault counselor.

87. That same day, Ms. ▇▇▇ also ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇. Dr. ▇▇'s notes state that Ms. ▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ Dr. ▇▇ referred Ms. ▇▇ to

West Point's Sexual Assault Response Counselor, ▇▇▇▇▇▇▇.

88. During their first and only meeting, ▇▇▇▇▇ explained to Ms. ▇▇ that

under West Point rules that Defendants ▇▇▇▇ and ▇▇ established and implemented, Ms.

▇▇ had the option of filing either a "restricted" or "unrestricted" report.

89. Ms. ▇▇ felt that she had no option but to file a restricted report. In part, she

believed that her reputation would be in jeopardy if she filed an unrestricted report, and that

other cadets would retaliate against and ostracize her. Furthermore, because her commanding

officer would receive a copy of any unrestricted report, Ms. ▇▇ feared that she would be

punished for having been out after Taps and for consuming a small amount of alcohol.

90. Ms. ▇▇ also felt that filing an unrestricted report would have a damaging effect

on her career prospects. It was common knowledge among the cadets that successful women in

the military did not report incidents of sexual assault. Ms. ▇▇ felt that if she made an

unrestricted report, West Point officials and fellow cadets would label her a troublemaker and

faker, which would irreparably hurt her chances for advancement in the military.

91. Ms. ▇▇ was not the only female cadet who feared the consequences of

reporting sexual assault. According to DoD's ▇▇▇▇▇▇▇▇▇▇▇▇,

▇▇▇ percent of female West Point cadets who declined to report unwanted sexual conduct

"did not want people gossiping about them" and "felt uncomfortable making a report." ▇▇▇

percent of female West Point cadets who declined to report unwanted sexual conduct "thought it

would hurt [their] reputation and standing," while ▮▮▮▮ percent feared some form of retaliation from the offender or his/her friends.

92.   Days after the rape, Ms. ▮▮▮▮ traveled to ▮▮▮▮ for summer training. Approximately two weeks later, Ms. ▮▮▮▮ received a single e-mail from another counselor, apparently a referral from ▮▮▮▮▮▮▮.

93.   Ms. ▮▮▮▮ felt isolated and did not know where to turn for emotional support following the rape.  She began to have sensations of feeling separated from her body.

94.   The hostile sexual climate was increasingly threatening to Ms. ▮▮▮▮. Each time she rejected a male cadet who came on to her, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ If Ms. ▮▮▮▮ had left West Point after the start of her junior year, she would also have been contractually required to repay the costs of her education at West Point. This was a financial risk that Ms. ▮▮▮▮ was unable to take.

95.   Her anxiety from the sexual assault ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ at West Point became intolerable.  On or about ▮▮▮▮▮▮▮▮▮, Ms. ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  On ▮▮▮▮▮▮▮▮, she was honorably discharged.

96.   On or about ▮▮▮▮▮▮▮▮, Ms. ▮▮▮▮ enrolled at ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮.  At ▮▮▮, she excelled academically and made friends. A ▮▮▮▮▮▮▮▮ and ▮▮▮ ▮▮▮▮▮▮▮▮, Ms. ▮▮▮▮ graduated in ▮▮▮ with a ▮▮▮▮▮▮▮▮▮▮▮.

97.   Although Ms. ▮▮▮▮ thrived academically at ▮▮▮, she struggled emotionally as she continued to process the experience of having been sexually assaulted at West Point.

98.    Ms. ███ has occasionally gone back to West Point to visit friends and attend sporting events. ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████

99.    Since graduating from ████, Ms. ████████████████████████████

███████████████████████████████. She currently works at a ████████

████████████████████████.

███████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████

████████████████████

## LEGAL CLAIMS

### FIRST CLAIM FOR RELIEF
### Fifth Amendment Due Process
(*Bivens*: Defendants ████████ and ███)

101.    Ms. ███ repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

102.    Defendants ████████ and ███ are liable in their individual capacities as the supervisors of Mr. ███ for his violations of Ms. █████ due process rights.

103.    Defendants ████████ and ███ were personally involved in and actually caused the aforementioned violations of Ms. █████ due process rights by knowingly and intentionally creating, implementing, enforcing, encouraging, sanctioning, and/or acquiescing in a policy, practice, and/or custom in which Mr. █████ violated Ms. █████ due process rights.

104.    Defendant ████████, as Superintendent of West Point and chair of the monthly

meetings of the Sexual Assault Review Board, and Defendant ███, as West Point Commandant

of Cadets, were responsible for creating, promulgating, implementing, and administering the

policies, practices and/or customs of the West Point sexual harassment program.

　　　105.　　Defendants ███ and ███ were personally involved in and proximately

caused the violations of Ms. ███ rights by creating, promulgating, implementing, and

administering policies, practices, and/or customs that (1) taught female cadets that it was their

responsibility to ward off the advances of male cadets, thus creating a culture of blaming the

victim; (2) discouraged female cadets from reporting sexual assault by causing them to fear

retaliation and harm to their career; (3) rarely punished cadet perpetrators of sexual assault or

punished them only mildly, thereby fostering an environment of sexual hostility and toleration of

violence against women; (4) provided female cadets with inadequate, if any, support services

after their attacks; (5) tolerated a culture of hostility towards women, including failing to punish

male cadets for the regular use of misogynistic chants and slurs and ignoring sexist comments by

West Point faculty and speakers; and (6) fostered the marginalization of women at West Point by

failing to hire female faculty and administrators and failing to recruit female cadets.

　　　106.　　Furthermore, Defendants ███ and ███ knew or should have known of the

high rate of sexual assault and sexual harassment against female cadets. In its ███ report,

the DoD found that ███ percent of female cadets at military service academies experienced

sexual harassment and ███ percent experienced unwanted sexual contact. This report, others by

the DoD and Government Accountability Office, and other journalistic or public accounts,

notified Defendants that female cadets at West Point faced unacceptably high levels of risk of

sexual harassment and assault.

　　　107.　　Despite this knowledge, Defendants failed to act to remedy the situation, thus

acquiescing in the widespread constitutional violations of which Ms. ███ injuries were a part. Instead, Defendants ███ and ███ created a policy, practice, and/or custom under which widespread due process violations continued and were exacerbated.

108.  Defendants ███ and ███ were personally involved in and proximately caused the violations of Ms. ███ rights through their deliberate indifference to and actual knowledge, prior to the violation of Ms. ███ constitutional rights, of the widespread rape and sexual assault of female cadets.

109.  Since the constitutional violations against female cadets were so widespread, they became a custom of constitutional violations in the face of which Defendants ███ and ███ deliberately refused to act, despite official and unofficial reports notifying them of this pervasive problem. ███ and ███ refusal to act, despite notice and actual knowledge, amounts to acquiescence to violations of Ms. ███ constitutional rights, for which they are personally liable.

110.  Defendants ███ and ███ were personally involved in and proximately caused the violations of Ms. ███ rights through their deliberate indifference to her constitutional rights. Defendants ███ and ███ (1) knew to a moral certainty that sexual assault and harassment occurred frequently at West Point and that female cadets faced a unrelentingly sexually aggressive culture; (2) knew that effective punishment of sexual assault perpetrators, refusal to tolerate sexually aggressive language and conduct by West Point faculty, officials, and male cadets, and a less misogynistic sexual education training would have made the male cadets less likely to violate constitutional rights; and (3) knew that under the current disciplinary system and education program, the male cadets at West Point were inadequately trained, were committing widespread due process violations by continuously assaulting the

female cadets, and would continue to do so without proper discipline and training geared towards changing the pervasive culture of violence against women at West Point.

111.    The inadequacy of the discipline and training program and the tolerance of sexually aggressive language and conduct by faculty, officials and male cadets was not only obvious, but had been reported to Defendants ███████ and ██ by internal investigations by the DoD and the Government Accountability Office and external criticisms by investigative journalists. Despite this knowledge, Defendants ███████ and ██ failed to create or implement an adequate training program or meaningfully to discipline cadets who raped or sexually assaulted other cadets, failed to act to end the use and endorsement of sexually aggressive language and conduct by faculty, officials and male cadets, and were deliberately indifferent to Ms. ████ rights.

112.    Defendants ███████ and ██ were personally involved in and proximately caused the aforementioned violations of Ms. ████ constitutional rights and were deliberately indifferent to the rights of Ms. ██ in failing to adequately supervise subordinate Mr. ██, who proximately caused the violations of Ms. ████ Fifth Amendment rights.

113.    Despite the obvious need for close supervision of male cadets due to the well-known problems of sexual assault and sexually aggressive culture at West Point, Defendants ███████ and ██ egregiously failed to supervise the actions of male cadets and other agents to ensure that due process violations did not occur, evidencing gross negligence in supervising subordinate male cadets and deliberate indifference to the rights of Ms. ██.

114.    By failing to punish perpetrators of sexual assault, failing to properly train male cadets, failing to adequately protect female cadets from sexual assaults, and tolerating sexually aggressive language and conduct by faculty, officials and male cadets, Defendants ███████



and ▇▇ communicated to male cadets that they could commit sexual assaults against female

cadets with impunity. By communicating this message, Defendants created a dangerous and

sexually hostile environment for Ms. ▇▇ and the other women of West Point.

115.    As a result of Defendants ▇▇ and ▇▇ acts and/or omissions, Ms.

▇▇ suffered damages, including but not limited to violations of her constitutional rights,

physical injury, and emotional distress.

116.    When Ms. ▇▇ was raped, she was not engaged in activities that fell within the

scope of military employment. Ms. ▇▇ was a student of West Point and not an employee.

Her injuries from being raped arose outside the scope of any employment, and she would not be

eligible to receive workers' compensation under federal or New York law.

117.    Ms. ▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇ seeks a judicial declaration that Defendants' conduct has deprived

her of her rights under the constitution and laws of the United States.

## SECOND CLAIM FOR RELIEF
### Fifth Amendment Equal Protection
*(Bivens*: Defendants ▇▇ and ▇▇)

118.    The Plaintiff repeats and incorporates by reference each and every allegation

contained in the preceding paragraphs as if fully set forth herein.

119.    Defendants ▇▇ and ▇▇ created and enforced a policy that put female

cadets at risk of violent harm. They knowingly and intentionally created and enforced a policy

and practice that tolerated attacks against female cadets and discouraged reporting of such

attacks, perpetrating a sexually aggressive culture at West Point.

120.    In designing and implementing a policy and practice that discriminated against

female cadets, Defendants violated the equal protection component of the Due Process Clause of

the Fifth Amendment of the United States Constitution.

     121.    The above-named Defendants deprived Ms. ███ of basic due process

protections by creating and enforcing a policy and practice that placed her at a high risk of harm

based on her gender in violation of her right to equal protection under the Fifth Amendment.

     122.    As a result of above-named Defendants' actions, Ms. ███ suffered damages,

including but not limited to, physical injury and emotional distress.

**THIRD CLAIM FOR RELIEF**
**Little Tucker Act: Breach of the Covenant of Good Faith and Fair Dealing**
**(Defendant: United States)**

     123.    The Plaintiff repeats and incorporates by reference each and every allegation

contained in the preceding paragraphs as if fully set forth herein.

     124.    In signing her Oath of Allegiance, Ms. ███ entered into a valid educational

contract and service agreement with Defendant United States.  She entered into this contract with

a reasonable expectation of receiving educational benefits, tuition, room, and board from West

Point in exchange for her promise of military service.

     125.    The contract provided that if she failed to satisfy her obligation to serve on active

duty under the contract, the United States would have an enforceable right to recoup the full

costs of her education. This recoupment clause confirmed the contractual nature of Ms. ███

agreement with the Defendant United States.

     126.    The United States has filed suit to enforce educational contracts substantially

similar to that executed by Ms. ███. In one such action, the United States characterized the

failure of a former West Point cadet to complete his course of study as a "breach of his service

agreement." The United States has characterized the West Point Oath of Allegiance as, variously,

a "service contract," a "cadet contract" and the equivalent of a "military education contract."

24

127.    The educational contract between Ms. ███ and the United States contained an implied covenant of good faith and fair dealing.

128.    By creating and enforcing policies and practices that fostered a sexually hostile environment and toleration of violence against women, failing to adequately punish perpetrators of sexual assault, failing to adequately train cadets, faculty and administrators, and endorsing a misogynistic culture, Defendant United States deprived Ms. ███ of her contractual right to receive this education.

129.    Defendant United States acted in bad faith by engaging in conduct that was designed to oppress women at West Point, after inducing them to enter into contractual obligations.

130.    By depriving Ms. ███ of her reasonable expectation of contractual education benefits and acting in bad faith, Defendant United States breached the covenant of good faith and fair dealing.

131.    Ms. ███ seeks damages of less than $10,000 on her breach of contract claim against the United States.  Accordingly, jurisdiction over her Little Tucker Act claim is proper in this Court.

### FOURTH CLAIM FOR RELIEF
### Federal Tort Claims Act
### (Defendant United States)

132.    The Plaintiff repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

*Negligent Supervision*

133.    Defendants ███ and ███ and other West Point officials negligently failed to supervise male cadets, including Mr. ███. Defendants ███ and ███ and other West

Point officials were fully aware that cadets had committed numerous acts of sexual violence in the past.  Defendants ███████ and ████ and other West Point officials failed to investigate these incidents, failed to punish the cadets for acts of sexual violence, and failed to condemn and end the prevalence of sexually aggressive language and conduct by faculty, officials, and male cadets. Defendants ███████ and ████ and other West Point officials were fully aware of these circumstances from the DoD, Government Accountability Office, congressional hearings, internal investigations, and various news reports.

134.  Defendants ███████ and ████ and other West Point officials also knew that there was a culture condoning sexual harassment, sexual assault, and rape among the cadets at West Point. Had Defendants ███████ and ████ and other West Point officials adequately supervised the cadets, the United States could have avoided the harm to Ms. ████.

135.  Defendants ███████ and ████ and other West Point officials also negligently failed to supervise West Point staff members, including ███████, in properly handling Ms. ███████ sexual assault report.  Defendants ███████ and ████ and West Point officials were fully aware that rape and sexual assault were prevalent at West Point, that reporting and training policies were inadequate, that punishment of those who committed rape or sexual assault was rare, and that there existed a culture condoning sexual harassment, sexual assault, and rape.

136.  Defendants ███████ and ████ and other West Point officials were fully aware that staff members had inadequately handled sexual assault complaints in the past.  Had Defendants ███████ and ████ and other West Point officials properly supervised West Point staff members, the United States could have avoided the harm to Ms. ████.

*Negligent Training*

137.   Defendants ███████ and ████ and other West Point officials also failed to adequately train West Point cadets, including Mr. ████, in preventing sexual assaults against female cadets.  The United States was fully aware that rape and sexual assault were prevalent at West Point and that the sexual assault trainings created a culture condoning sexual harassment, sexual assault, and rape.

138.   Even when Defendants ███████, ████, and other West Point officials learned of previous instances of sexual assault among cadets, they failed to change the ineffective cadet training.  Had Defendants ███████ and ████ and other West Point officials corrected the inadequate training, the United States could have avoided the harm to Ms. ████.

139.   Defendants ███████ and ████ and other West Point officials also failed to train West Point staff members to properly respond to sexual assaults reports by cadets.

140.   The United States was fully aware that rape and sexual assault were prevalent at West Point, that reporting and training policies were inadequate, that punishment of rapists and those who committed sexual assaults were rare, and that there existed a culture allowing and condoning sexual harassment, sexual assault, and rape.

141.   Even when Defendants ███████ and ████ and other West Point officials learned of previous instances where West Point staff inadequately responded to sexual assault reports, they failed to change the defective trainings and policies.  Had Defendants ███████ and ████ and other West Point officials corrected the inadequate training, the United States could have avoided the harm to Ms. ████.

*Negligence*

142.   Defendants ███████ and ████ and other West Point officials negligently established, promulgated, and implemented the inadequate policies and practices that caused Ms.

 to be sexually assaulted. Defendants ▮▮▮ and ▮ and other West Point officials negligently created, condoned, and failed to amend a culture that allowed sexual harassment, sexual assault, and rape.

### Negligent Infliction of Emotional Distress

143.    ▮▮▮ created an unreasonable risk of causing Ms. ▮ emotional distress. Mr. ▮ rape of Ms. ▮ unreasonably endangered Ms. ▮ physical safety, and it was clearly foreseeable that his act would cause Ms. ▮ emotional distress.  Mr. ▮ conduct caused Ms. ▮ emotional distress, and his conduct was severe enough that it resulted in Ms. ▮ emotional injury and bodily harm.



144.    Defendants ▮▮▮ and ▮ and other West Point officials created an unreasonable risk of causing Ms. ▮ emotional distress. Their creation and maintenance of inadequate sexual assault prevention and reporting policies, as well as their failure to discipline assailants and their tolerance of sexually aggressive language and conduct by faculty, officials and male cadets, unreasonably endangered Ms. ▮ physical safety. It was clearly foreseeable that these acts would cause Ms. ▮ emotional distress.  Defendants ▮▮▮ and ▮ and other West Point officials caused Ms. ▮ emotional distress, and their conduct was severe enough that it resulted in Ms. ▮ emotional injury and bodily harm.

### Abuse of process

145.    Defendants ▮▮▮ and ▮ and other West Point officials abused legal process in their actions.  Defendants refused to properly investigate and punish incidents of sexual assault. Defendants also established and operated a system that discouraged and prevented Ms. ▮ from pursuing an unrestricted report and/or criminal charges against Mr. ▮ without fear of retaliation.

146.    On information and belief, Defendants ███████ and ███ and other West Point officials deliberately abused the investigation and reporting process for the improper purpose of discouraging reports so as to conceal the true extent of the sexual violence at West Point, avoiding further investigation or review of their constitutionally deficient sexual assault policies, practices, and customs, and attempting to maintain a favorable public image of West Point.

147.    Defendants ███████ and ███ and other West Point officials are, by their military rank, empowered to make arrests and are thus law enforcement officers for the purposes of the FTCA, 28 U.S.C. § 2680(c).

148.    The United States is liable pursuant to the FTCA for the tortious acts of its employees in "circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b).

149.    Defendants ████████ (as Superintendent of West Point) and ████ (as Commandant of Cadets at West Point), as well as other West Point officials, were acting within the course and scope of their employment as agents of the United States, and on behalf of the United States, when they committed the tortious and unlawful acts complained of here, including negligent supervision, negligent training, negligent infliction of emotional distress, negligence, and abuse of process.

150.    In these circumstances, if the United States were a private person, liability would be imposed in accordance with the law of New York. When Ms. ██████ was raped, she was not engaged in activities that fell within the scope of military employment. She was a student of West Point and not an employee, and her injuries were in no way work-related. She would thus be ineligible to receive workers' compensation under federal or New York law.

151.    Ms. ▮▮▮ has administratively exhausted her claims under the FTCA. Ms. ▮▮▮

timely filed an FTCA administrative claim with DoD on or about ▮▮▮. As of April 26,

2013, DoD has not issued a decision on her claim.

## **PRAYER FOR RELIEF**

WHEREFORE, Ms. ▮▮▮ respectfully requests that this Court:

(1) Enter a declaratory judgment that the actions of Defendants ▮▮▮ and ▮▮▮

violated the United States Constitution;

(2) Award Ms. ▮▮▮ compensatory damages in an amount to be proven at trial;

(3) Hold Defendants jointly and severally liable for compensatory damages; and

(4) Grant such other relief as the Court deems just and equitable.


Dated:  April 26, 2013
New Haven, Connecticut


Respectfully Submitted,

By: _____
Michael J. Wishnie, Esq. MW1952
Margaret Middleton, Esq.
Chelsea Kelly, Law Student Intern
Jessica Marsden, Law Student Intern
Sofia Nelson, Law Student Intern
Lisa Wang, Law Student Intern
Veterans Legal Services Clinic
Jerome N. Frank Legal Services Organization
Yale Law School
P.O. Box 209090
New Haven, CT 06520-9090
Tel: (203) 432-4800
*Counsel for* ▮▮▮