SENT TO CHAMBERS
FOR REVIEW

AUG 3 0 2013

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

U.S.D.C.S.D.N.Y.
CASHIERS

| | |
|---|---|
| JANE DOE,<br><br>                Plaintiff,<br><br>        v.<br><br>LT. GEN. FRANKLIN LEE HAGENBECK,<br>BRIG. GEN. WILLIAM E. RAPP, and the<br>UNITED STATES OF AMERICA,<br><br>                Defendants. | Civil No.: 13 CIV. 2802 (AKH)<br><br>AMENDED COMPLAINT<br><br><br><br>August 30, 2013 |

Plaintiff Jane Doe, through counsel, alleges the following upon information and belief:

## AMENDED COMPLAINT

1.     The leaders of the United States Military Academy ("West Point") have failed to take necessary steps to protect women cadets from a pervasive and well-known culture of sexual violence. Jane Doe, a cadet at West Point, suffered the consequence of these senseless policies when she was raped by a fellow cadet. She brings this suit seeking declaratory relief and monetary damages, and hopes that this action will deter Defendants and their successors from perpetuating the practices that caused her suffering, protect future female cadets, and better ensure that West Point realizes the noble ideals it represents.

## JURISDICTION AND VENUE

2.     This Court has jurisdiction under 28 U.S.C. § 1331. This action arises under the U.S. Constitution; the Little Tucker Act, 28 U.S.C. § 1491; Federal Torts Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671 *et seq.*; and the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02.

3.     Venue lies in this district pursuant to 28 U.S.C. § 1391(b) in that all events

complained of and giving rise to Plaintiff's claims arose in this district.

### PARTIES

4.      Plaintiff Jane Doe (a pseudonym) is a former West Point cadet.

5.      Defendant Lt. Gen. Franklin Lee Hagenbeck is sued in his personal capacity.  He was Superintendent of West Point from approximately July 2006 to July 2010, and among other duties, he chaired the Sexual Assault Review Board, which is the "primary means of oversight" of the sexual assault prevention and response program at West Point.

6.      Defendant Brigadier General William E. Rapp is sued in his personal capacity. He was Commandant of Cadets at West Point from 2009 to 2011 and was in charge of the administration and training of cadets.

7.      Defendant United States of America is sued under the FTCA for the tortious acts of its agents or employees and under the Little Tucker Act for breach of contractual obligations.

### FACTS AND PROCEEDINGS

8.      Ms. Doe grew up in a military family. During high school, she received a West Point mailing displaying women in uniform demonstrating leadership, honor, and dignity.  She began to imagine studying at West Point. In her senior year, Ms. Doe applied to West Point. After years of balancing studies, extracurricular activities, and jobs to help support her family, she hoped to take advantage of West Point's offerings without incurring the debt that attendance at another college would have imposed.

9.      Ms. Doe was convinced that West Point would provide the academic, physical, and mental rigor that she desired. She also viewed West Point as an honorable and meritocratic institution where she would have an opportunity to excel based on her abilities and hard work.

10.     Ms. Doe was nominated by her U.S. Representative. One of her Senators

2

identified her as the top candidate in her state. Ms. Doe was thrilled when she learned that she had been offered admission to West Point.

11.     Ms. Doe graduated from high school in June 2008, near the top of her class. She accepted West Point's offer of admission and on June 30, 2008 signed an Oath of Allegiance, an educational services contract with the United States, which committed Ms. Doe to serving in the Army for eight years, including five on active duty. In consideration for this promise of service, Ms. Doe was to receive her tuition, room, and board from West Point without charge.

12.     The oath explained that if Ms. Doe failed to complete her contractual military service, she would be required to "reimburse the United States in an amount that bears the same ratio to the total cost of advanced education provided me as the unserved portion of active duty bears to the total period of active duty I have agreed to serve."

13.     Ms. Doe's contract with the Army allowed her to take advantage of the numerous educational opportunities available at West Point's campus, located on approximately 16,000 acres on the Hudson River. At the time she enrolled, there were approximately 4,600 cadets and 600 faculty members at West Point. Approximately three-quarters of the faculty were military personnel and one-quarter were civilian employees.

14.     Cadets live in on-campus dormitories ("barracks") for all four years, eat in the dining hall ("mess hall"), and receive a monthly stipend.

15.     The curriculum at West Point is designed to train "officer-leaders of character to serve the Army and the Nation." Cadets may choose from thirty-six majors. Cadets also participate in the Physical Education Program, which includes military movement, swimming, combatives, and boxing.

16.     West Point offers a number of extracurricular activities, including athletics, Cadet

Honor Societies, academic competitions. West Point's athletic program includes twenty-four

National Collegiate Athletic Association Division I teams  and twenty-one club sports. Musical

activities include the West Point Band, Concert Band, Jazz Knights, Marching Band, and

Hellcats (comprised of buglers and drummers). Cadets may also apply for merit-based

scholarships, including grants for two years of foreign language graduate study or other

educational experiences in foreign countries.  Upon graduation, West Point graduates earn a

Bachelor of Science and become commissioned as second lieutenants in the U.S. Army.

17.     At West Point, Ms. Doe flourished. She thrived academically, participated in

extracurricular activities, and ranked high in her class. A representative faculty evaluation stated,

"CDT [Doe] has what it takes . . . she is one of the most professional and internally motivated

cadets I've worked with . . . I am confident that she will excel as an Army officer. I would gladly

recruit her to serve on my team, regardless of the mission."

18.     About 200 of the approximately 1,300 cadets in Ms. Doe's entering class were

women. Ms. Doe was often the only woman in her squad of approximately ten cadets, and

frequently felt isolated as a result.

19.     Upon information and belief, West Point has been unwilling to increase the

number of female cadets in each entering class, despite having enough qualified candidates to do

so. Through this policy and practice, West Point leaders seek to preserve the male culture of

West Point and the military leadership for future generations.

20.     There has never been a female Superintendent or Commandant of Cadets at West

Point. The faculty is overwhelmingly male. The underrepresentation of women in the school

administration causes female cadets to feel even more marginalized.

21.     In their 2009-2010 Plan for Sexual Assault and Harassment Prevention,

Defendants state that one of their priorities is the "continued effort to increase the recruitment of military women for positions within the Staff and Faculty at USMA, to include positions with both the Office of the Dean and USCC Staff." Defendants have failed to achieve this goal, despite acknowledging its importance in abating the culture of sexual violence at West Point.

22.     As set forth herein, Defendants Hagenbeck and Rapp created a misogynistic culture at West Point that marginalized Ms. Doe and other female cadets, caused them to be subjected to routine harassment, suffer emotional distress and other harms, and be pressured to conform to male norms.

23.     The male cadets, teachers, and supervisors constantly made Ms. Doe aware of her gender at West Point. Ms. Doe and other female cadets felt immense pressure to match the men's physical capabilities and to align themselves with their male colleagues socially and psychologically. Women who associated themselves with men received top leadership positions and respect; cadets perceived women who were allied with other women as weak.

24.     Ms. Doe observed her cadet classmates making misogynistic and sexually aggressive comments on a regular basis. The West Point administration frequently ignored and sometimes condoned these comments.

25.     During team-building exercises, for instance, cadets would march and sing a song that began, "I wish that all the ladies / were bricks in a pile / and I was a mason / I'd lay them all in style." Later verses stated, "I wish that all the ladies / were holes in the road / and I was a dump truck / I'd fill'em with my load" and "I wish that all the ladies / were statues of Venus/ and I was a sculptor / I'd break'em with my penis."

26.     Another popular song warned listeners to avoid a steamroller. Male cadets created versions of this song such as "I'm a cream puff, baby, and I'm going to cream all over you," or

"I'm a skeet shooter, and I'm going to skeet all over you," referencing male ejaculation.

27.     West Point officials knew about the sexual, misogynistic chants and did not stop them. The cadets sang these chants as they marched around campus, in view and earshot of faculty and administrators.

28.     Cadets often used derogatory terms to describe women. Cadets turned the word "trou," a term based on the unflattering pants that Defendants required female cadets to wear, into a slur for an unattractive or worthless female cadet. For example, cadets referred to pints of Ben & Jerry's ice cream as "trou buckets" and disparaged exercise bikes as "trou chariots."

29.     Male cadets frequently made contemptuous comments about female civilians' appearance and weight. Cadets used the term "whale-watching" to describe collectively making fun of a fat woman.

30.     In addition to ignoring or endorsing the cadets' misogynistic and sexually aggressive comments, West Point officials openly joked with male cadets about sexual exploits. Male cadets believed opportunities to have sex with women at West Point were rare because of the gender imbalance among cadets. Many faculty members and officers, the vast majority of whom are male, are also West Point alumni, from a time when there were few or no women at the school. Male faculty routinely expressed sympathy with male cadets over the lack of sexual opportunities, and communicated that they should seize any chance to have sex they could.

31.     Some faculty members communicated to male cadets that heavy drinking was an understandable response to the lack of sexual opportunities. Cadets often engaged in irresponsible drinking as a means of exploring other social outlets. Male cadets joked about getting female cadets or other women drunk enough that they would have sex.

32.     The administration endorsed inappropriate or sexually aggressive comments even

6

in some formal West Point events. During Ms. Doe's second year, a guest speaker for West Point's professional military ethics program concluded his speech by hugging a civilian woman and observing that he liked hugging women because "they have bumps." When Ms. Doe reported the speaker's comments, school administrators ignored her complaints.

33.     West Point's training on sexual assault and harassment was inadequate and did little to combat the overwhelmingly misogynistic culture of the school.

34.     During the 2009-2010 academic year, the highest-ranking officers in the West Point sexual harassment program were Defendants Hagenbeck and Rapp. Superintendent Hagenbeck implemented new sexual assault policies.

35.     Under Defendants Hagenbeck and Rapp's policies, West Point officials failed to punish cadet perpetrators of sexual assault and approved egregiously inadequate punishments.

36.     A 2010 Department of Defense ("DoD") survey found that cadets did not report approximately ninety percent of sexual assaults. Fifty-one percent of female cadets and nine percent of male cadets reported that they had experienced sexual assault.

37.     In academic year 2009-2010, West Point received eleven official reports of sexual assault. These reports were a small fraction of the assaults at West Point that year. Of these eleven reports , five were "unrestricted" (informing the perpetrator's superiors and initiating an investigation) and six were "restricted" (meaning no action was to be taken). Defendants Hagenbeck and Rapp approved the dismissal of only one perpetrator from West Point, after a court-martial convicted him of rape.

38.     Defendants' punishment of perpetrators of sexual harassment was also grossly inadequate. In one instance, multiple female cadets complained that a male supervisor subjected them to unwanted and unsolicited comments that were offensive and sexual in nature. The

victims alleged that he touched them in a manner that made them feel uncomfortable and created a sexually hostile work environment. Defendants Hagenbeck and Rapp did not punish or dismiss the supervisor, but simply relieved him of his duties.

39.     By failing to adequately punish perpetrators of sexual violence, Defendants Hagenbeck and Rapp sent the message to male cadets that they would tolerate sexual violence at West Point. They created a system in which male cadets understood that they could sexually assault their female colleagues with near impunity, while at the same time teaching female cadets that they risked their own reputations and military careers by reporting assault and that little or no action would be taken against their assailants.

40.     In addition, Defendants Hagenbeck and Rapp implemented harmful training and education on sexual assault and harassment, which further engrained a "blame the victim" mentality in the cadet student body.

41.     At West Point, sexual assault and harassment training is part of Defendants' "Respect Program." Respect program officers simply informed cadets of the definitions of sexual harassment and assault, the reporting options, and points of contact for reporting. Fourth Class (freshman) and Third Class (sophomore) cadets received approximately four hours of Respect training in the 2009-10 academic year, only some of which pertained directly to sexual assault.

42.     West Point officials offered Sex Signals, a training program on the meaning of consent, only to Second Class (junior) cadets.

43.     The trainings that cadets did receive communicated the message that sexual assault prevention was a woman's responsibility. The Respect program officers explicitly told Ms. Doe and her fellow female cadets that it was their job to say "no," when faced with inevitable advances from their male colleagues.

44.     West Point officials also required mandatory annual sexually transmitted disease (STD) testing for female cadets, but not for male cadets. During Ms. Doe's second year, West Point officials and health administrators from Mologne Cadet Health Clinic convened a briefing for the female cadets. There, they admitted that the policy was unfair, but expressed that it was the Army's opinion that STDs were more harmful to women than men and that it was the responsibility of women to prevent their spread.

45.     The school's Physical Education Program reinforced the message that men should develop their natural aggression, while women should focus on protecting themselves. During Ms. Doe's plebe (first) year at West Point, Defendants required male cadets to take boxing. They required female cadets to take self-defense classes instead. Apart from this single distinction, first-year cadets otherwise followed the same curriculum.

46.     Defendants Hagenbeck and Rapp knew or should have known that their policies were inadequate to protect women and discourage sexual violence on campus. In 2011, DoD found that West Point was only "partially in compliance" with sexual harassment and assault policies. DoD's report found that West Point's prevention training was "deficient," did not meet the minimum standard of annual training for all cadets, and lacked an institutionalized comprehensive Sexual Assault Prevention and Response (SAPR) curriculum.

47.     The 2011 Report also found that West Point failed to comply with DoD directives intended to reduce rape and sexual assault, including but not limited to DoD Directives 6495.01 (Nov. 7, 2008), 6495.02 (Nov. 13, 2008), 1350.2 (Nov. 21, 2003) and 1020.02 (Feb. 5, 2009).

48.     The DoD 2009-2010 Annual Report on Sexual Harassment and Violence at Military Service Academies found that some alarming trends at West Point grew worse during the time that Defendant Hagenbeck served as Superintendent and Defendant Rapp as

Commandant of Cadets. These trends included increasing unwanted sexual contact experienced

by female cadets. The 2009-2010 Annual Report found that the number of incidents involving

multiple offenders had more than doubled since 2008, almost half of all women surveyed

indicated that alcohol or drugs were involved in episodes of unwanted sexual contact, and such

episodes had increased in number.

49.     Total reports of sexual assault at West Point have also increased since 2007.

50.     Defendants Hagenbeck and Rapp received all of these annual reports from DoD.

They knew of the pervasive threats facing the female cadets at West Point and that their policies

exacerbated these dangers. Nevertheless, they failed to act or acted with deliberate indifference

to the evidence of pervasive sexual assault and harassment.

51.     Defendant Hagenbeck recommended a successor, Lt. Gen. David H. Huntoon,

who has also refused to take sexual assault and gender relations seriously. The Pentagon's

Inspector General recently censured Lt. Gen. Huntoon for misconduct, including an alleged

improper relationship with a civilian female employee.

52.     Throughout her time at West Point, Ms. Doe experienced the effects of

Defendants' policies first-hand. She coped with regular harassment from male cadets who

pressured her to go on dates with them. Due to the cadet gender ratio, male cadets perceived

female cadets who were not dating or in relationships as abnormal.

53.     It was impossible for Ms. Doe to escape from these male cadets' harassment due

to strict rules requiring cadets to stay on campus at nearly all times. To go further than the

nearest town—to which West Point officials permitted visits only on weekends—cadets had to

obtain a pass several days in advance. First-year cadets were entitled to only a few weekend

passes per year, and even more senior cadets could only obtain a limited number of passes.

54.     The atmosphere at West Point created significant stress for Ms. Doe. In 2010, these stresses led Ms. Doe to seek treatment for anxiety. Her psychiatrist at West Point prescribed a sedative to help her sleep. The psychiatrist did not warn Ms. Doe of the sedative's dangerous side effects, including impaired awareness and reactions, as well as memory loss. Ms. Doe was unaware of the drug's risks until one evening when she tried to study after taking the sedative. Her vision became blurred and she was unable to concentrate.

55.     On or about April 2009, Ms. Doe began to consider transferring out of West Point. Nonetheless, Ms. Doe's commitment to the military and her desire to pursue a career in the Army motivated her to try to complete her studies at West Point.

56.     On or about the evening of May 8, 2010, Ms. Doe took a prescribed sedative as she was preparing for bed. Around 1:00 a.m. that night, a cadet referred to by the pseudonym "Robert Smith" came to her bedroom and asked if she wanted to go for a walk.

57.     Mr. Smith was a combat veteran who had enrolled at West Point after serving in the Army. He was a classmate, but having already completed a tour of duty, he was older and more seasoned than most other second-year cadets.

58.     Mr. Smith had previously told Ms. Doe that he suffered from nightmares and violent flashbacks, symptoms consistent with Post-Traumatic Stress Disorder, but that he was not seeing a psychiatrist at West Point. Instead, he said he was self-medicating with alcohol.

59.     While alcohol was technically prohibited, West Point officials and upperclassmen widely tolerated its consumption by combat veterans.

60.     Ms. Doe considered Mr. Smith a friend. She knew that he was dating another cadet and believed that there was nothing romantic about their own friendship.  Ms. Doe accepted Mr. Smith's request that they go for a walk, even though it was a violation of West

Point rules to be out of the dorm after Taps.

61.     Ms. Doe and Mr. Smith entered an academic building. Mr. Smith began drinking liquor that he had brought with him. He offered Ms. Doe a few sips, which she accepted. As the alcohol mixed with her sedative, Ms. Doe began to lose awareness of her surroundings and consciousness of what she was doing.

62.     Mr. Smith was aware that Ms. Doe had lost consciousness and took advantage. He attacked Ms. Doe and had forcible, non-consensual intercourse with her. Ms. Doe remembers lying on the concrete floor of a boiler room, not understanding what was going on. She does not remember the details of the attack.

63.     Ms. Doe woke up a few hours later in her bed, on or about the morning of May 9, 2010, with dirt on her clothes and hair, bruises on her lower back, and blood between her legs. Ms. Doe was confused and alarmed. She confided in a friend, who advised her to obtain emergency contraception.

64.     The next day, on or about May 10, 2010, Ms. Doe confronted Mr. Smith. With a happy, satisfied look on his face, he said that they had slept together. Mr. Smith said he believed it was consensual, but Ms. Doe felt horrified and violated. She told Mr. Smith that he had taken advantage of her. Mr. Smith apologized and said that he was a "creep." He said that he had had no control of his actions because of the alcohol.

65.     After this conversation, Ms. Doe went to the Mologne Cadet Health Clinic and Center for Personal Development. She requested and received emergency contraception.

66.     On or about May 11, 2010, Ms. Doe returned to the Mologne Clinic to seek medical treatment for her injuries and for the possible consequences of unprotected sex. She requested and received tests for HIV, syphilis, chlamydia, and gonorrhea.

12

67.     At the health clinic, the nurse treating Ms. Doe performed a vaginal exam and informed her that she had signs of vaginal tearing. The clinic did not perform any forensic collection or preservation of evidence of the sexual assault.

68.     The medical record from this visit notes that Ms. Doe "was drinking this weekend when she was sexually assaulted by a friend. She does not remember most of it. She has glimpses of it because of pain. She is still sore."

69.     That same day, Ms. Doe also went to a regular appointment with Dr. Joshua Hain, her psychiatrist. Dr. Hain's notes state that Ms. Doe "reported today that over the weekend, she had nonconsensual sexual relations with a friend." Dr. Hain referred Ms. Doe to West Point's Sexual Assault Response Counselor, Maj. Maria Burger.

70.     During their only meeting, Maj. Burger explained to Ms. Doe that under West Point rules that Defendants Hagenbeck and Rapp established and implemented, Ms. Doe had the option of filing either a "restricted" or "unrestricted" report. Unlike a restricted report, an unrestricted report would include both Ms. Doe and Mr. Smith's names and would be given to commanders for potential disciplinary action.

71.     Ms. Doe felt that she had no option but to file a restricted report. In part, she believed that her reputation would be in jeopardy if she filed an unrestricted report, and that other cadets would retaliate against and ostracize her. Furthermore, because her commanding officer would receive a copy of any unrestricted report, Ms. Doe feared that she would be punished for having been out after Taps and for consuming a small amount of alcohol.

72.     Ms. Doe also felt that filing an unrestricted report would have a damaging effect on her career prospects. It was common knowledge among the cadets that successful women in the military did not report incidents of sexual assault. Ms. Doe felt that if she made an

unrestricted report, West Point officials and fellow cadets would label her a troublemaker and faker, which would irreparably hurt her chances for advancement in the military.

73. Ms. Doe was not the only female cadet who feared the consequences of reporting sexual assault. According to DoD's 2010 Service Academy Gender Relations Survey, seventy percent of female West Point cadets who declined to report unwanted sexual conduct "did not want people gossiping about them" and "felt uncomfortable making a report." Sixty-one percent of female West Point cadets who declined to report unwanted sexual conduct "thought it would hurt [their] reputation and standing," and forty-four percent feared some form of retaliation.

74. Approximately two weeks after the rape, Ms. Doe received a single e-mail from another counselor, apparently a referral from Maj. Burger.

75. Ms. Doe felt isolated and did not know where to turn for emotional support following the rape. She began to have sensations of feeling separated from her body.

76. Her anxiety after the sexual assault became intolerable. Ms. Doe knew that if she left West Point after the start of her third year, she would be contractually required to repay the cost of her education. This was a financial risk that Ms. Doe was unable to take. On or about August 10, 2010, Ms. Doe informed West Point that she would be resigning from the Academy. On August 13, 2010, she was honorably discharged.

77. Ms. Doe enrolled in a civilian college after leaving West Point. Although she earned a degree, she struggled emotionally as she continued to process the experience of having been sexually assaulted at West Point.

78. Ms. Doe remains committed to military service. She is drawn to the constant pursuit of bettering oneself physically and mentally and to the leadership development opportunities that military service affords. Ms. Doe hopes to enroll in Army Corps Officer

Candidate School this fall.

## LEGAL CLAIMS

### FIRST CLAIM FOR RELIEF
### Fifth Amendment Due Process
### (*Bivens*: Defendants Hagenbeck and Rapp)

79.     Ms. Doe repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

80.     Defendants Hagenbeck and Rapp are liable in their individual capacities as the supervisors of Mr. Smith for his violations of Ms. Doe's due process rights.

81.     Defendants Hagenbeck and Rapp were personally involved in and actually caused the aforementioned violations of Ms. Doe's due process rights by knowingly and intentionally creating, implementing, enforcing, encouraging, sanctioning, and/or acquiescing in a policy, practice, and/or custom in which Mr. Smith violated Ms. Doe's due process rights.

82.     Defendant Hagenbeck, as Superintendent of West Point and chair of the monthly meetings of the Sexual Assault Review Board, and Defendant Rapp, as West Point Commandant of Cadets, were responsible for creating, promulgating, implementing, and administering the policies, practices and/or customs of the West Point sexual harassment program.

83.     Defendants Hagenbeck and Rapp were personally involved in and proximately caused the violations of Ms. Doe's rights by creating, promulgating, implementing, and administering policies, practices, and/or customs that (1) taught female cadets that it was their responsibility to ward off the advances of male cadets, thus creating a culture of blaming the victim; (2) discouraged female cadets from reporting sexual assault by causing them to fear retaliation and harm to their career; (3) rarely punished cadet perpetrators of sexual assault or punished them only mildly, thereby fostering an environment of sexual hostility and toleration of

violence against women; (4) provided female cadets with inadequate, if any, support services after their attacks; (5) tolerated a culture of hostility towards women, including failing to punish male cadets for the regular use of misogynistic chants and slurs and ignoring sexist comments by West Point faculty and speakers; and (6) fostered the marginalization of women at West Point by failing to hire female faculty and administrators and failing to recruit female cadets.

84.     Furthermore, Defendants Hagenbeck and Rapp knew or should have known of the high rate of sexual assault and sexual harassment against female cadets. In its 2009-2010 report, the DoD found that fifty-six percent of female cadets at military service academies experienced sexual harassment and 12.9 percent experienced unwanted sexual contact. This report, others by the DoD and Government Accountability Office, and other journalistic or public accounts, notified Defendants that female cadets at West Point faced unacceptably high levels of risk of sexual harassment and assault.

85.     Despite this knowledge, Defendants failed to act to remedy the situation, thus acquiescing in the widespread constitutional violations of which Ms. Doe's injuries were a part. Instead, Defendants Hagenbeck and Rapp created a policy, practice, and/or custom under which widespread due process violations continued and were exacerbated.

86.     Defendants Hagenbeck and Rapp were personally involved in and proximately caused the violations of Ms. Doe's rights through their deliberate indifference to and actual knowledge, prior to the violation of Ms. Doe's constitutional rights, of the widespread rape and sexual assault of female cadets.

87.     Since the constitutional violations against female cadets were so widespread, they became a custom of constitutional violations in the face of which Defendants Hagenbeck and Rapp deliberately refused to act, despite official and unofficial reports notifying them of this

16

pervasive problem. Their refusal to act, despite notice and actual knowledge, amounts to acquiescence to violations of Ms. Doe's constitutional rights for which they are personally liable.

88.     Defendants Hagenbeck and Rapp were personally involved in and proximately caused the violations of Ms. Doe's rights through their deliberate indifference to her constitutional rights. Defendants Hagenbeck and Rapp (1) knew to a moral certainty that sexual assault and harassment occurred frequently at West Point and that female cadets faced a unrelentingly sexually aggressive culture; (2) knew that effective punishment of sexual assault perpetrators, refusal to tolerate sexually aggressive language and conduct by West Point faculty, officials, and male cadets, and a less misogynistic sexual education training would have made the male cadets less likely to violate constitutional rights; and (3) knew that under the current disciplinary system and education program, the male cadets at West Point were inadequately trained, were committing widespread due process violations by continuously assaulting the female cadets, and would continue to do so without proper discipline and training geared towards changing the pervasive culture of violence against women at West Point.

89.     The inadequacy of the discipline and training program and the tolerance of sexually aggressive language and conduct by faculty, officials and male cadets was obvious and had been reported to Defendants Hagenbeck and Rapp by internal investigations by the DoD and the Government Accountability Office and external criticisms by investigative journalists. Despite this knowledge, Defendants Hagenbeck and Rapp failed to create or implement an adequate training program or meaningfully to discipline cadets who sexually assaulted other cadets, failed to act to end the use and endorsement of sexually aggressive language and conduct by faculty, officials and male cadets, and were deliberately indifferent to Ms. Doe's rights.

90.     Defendants Hagenbeck and Rapp were personally involved in and proximately

17

caused the aforementioned violations of Ms. Doe's constitutional rights and were deliberately indifferent to the rights of Ms. Doe in failing to adequately supervise subordinate Mr. Smith, who proximately caused the violations of Ms. Doe's Fifth Amendment rights.

91.     Despite the obvious need for close supervision of male cadets due to the well-known problems of sexual assault and sexually aggressive culture at West Point, Defendants Hagenbeck and Rapp egregiously failed to supervise the actions of male cadets and other agents to ensure that due process violations did not occur, evidencing gross negligence in supervising subordinate male cadets and deliberate indifference to the rights of Ms. Doe.

92.     By failing to punish perpetrators of sexual assault, failing to properly train male cadets, failing to adequately protect female cadets from sexual assaults, and tolerating sexually aggressive language and conduct by faculty, officials and male cadets, Defendants Hagenbeck and Rapp communicated to male cadets that they could commit sexual assaults against female cadets with impunity. By communicating this message, Defendants created a dangerous and sexually hostile environment for Ms. Doe and the other women of West Point.

93.     As a result of Defendants Hagenbeck and Rapp's acts and/or omissions, Ms. Doe suffered damages, including but not limited to violations of her constitutional rights, physical injury, and emotional distress.

94.     When Ms. Doe was raped, she was not engaged in activities that fell within the scope of military employment. Ms. Doe was a student of West Point and not an employee. Her injuries from being raped arose outside the scope of any employment, and she would not be eligible to receive workers' compensation under federal or New York law.

95.     Ms. Doe fears that she will again be subjected to such unlawful and unconstitutional actions and seeks a judicial declaration that Defendants' conduct has deprived

her of her rights under the constitution and laws of the United States.

## SECOND CLAIM FOR RELIEF
### Fifth Amendment Equal Protection
### (*Bivens*: Defendants Hagenbeck and Rapp)

96.     The Plaintiff repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

97.     Defendants Hagenbeck and Rapp created and enforced a policy that put female cadets at risk of violent harm. They knowingly and intentionally created and enforced a policy and practice that tolerated attacks against female cadets and discouraged reporting of such attacks, perpetrating a sexually aggressive culture at West Point.

98.     In designing and implementing a policy and practice that discriminated against female cadets, Defendants violated the equal protection component of the Due Process Clause of the Fifth Amendment of the United States Constitution.

99.     The above-named Defendants deprived Ms. Doe of basic due process protections by creating and enforcing a policy and practice that placed her at a high risk of harm based on her gender in violation of her right to equal protection under the Fifth Amendment.

100.    As a result of above-named Defendants' actions, Ms. Doe suffered damages, including but not limited to, physical injury and emotional distress.

## THIRD CLAIM FOR RELIEF
### Little Tucker Act: Breach of the Covenant of Good Faith and Fair Dealing
### (Defendant: United States)

101.    The Plaintiff repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

102.    In signing her Oath of Allegiance, Ms. Doe entered into a valid educational contract and service agreement with Defendant United States. She entered into this contract with

a reasonable expectation of receiving educational benefits, tuition, room, and board from West Point in exchange for her promise of military service.

103.    The contract provided that if she failed to satisfy her obligation to serve on active duty under the contract, the United States would have an enforceable right to recoup the full costs of her education. This recoupment clause confirmed the contractual nature of Ms. Doe's agreement with the Defendant United States.

104.    The United States has filed suit to enforce educational contracts substantially similar to that executed by Ms. Doe. In one such action, the United States characterized the failure of a former West Point cadet to complete his course of study as a "breach of his service agreement." The United States has characterized the West Point Oath of Allegiance as, variously, a "service contract," a "cadet contract" and the equivalent of a "military education contract."

105.    The educational contract between Ms. Doe and the United States contained an implied covenant of good faith and fair dealing.

106.    By creating and enforcing policies and practices that fostered a sexually hostile environment and toleration of violence against women, failing to adequately punish perpetrators of sexual assault, failing to adequately train cadets, faculty and administrators, and endorsing a misogynistic culture, Defendant United States deprived Ms. Doe of her contractual right to receive this education.

107.    Defendant United States acted in bad faith by engaging in conduct that was designed to oppress women at West Point, after inducing them to enter into contractual obligations.  By depriving Ms. Doe of her reasonable expectation of contractual education benefits and acting in bad faith, Defendant United States breached the covenant of good faith and fair dealing.

20

108.    Ms. Doe seeks damages of less than $10,000 on her breach of contract claim. Accordingly, jurisdiction over her Little Tucker Act claim is proper in this Court.

### FOURTH CLAIM FOR RELIEF
### Federal Tort Claims Act
### (Defendant United States)

109.    The Plaintiff repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

*Negligent Supervision*

110.    Defendants Hagenbeck and Rapp and other West Point officials negligently failed to supervise male cadets, including Mr. Smith. Defendants Hagenbeck and Rapp and other West Point officials were fully aware that cadets had committed numerous acts of sexual violence in the past. Defendants Hagenbeck and Rapp and other West Point officials failed to investigate these incidents, failed to punish the cadets for acts of sexual violence, and failed to condemn and end the prevalence of sexually aggressive language and conduct by faculty, officials, and male cadets. Defendants Hagenbeck and Rapp and other West Point officials were fully aware of these circumstances from the DoD, Government Accountability Office, congressional hearings, internal investigations, and various news reports.

111.    Defendants Hagenbeck and Rapp and other West Point officials also knew that there was a culture condoning sexual harassment, sexual assault, and rape among the cadets at West Point. Had Defendants Hagenbeck and Rapp and other West Point officials adequately supervised the cadets, the United States could have avoided the harm to Ms. Doe.

112.    Defendants Hagenbeck and Rapp and other West Point officials also negligently failed to supervise West Point staff members, including Maj. Burger, in properly handling Ms. Doe's sexual assault report. Defendants Hagenbeck and Rapp and West Point officials were fully

21

aware that rape and sexual assault were prevalent at West Point, that reporting and training policies were inadequate, that punishment of those who committed rape or sexual assault was rare, and that there existed a culture condoning sexual harassment, sexual assault, and rape.

113.   Defendants Hagenbeck and Rapp and other West Point officials were fully aware that staff members had inadequately handled sexual assault complaints in the past. Had Defendants Hagenbeck and Rapp and other West Point officials properly supervised West Point staff members, the United States could have avoided the harm to Ms. Doe.

*Negligent Training*

114.   Defendants Hagenbeck and Rapp and other West Point officials also failed to adequately train West Point cadets, including Mr. Smith, in preventing sexual assaults against female cadets. The United States was fully aware that rape and sexual assault were prevalent at West Point and that the sexual assault trainings created a culture condoning sexual harassment, sexual assault, and rape.

115.   Even when Defendants Hagenbeck, Rapp, and other West Point officials learned of previous instances of sexual assault among cadets, they failed to change the ineffective cadet training. Had Defendants Hagenbeck and Rapp and other West Point officials corrected the inadequate training, the United States could have avoided the harm to Ms. Doe.

116.   Defendants Hagenbeck and Rapp and other West Point officials also failed to train West Point staff members to properly respond to sexual assaults reports by cadets.

117.   The United States was fully aware that rape and sexual assault were prevalent at West Point, that reporting and training policies were inadequate, that punishment of rapists and those who committed sexual assaults were rare, and that there existed a culture allowing and condoning sexual harassment, sexual assault, and rape.

118.    Even when Defendants Hagenbeck and Rapp and other West Point officials learned of previous instances where West Point staff inadequately responded to sexual assault reports, they failed to change the defective trainings and policies. Had Defendants Hagenbeck and Rapp and other West Point officials corrected the inadequate training, the United States could have avoided the harm to Ms. Doe.

*Negligence*

119.    Defendants Hagenbeck and Rapp and other West Point officials negligently established, promulgated, and implemented the inadequate policies and practices that caused Ms. Doe to be sexually assaulted. Defendants Hagenbeck and Rapp and other West Point officials negligently created, condoned, and failed to amend a culture that allowed sexual harassment, sexual assault, and rape.

*Negligent Infliction of Emotional Distress*

120.    Robert Smith created an unreasonable risk of causing Ms. Doe emotional distress. Mr. Smith's rape of Ms. Doe unreasonably endangered Ms. Doe's physical safety, and it was clearly foreseeable that his act would cause Ms. Doe emotional distress. Mr. Smith's conduct caused Ms. Doe's emotional distress, and his conduct was severe enough that it resulted in Ms. Doe's emotional injury and bodily harm.

121.    Defendants Hagenbeck and Rapp and other West Point officials created an unreasonable risk of causing Ms. Doe emotional distress. Their creation and maintenance of inadequate sexual assault prevention and reporting policies, as well as their failure to discipline assailants and their tolerance of sexually aggressive language and conduct by faculty, officials and male cadets, unreasonably endangered Ms. Doe's physical safety. It was clearly foreseeable that these acts would cause Ms. Doe's emotional distress. Defendants Hagenbeck and Rapp and

other West Point officials caused Ms. Doe's emotional distress, and their conduct was severe enough that it resulted in Ms. Doe's emotional injury and bodily harm.

*Abuse of process*

122.    Defendants Hagenbeck and Rapp and other West Point officials abused legal process in their actions. Defendants refused to properly investigate and punish incidents of sexual assault. Defendants also established and operated a system that discouraged and prevented Ms. Doe from pursuing an unrestricted report and/or criminal charges against Mr. Smith without fear of retaliation.

123.    On information and belief, Defendants Hagenbeck and Rapp and other West Point officials deliberately abused the investigation and reporting process for the improper purpose of discouraging reports so as to conceal the true extent of the sexual violence at West Point, avoiding further investigation or review of their constitutionally deficient sexual assault policies, practices, and customs, and attempting to maintain a favorable public image of West Point.

124.    Defendants Hagenbeck and Rapp and other West Point officials are, by their military rank, empowered to make arrests and are thus law enforcement officers for the purposes of the FTCA, 28 U.S.C. § 2680(c).

125.    The United States is liable pursuant to the FTCA for the tortious acts of its employees in "circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b).

126.    Defendants Hagenbeck and Rapp, as well as other West Point officials, were acting within the course and scope of their employment as agents of the United States, and on behalf of the United States, when they committed the tortious and unlawful acts complained of

here, including negligent supervision, negligent training, negligent infliction of emotional distress, negligence, and abuse of process.

127.    In these circumstances, if the United States were a private person, liability would be imposed in accordance with the law of New York. When Ms. Doe was raped, she was not engaged in activities that fell within the scope of military employment. She was a student of West Point and not an employee, and her injuries were in no way work-related. She would thus be ineligible to receive workers' compensation under federal or New York law.

128.    Ms. Doe has administratively exhausted her claims under the FTCA. Ms. Doe timely filed an FTCA administrative claim with DoD on or about May 3, 2012. As of August 30, 2013, DoD has not issued a decision on her claim.

## PRAYER FOR RELIEF

WHEREFORE, Ms. Doe respectfully requests that this Court:

(1) Enter a declaratory judgment that the actions of Defendants Hagenbeck and Rapp violated the United States Constitution;

(2) Award Ms. Doe compensatory damages in an amount to be proven at trial;

(3) Hold Defendants jointly and severally liable for compensatory damages; and

(4) Grant such other relief as the Court deems just and equitable.

Dated:  August 30, 2013
New Haven, Connecticut

Respectfully Submitted,

By: *Michael J. Wishnie /RBM*
Michael J. Wishnie, Esq. MW1952
Veterans Legal Services Clinic
Jerome N. Frank Legal Services Organization
Yale Law School
P.O. Box 209090
New Haven, CT 06520-9090
Tel: (203) 432-4800

25

## CERTIFICATE OF SERVICE

I hereby certify that, on August 30, 2013, I caused a true and correct copy of the foregoing Amended Complaint to be served on Christopher Connolly, counsel for all defendants, via mail at the U.S. Attorney's Office, Southern District of New York, 86 Chambers Street, New York, NY 10007, and via e-mail at christopher.connolly@usdoj.gov.

By: _____

Michael J. Wishnie, Esq. MW1952