# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

_____
)
)
JANE DOE,                                )
)
          Plaintiff,            )        No. 13 CIV. 2802 (AKH)
)
      v.                            )
)
)
LT. GEN. FRANKLIN LEE HAGENBECK,         )
BRIG. GEN. WILLIAM E. RAPP, and the      )
UNITED STATES OF AMERICA,                )
)        October 16, 2013
         Defendants.           )
)
_____)


## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO MOTION TO DISMISS THE AMENDED COMPLAINT


MICHAEL WISHNIE
Jerome N. Frank Legal Services Organization
Yale Law School
P.O. Box 209090
New Haven, CT  06520-9090
Tel.: (203) 436-4780
Fax: (203) 432-1426


ORAL ARGUMENT REQUESTED

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ................................................................................ iii

PRELIMINARY STATEMENT ......................................................................... 1

FACTS AND PROCEEDINGS .......................................................................... 2

STANDARD OF REVIEW ................................................................................ 6

ARGUMENT ...................................................................................................... 7

I.   THIS COURT HAS SUBJECT MATTER JURISDICTION OVER
     PLAINTIFF'S FTCA CLAIMS .............................................................. 7

     A.   Plaintiff's Injuries Would Not be Covered by Workers' Compensation ...... 8

          1.   Ms. Doe Was a Student, Not an Employee ..................................... 9

          2.   Ms. Doe Was Engaged in a "Frolic" at the Time of Her Assault ..... 12

     B.   Ms. Doe's Rape Was Not Incident to Service ................................. 14

          1.   Ms. Doe's Status as a Member of the Military was Uncertain ......... 14

          2.   Ms. Doe Was Engaged in an Activity Unrelated to Military Service ... 15

     C.   Military Discipline Concerns Do Not Oust This Court's Jurisdiction .......... 16

     D.   The Discretionary Function Exception Does Not Preclude This Court
          From Hearing Ms. Doe's FTCA Claims .......................................... 17

     E.   Plaintiff's Negligent Supervision, Negligent Training, and Abuse of Process
          Claims Are Cognizable Under New York Law .................................. 21

II.  THIS COURT HAS JURISDICTION OVER PLAINTIFF'S CONTRACT
     CLAIM UNDER THE LITTLE TUCKER ACT .................................... 23

     A.   The Oath of Allegiance is a Valid Contract that the United States
          Breached ........................................................................................... 23

     B.   The Contract is a Recoupment and Educational Contract Governing Rights
          Not Established by Statute .............................................................. 26

1.  The Provisions In the Contract Are Not Governed By Statutory Right .................................................................................. 26

2.  The United States Frequently Invokes Courts' Jurisdiction To Enforce Educational And Recoupment Contracts Against Cadets ... 29

C.  Money-Mandating Provisions Are Not Required For the Court to Exercise Jurisdiction Over Plaintiff's Little Tucker Act Claim ................... 30

III.  **THIS COURT HAS JURISDICTION OVER PLAINTIFF'S *BIVENS* CLAIMS** ................................................................................. 32

A.  Defendants Hagenbeck and Rapp Are Liable As Supervisors for the Violations of Ms. Doe's Constitutional Rights ............................. 33

B.  Defendants Hagenbeck and Rapp Are Liable for Creating the Danger that Mr. Smith Would Rape Ms. Doe and for Failing to Protect Her ........... 39

**CONCLUSION** ....................................................................................... 43

# TABLE OF AUTHORITIES

**CASES**

*Anderson v. Recore*, 317 F.3d 194 (2d Cir. 2003) ........................................................37

*Andrulonis v. United States*, 952 F.2d 652 (2d Cir. 1991) ............................................20

*Arar v. Ashcroft*, 585 F.3d 559 (2d Cir. 2009) ..............................................................36

*Archer v. United States*, 217 F.2d 548 (9th Cir. 1955) ................................................15

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ....................................................... 33, 34, 36, 37

*Atuahene v. City of Hartford*, 10 Fed. App'x 33 (2d Cir. 2001) ...................................36

*Awad v. United States*, 301 F.3d 1367, 1372-74 (Fed. Cir. 2002) ...............................28

*Awad v. United States*, 61 Fed. Cl. 281 (2004) ............................................................32

*Bagner v. United States*, 428 F. Supp. 2d 101 (N.D.N.Y. 2006) ..................................18

*Bd. of Ed. of Farmingdale Union Free Sch. Dist. v. Farmingdale Classroom Teachers Ass'n, Local 1889, AFT AFL-CIO*, 38 N.Y.2d 397 (1975) ................................................22

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ..........................................................7

*Bell v. United States*, 366 U.S. 393 (1961) ...................................................................27

*Bellamy v. Mount Vernon Hosp.*, 07 Civ. 1801, 2009 WL 1835939 (S.D.N.Y. June 26, 2009) . 34, 39

*Berkovitz v. United States*, 486 U.S. 531 (1988) ...........................................................18

*Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971) .........34

*Boles v. Dormer Giant, Inc.*, 4 N.Y.3d 235 (2005) ........................................................12

*Bright View Trading Co. v. Park*, No. 03 Civ 2330 (HB), 2004 WL 2071976 (S.D.N.Y. Sept. 16, 2004) ..................................................................................................................22

*Brock v. Wright*, 315 F.3d 158 (2d Cir. 2003) ..............................................................38

*Bryan v. Bunis*, 203 N.Y.S. 634 (App. Div. 1924) ................................................. 12, 13

*Cestonaro v. United States*, 211 F.3d 749 (3d Cir. 2000) .............................................17

*Cioca v. Rumsfeld*, 720 F.3d 505 (4th Cir. 2013) .........................................................33

*Collins v. United States*, 642 F.2d 217 (7th Cir. 1981) ................................................ 15

*Colon v. Coughlin*, 58 F.3d 865 (2d Cir. 1995) ................................................... 34, 38

*Crispim v. Athanson*, 275 F. Supp. 2d 240 (D. Conn. 2003) ....................................... 41

*D'Amico v. Christie*, 71 N.Y.2d 76 (1987) ................................................................. 13

*D'Andrea Bros. LLC v. United States*, 96 Fed. Cl. 205 (2010) .................................... 30

*D'Olimpio v. Crisafi*, 718 F. Supp. 2d 340 (S.D.N.Y. 2010) ....................................... 35

*Dalton v. Educ. Testing Serv.*, 87 N.Y.2d 384 (1995) ................................................. 25

*DeCrane v. United States*, 231 Ct. Cl. 951 (1982) ................................................ 26, 28

*DeShaney v. Winnebago Cty. Dept. of Soc. Services*, 489 U.S. 189 (1989) ................ 41

*Diaz-Bernal v. Myers*, 758 F. Supp. 2d 106 (D. Conn. 2010) ............................... 34, 35

*Doe v. N.Y.C. Dep't of Soc. Servs.*, 649 F.2d 134 (2d Cir. 1981) ............................... 42

*Doe v. Taylor Ind. Sch. Dist.*, 15 F.3d 443 (5th Cir. 1994) ........................................ 38

*Dreier v. United States*, 106 F.3d 844 (9th Cir. 1996) ................................................ 16

*Dwares v. City of New York*, 985 F.2d 94 (2d Cir. 1993) ............................................ 39

*El-Badrawi v. Dep't of Homeland Sec.*, 579 F. Supp. 2d 249 (D. Conn. 2008) ............ 21

*Express Indus. & Terminal Corp. v. New York State Dept. of Transp.*, 715 N.E.2d 1050 (N.Y. 1999) ........................................................................................................ 24

*Feres v. United States*, 340 U.S. 135 (1950) ........................................................... 1, 7

*Finkel v. Stratton Corp.*, 962 F.2d 169 (2d Cir.1992) ................................................ 14

*Fischer v. United States*, 451 F.Supp. 918 (E.D.N.Y. 1978) ...................................... 15

*Gant v. Wallingford Bd. of Educ.*, 69 F.3d 669 (2d Cir. 1995) ..................................... 6

*Goldstein v. Pataki*, 516 F.3d 50 (2d Cir. 2008) ......................................................... 6

*Gonzalez v. U.S. Air Force*, 88 F. App'x 371 (10th Cir. 2004) ................................... 31

*Grulke v. United States*, 228 Ct. Cl. 720 (1981) .................................................. 27, 28

*Guest v. Hansen*, No. 06 Civ. 0500 GLS/DRH, 2007 WL 4561104 (N.D.N.Y. Dec. 18, 2007)..22

*Hall v. Nat'l Collegiate Athletic Ass'n*, 985 F. Supp. 782 (N.D. Ill. 1997) .................... 32

*Hamm v. United States*, 439 F. Supp. 2d 262 (W.D.N.Y. 2006), *aff'd*, 483 F.3d 135 (2d Cir. 2007) ............................................................................................................... 12

*Heard v. City of New York*, 82 N.Y.2d 66 (1993) ......................................................... 22

*Heredia v. United States*, 887 F. Supp. 77 (S.D.N.Y. 1995) ......................................... 10

*Holland v. City of Poughkeepsie*, 90 A.D.3d 841 (N.Y. App. Div. 2011) ..................... 21

*Hope v. Pelzer*, 536 U.S. 730 (2002) ............................................................................ 40

*Ingraham v. Wright,* 430 U.S. 651 (1977) ..................................................................... 37

*Jones v. Wellham*, 104 F.3d 620 (4th Cir. 1997) ........................................................... 38

*Judith M. v. Sisters of Charity Hosp.*, 93 N.Y.2d 932 (1999) ....................................... 14

*Kenneth R. v. Roman Catholic Diocese of Brooklyn*, 229 A.D.2d 159 (N.Y. App. Div. 1997) ... 21

*King v. United States*, 491 F. Supp. 2d 286 (D. Conn. 2007) ................................. 17, 20

*Klay v. Panetta*, 924 F. Supp. 2d 8 (D.D.C. 2013), *appeal docketed*, No. 13-5081 (D.C. Cir. March 14, 2013) ....................................................................................................... 33

*Knaub v. Realtime Bus. Sys. Inc.*, 674 N.Y.S.2d 799 (App. Div. 1998) ....................... 12

*Lance v. New Mexico Military Inst.*, 70 N.M. 158 (1962) ............................................ 11

*Lombardi v. Whitman*, 485 F.3d 73 (2d Cir. 2007) ................................................. 37, 41

*Lutz v. Sec'y of Air Force*, 944 F.2d 1477 (9th Cir. 1991) ........................................... 16

*Makarova v. United States*, 201 F.3d 110 (2d Cir. 2000) ............................................... 7

*Marotta v. Town & Country Elec., Inc.*, 51 A.D.3d 1126 (N.Y. App. Div. 2008) ......... 12

*Marquet v. Gates*, No. 12 Civ. 3117 (ALC)(MHD) (S.D.N.Y. Sept. 11, 2013) ........... 33

*Marshall v. Pittsford Cent. Sch. Dist.*, 100 A.D.3d 1498 (N.Y. App. Div. 2012) ........ 29

*Mastrolia v. United States*, 91 Fed. Cl. 369 (2010) ...................................................... 30

*Medina* v. *United States,* 259 F.3d 220 (4th Cir. 2001) ................................................ 21

*Mentavlos v. Anderson*, 85 F. Supp. 2d 609 (D.S.C. 2000) .......................................... 15

*Miller v. United States*, 42 F.3d 297 (5th Cir. 1995) .................................................... 15

*Morrison v. Nat'l Australia Bank Ltd.*, 547 F.3d 167 (2d Cir. 2008) ............................. 7

*Morse v. West*, 975 F. Supp. 1379 (D. Colo. 1997), *aff'd*, 172 F.3d 63 (10th Cir. 1999)............ 15

*Myers & Myers, Inc. v. U. S. Postal Serv.*, 527 F.2d 1252 (2d Cir. 1975).................................... 21

*N.X. v. Cabrini Med. Ctr.*, 97 N.Y.2d 247 (2002)........................................................................ 14

*Nat'l Union Fire Ins. v. United States*, 115 F.3d 1415 (9th Cir. 1997) ...................................... 17

*Nat'l Res. Def. Council v. Johnson*, 461 F.3d 164 (2d Cir. 2006) ................................................ 7

*O'Rourke v. Dep't of Air Force*, No. 3:04 Civ. 7228, 2005 WL 3088611 (N.D. Ohio May 31, 2005)........................................................................................................................................... 29

*Okin v. Village of Cornwall-On-Hudson Police Dep't*, 577 F.3d 415 (2d Cir. 2009) ................. 39

*Pabon v. Wright*, 459 F.3d 241 (2d Cir. 2006) ............................................................................ 38

*Pagano by Pagano v. Massapequa Pub. Sch.*, 714 F. Supp. 641 (E.D.N.Y. 1989)..................... 41

*Pearson v. Callahan*, 555 U.S. 223 (2009) ................................................................................. 37

*Pena v. DePrisco*, 432 F.3d 98 (2d Cir. 2005)............................................................................ 39

*Poe v. Leonard*, 282 F.3d 123 (2d Cir. 2002) ...................................................................... 37, 38

*Rector, Etc., of St. Mark's Church v. Teed*, 120 N.Y. 583 (1890) ............................................... 25

*Regan v. Starcraft Marine, LLC*, 524 F.3d 627 (5th Cir. 2008)................................................. 16

*Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393 (2d Cir. 2004) ................................................... 24

*Riviello v. Waldron*, 47 N.Y.2d 297 (1979) ............................................................................... 13

*Romero v. City of New York*, 839 F. Supp. 2d 588 (E.D.N.Y. 2012).......................................... 38

*Ross v. Creighton Univ.*, 957 F.2d 410 (7th Cir. 1992) .............................................................. 32

*Santigate v. Linsalata*, 759 N.Y.S.2d 100 (App. Div. 2003) ..................................................... 10

*Schism v. United States*, 316 F.3d 1259 (Fed. Cir. 2002) ..................................................... 28, 29

*Scott v. Fischer*, 616 F.3d 100 (2d Cir. 2010)............................................................................ 34

*Showalter v. Dep't of Army*, No. 01-1419, 2002 WL 77232 (Fed. Cir. Jan. 18, 2002) .............. 28

*Speed v. United States*, 97 Fed. Cl. 58 (2011)............................................................................ 30

*Startech, Inc. v. VSA Arts*, 126 F. Supp. 2d 234 (S.D.N.Y. 2000) ........................................ 24, 25

*Stovall v. United States*, 71 Fed. Cl. 696 (2006) ........................................................................ 23

*Taber v. Maine,* 67 F.3d 1029 (2d Cir. 1995) ....................................................................passim

*Thames Shipyard & Repair Co. v. United States*, 350 F.3d 247 (1st Cir. 2003) ..........................21

*Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471 (2d Cir. 2006)............................................18

*Tully v. Live Right Realty Corp.*, 827 N.Y.S.2d 362 (App. Div. 2007) .......................................10

*United States v. China*, CIV-A No. 3:05-3037, 2007 WL 775615 (D.S.C. March 18, 2007) ......29

*United States v. Chrzanowski*, 358 F. Supp. 2d 693 (N.D. Ill. 2005) ...........................................29

*United States v. Gaubert*, 499 U.S. 315 (1991)....................................................................17, 18

*United States v. Giordano*, 442 F.3d 30 (2d Cir. 2006) ...............................................................38

*United States v. Johnson,* 481 U.S. 681 (1987)...........................................................................16

*United States v. Lanier*, 520 U.S. 259 (1997) .............................................................................38

*United States v. Mitchell*, 463 U.S. 206 (1983)................................................................23, 31, 32

*United States v. Moore*, 949 F.2d 68, 71 (2d Cir. 1991) ..............................................................14

*United States v. Roetenberg*, No. Civ.A. 01–6247, 2002 WL 32351113 (E.D. Pa. Aug. 2, 2002) ....................................................................................................................................................30

*United States v. Stanley*, 483 U.S. 669 (1987) .............................................................................17

*United States v. Testan*, 424 U.S. 392 (1976) ........................................................................23, 31

*United States v. Winstar Corp.*, 518 U.S. 839 (1996) ..................................................................30

*Wake v. United States*, 89 F.3d 53 (2d Cir. 1996) .................................................................14, 15

*Williams v. United States*, 183 F. App'x 125 (2d Cir. 2006) .......................................................13

*Wyatt v. Cole*, 504 U.S. 158 (1992) ............................................................................................37

## STATUTES

10 U.S.C. § 2005 ...........................................................................................................................27

28 U.S.C. § 1295(a)(2) ..................................................................................................................31

28 U.S.C. § 1346(a)(2) ..................................................................................................................23

28 U.S.C. § 1346(b)(1) ....................................................................................................................7

28 U.S.C. §§ 1491(a)(1) ................................................................................................................23

N.Y. Workers' Comp. Law § 2(4) (McKinney 2013) .......................................................... 9, 10, 12

**RULES**

32 C.F.R. § 103.5 ..................................................................................................................... 19

U.S. Dep't of Army, Reg. 600-20, p. 102-103 (30 November 2009) ..................................... 20, 21

U.S. Dep't of Def. Dir. 6495.01, Sexual Assault Prevention and Response Program (21 Jan. 2012) ........................................................................................................................... 19, 20, 21

U.S. Dep't of Def. Instr. 6495.02, Sexual Assault Prevention and Response Program Procedures (28 Mar. 2013) ..................................................................................................................... 19

**OTHER AUTHORITIES**

Charles Alan Wright, Arthur R. Miller, & Edward H. Cooper, Federal Practice and Procedure § 3658.1 (3d ed. 2010) ............................................................................................................. 17

Greg Bishop, *Standing Ready to Play, If Allowed*, N.Y. Times, Oct. 1, 2013 ............................. 11

Jennifer Steinhauer, *Navy Hearing in Rape Case Raises Alarm*, N.Y. Times, Sept. 20, 2013 ....... 4

Lex K. Larson, 3 Larson's Workers' Compensation § 65.01 (Matthew Bender, Rev. Ed.) ......... 11

Restatement (Third) of Emp't Law § 1.02 (2009) ....................................................................... 11

S. Rep. No. 96-850 (1980) ........................................................................................................... 27

## PRELIMINARY STATEMENT

Jane Doe comes to this Court seeking redress for a rape that she suffered as a second-year cadet at West Point in May 2010. Ms. Doe's rape was one of many sexual assaults that occur every year at the United States Military Academy. West Point officials, including Defendants, have refused to protect the constitutional and contractual rights of victimized students like Ms. Doe. In their motion to dismiss, Defendants argue that this Court is also precluded from protecting the rights of these students. Defendants are incorrect. This Court has the power to adjudicate Ms. Doe's claims and provide restitution for her physical and emotional injuries.

West Point's culture of rampant sexual hostility and gender-based violence caused Ms. Doe's violent assault. Defendants Lieutenant General Franklin Hagenbeck and Brigadier General William Rapp knowingly created this hostile environment through their grossly inadequate sexual assault prevention and response policies. Defendants failed to punish cadet perpetrators of sexual assault or approved egregiously inadequate punishments; implemented a sexual assault education program that ingrained a "blame-the-victim" mentality among the student population; and endorsed cadets' prevalent sexist slurs and training songs. Defendants' policies caused another cadet, Robert Smith, to rape Ms. Doe without fearing punishment or even adverse reaction by the West Point community.

Defendants argue that this Court is precluded from hearing Ms. Doe's claims because of the widely criticized *Feres* doctrine, which bars military service members from bringing tort claims against the United States when their injuries are "incident to service." *Feres v. United States*, 340 U.S. 135 (1950). But Ms. Doe's rape had nothing to do with her military service. She was attacked after taking a walk and having a drink with another student, late one night on a school weekend—a circumstance devoid of military implications and which could easily have

occurred on any civilian campus in the country. Moreover, in invoking the *Feres* doctrine in an effort to avoid responsibility for their actions, Defendants fail to cite, let alone address, the leading Second Circuit opinion interpreting *Feres*. In fact, Second Circuit precedent holds that this Court may adjudicate tort claims brought by service members like Ms. Doe whose injuries would not be covered under New York workers' compensation law.

For too long, military service academies have hidden behind the *Feres* doctrine to avoid liability for wrongdoings that other university officials must confront. Where, as here, the plaintiff did not incur injury "incident to service" and the plaintiff's claims would not be covered under workers' compensation law, *Feres* does not apply, and this Court retains jurisdiction. Furthermore, the Little Tucker Act provides a second statutory basis for this Court's jurisdiction, a basis not considered by other courts hearing similar claims. Ms. Doe respectfully requests that the Court exercise its statutory and constitutional jurisdiction and deny the motion to dismiss.

## FACTS AND PROCEEDINGS

Plaintiff Jane Doe enrolled in the United States Military Academy ("West Point") in June 2008. Amended Complaint dated August 30, 2013 ("Am. Compl."), ECF No. 14 ¶ 11. On her first day as a cadet, Ms. Doe entered into a contract with the United States, in which she promised to serve as a member of the Army for eight years. *Id*. In exchange, the United States promised that she would receive a first-class education, military training, and the opportunity to excel on her own merits. *Id*. ¶¶ 9, 11. If she failed to complete her military service, however, the United States would be entitled to recoup the cost of the education she had received. *Id*. ¶ 12.

West Point's Hostile Environment and Epidemic of Sexual Assault

At West Point, Ms. Doe thrived in her academics and training. *Id*. ¶ 17. But she was appalled by the Academy's hostile and misogynistic environment. *Id*. ¶ 18. Ms. Doe was one of

only 200 female cadets, approximately 15 percent of the 1,300 cadets in her class. *Id.* ¶ 18. She often felt isolated, especially in light of the routine sexual harassment that she and other female cadets endured. *Id.* Defendants Lt. Gen. Franklin L. Hagenbeck, then the Superintendent, Brig. Gen. William E. Rapp, the Commandant of Cadets, and other West Point officials created a misogynistic culture at West Point by, for instance, failing to increase the representation of women cadets, faculty and staff at the school, *id.* ¶¶ 19-21, promoting primarily women who conformed to the school's male norm, *id.* ¶ 23, condoning misogynistic chants and slang, *id.* ¶¶ 24-29, and endorsing sexually aggressive comments by a guest speaker, *id.* ¶ 32. In full view of West Point faculty and administrators, cadets conducted marching drills to the tune of crass, sexualized lyrics. *Id.* ¶¶ 24-27. Members of the overwhelmingly male faculty openly commiserated with male cadets about the lack of sexual opportunities at West Point. *Id.* ¶¶ 20, 30.

The most serious consequence of these policies was an epidemic of sexual assault on campus. In 2010, Ms. Doe's final year at West Point, fifty-one percent of female cadets reported that they had experienced sexual assault while at West Point. *Id.* ¶ 36. Defendants Hagenbeck and Rapp, the West Point administrators in charge of the school's sexual assault response program for the 2009-10 academic year, created rape prevention and response policies that caused West Point's sexual assault problem to worsen. Defendants routinely declined to punish alleged cadet perpetrators of sexual assault or approved egregiously inadequate punishments. *Id.* ¶¶ 35, 37-39. In 2009-10, eleven cadets came forward to report a sexual assault, but Defendants dismissed only one perpetrator. *Id.* ¶ 37. In one case, when cadets reported a supervisor's sexual harassment and inappropriate sexual conduct, Defendants merely relieved the supervisor of his duties. *Id.* ¶ 38. These actions communicated that sexual violence would be tolerated at West

Point and that male cadets would not jeopardize their education or careers if they assaulted a female student. *Id.* ¶ 39.

Defendants' failure to punish perpetrators also communicated to female cadets that they risked their own reputations and military careers by reporting assault, with little chance that their assailants would be held to account. *Id.* In 2010, more than half of all female cadets believed that reporting unwanted sexual conduct would harm their reputations on campus, and forty-four percent of women feared some form of retaliation. *Id.* ¶ 73. As a result of Defendants' policies, official sexual assault reports lagged far behind the number of cadets who described experiencing sexual assault in Department of Defense surveys. In 2009-10, the same year that half of all female cadets reported experiencing sexual assault, only eleven women and men filed official reports, *id.* ¶ 37, and only one perpetrator was dismissed, *id.* Defendants' failure to punish rapists created a cycle in which men believed they could commit assaults without consequence and women believed that reporting would be futile or dangerous.[1]

In addition, Defendants implemented a sexual assault prevention program that was woefully inadequate to address the sexual assault crisis on campus and that further perpetuated gender stereotypes. Defendants asked first- and second-year cadets to attend fewer than four hours of training on sexual assault annually. *Id.* ¶¶ 41-42. The programming was limited to definitions of sexual harassment and assault and an explanation of reporting procedures. *Id.* ¶ 41. Furthermore, the training focused on explaining to female cadets that it was their responsibility to say "no" to the inevitable sexual advances of their male peers. *Id.* ¶ 43. In 2011, the Department of Defense ("DoD") deemed Defendants' regime of sexual assault prevention

---

[1] West Point is not the only service academy at which students learn that those who report sexual assault may be condemned and re-victimized. *See, e.g.*, Jennifer Steinhauer, *Navy Hearing in Rape Case Raises Alarm*, N.Y. Times, Sept. 20, 2013, at A1.

training "deficient" and out of compliance with DoD directives. *Id.* ¶ 46.

<u>The Assault</u>

On or about May 8, 2010, during her second year at West Point, Ms. Doe suffered the terrible but predictable consequences of Defendants' policies. *Id.* ¶¶ 56-63. That evening, shortly after Ms. Doe took a mild sedative prescribed to her by a West Point doctor, a male cadet whom she believed to be her friend came to her room. *Id.* ¶ 56. The cadet, referred to by the pseudonym Robert Smith, was a combat veteran who had enrolled at West Point after serving in the Army. *Id.* ¶ 57. He invited Ms. Doe to walk with him to a nearby academic building. *Id.* ¶ 60. When they arrived, he offered Ms. Doe a few sips of alcohol, which while technically prohibited on campus was widely tolerated among combat veterans. *Id.* ¶¶ 59, 61. As the alcohol mixed with her sedative, Ms. Doe lost awareness of her surroundings and slipped out of consciousness. *Id.* ¶ 61. Mr. Smith attacked and raped her. *Id.* ¶ 62. Ms. Doe remembers few details from the assault. *Id.*

Ms. Doe woke up hours later in her bed, with dirt on her clothes and hair, bruises on her lower back, and blood between her legs. *Id.* ¶ 63. Confused and alarmed, she realized that Mr. Smith had raped her while she was unconscious. *Id.* When she confronted Mr. Smith the next day, he admitted he had had sex with her and that he was a "creep." *Id.* ¶ 64. On a friend's advice, Ms. Doe went to the student health clinic for emergency contraception. *Id.* ¶¶ 63, 65.

The following day, Ms. Doe returned to the health clinic to seek medical treatment for her injuries and testing for sexually transmitted infections. *Id.* ¶ 66. The nurse who examined her said that Ms. Doe had signs of vaginal tearing, and the nurse's notes record Ms. Doe's statement that she had been sexually assaulted. *Id.* ¶¶ 67-68. The nurse made no effort to preserve physical evidence of the assault. *Id.* ¶ 67. The same day, Ms. Doe told her regular psychiatrist of the

assault, and the doctor referred her to West Point's Sexual Assault Response Counselor, Maj. Maria Burger. *Id.* ¶ 69. Ms. Doe met once with Ms. Burger and filed a "restricted" report. *Id.* ¶ 70. Ms. Doe believed that this was her only option, fearing that she risked retaliation, ostracism, and harm to her future military career if she filed an unrestricted report. *Id.* ¶¶ 71-72.

After the assault, Ms. Doe's anxiety became intolerable. *Id.* ¶ 76. She understood that if she left West Point after the start of her third year, she would be contractually required to repay the cost of her education. *Id.* Unwilling to take this chance, Ms. Doe resigned from the Academy on or about August 10, 2010. The Army discharged her honorably on August 13, 2010, and she went on to graduate from a civilian college. *Id.* ¶ 77.

Procedural History

Ms. Doe filed this action on April 26, 2013. ECF No. 1. On the same date, Judge Harold Baer granted her *ex parte* application for a protective order. On August 15, 2013, this Court entered a modified protective order, ECF No. 15, and directed Ms. Doe to file an Amended Complaint in conformity with that order. Ms. Doe filed her Amended Complaint, ECF No. 14, seeking relief for harms caused by Defendants Hagenbeck, Rapp, and the United States. On September 20, 2013, the Defendants filed the instant Motion to Dismiss. ECF No. 15.

**STANDARD OF REVIEW**

When considering a 12(b)(6) motion to dismiss, a court must "constru[e] the complaint liberally, accept[] all factual allegations in the complaint as true, and draw[] all reasonable inferences in the plaintiff's favor." *Goldstein v. Pataki*, 516 F.3d 50, 56 (2d Cir. 2008) (internal quotation omitted). "The issue is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims." *Gant v. Wallingford Bd. of Educ.*, 69 F.3d 669, 673 (2d Cir. 1995) (internal quotation omitted). Thus, a plaintiff need only

plead factual allegations that, when accepted as true, "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007). If a plaintiff clears this low bar, the 12(b)(6) motion to dismiss must be denied.

Similarly, review of a 12(b)(1) motion to dismiss for lack of subject-matter jurisdiction requires a court to "take all facts alleged in the complaint as true and draw all reasonable inferences in favor of the plaintiff." *Nat'l Res. Def. Council v. Johnson*, 461 F.3d 164, 171 (2d Cir. 2006) (internal quotation omitted). Whether subject-matter jurisdiction exists is a basic "threshold inquiry" that centers on whether "the district court lacks the statutory or constitutional power to adjudicate [the claim]." *Morrison v. Nat'l Australia Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008) (internal quotation omitted). "A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000).

## ARGUMENT

### I.  THIS COURT HAS SUBJECT MATTER JURISDICTION OVER PLAINTIFF'S FTCA CLAIMS.

This Court has jurisdiction to hear Ms. Doe's claims pursuant to the Federal Tort Claims Act, which renders the United States liable "for money damages … for personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment." 28 U.S.C. § 1346(b)(1). Defendants argue that *Feres v. United States*, 340 U.S. 135 (1950), a widely criticized Supreme Court opinion, bars this Court from hearing Plaintiff's FTCA claims. Defs.' Br. at 7. In *Feres*, the Supreme Court held that "the Government is not liable under the [FTCA] for injuries to servicemen where the injuries arise out of or are in the course of activity incident to service." *Feres*, 340 U.S. at 146.

*Feres* does not prevent this Court from adjudicating Plaintiff's FTCA claims. Second

Circuit precedent since *Feres* holds that service members may recover under the FTCA when their injuries would not be covered under workers' compensation law. *Taber v. Maine*, 67 F.3d 1029 (2d Cir. 1995). Ms. Doe's injuries would not be covered under workers' compensation law because 1) she was a student at West Point, not an employee; and 2) even if she were an employee, she was engaged in a "frolic" at the time of her assault. Moreover, *Feres* is inapplicable because Ms. Doe's activity at the time of the assault was not "incident to service." Additionally, the United States argues that the FTCA's discretionary function exception divests this Court of its jurisdiction. The discretionary function exception does not apply here, as Department of Defense regulations required Defendants to follow mandatory procedures implementing the Sexual Assault and Prevention Response Program. Furthermore, where the acts that form the basis of FTCA claims also give rise to constitutional violations, as is the case here, the discretionary function exception does not apply.

### A.  Plaintiff's Injuries Would Not Be Covered by Workers' Compensation.

The Second Circuit has clarified that district courts have jurisdiction over FTCA claims by service members when their injuries would not be covered by workers' compensation. Nowhere in its brief, however, does the United States acknowledge *Taber*, the leading Second Circuit case explicating *Feres*. *See Taber*, 67 F.3d at 1029. There, the Second Circuit considered whether a Navy serviceman could recover under the FTCA for injuries from an automobile accident with another serviceman who had been drinking on base. *Id*. Analyzing the history and rationale of the *Feres* doctrine, the Second Circuit noted that the language of the *Feres* doctrine derives its words from state and federal workers' compensation statutes. *Id*. at 1038. These statutes typically bar tort suits against employers for injuries arising in the course of employment. *Id*.

As a result, the Second Circuit concluded that in determining whether *Feres* bars FTCA claims by service members, a court should ask whether the plaintiff acted within the scope of her military employment, and thus would be entitled to receive standard workers' compensation payments for her injury. *Id.* at 1050. If so, *Feres* bars recovery under the FTCA; but if not, then *Feres* is not a bar to suit. *Id.* Applying this test to the facts of *Taber*, the Second Circuit concluded that Taber's actions constituted a classic "frolic," behavior that is not properly part of the employer's enterprise. *Id.* Specifically, the accident occurred after working hours, while Taber was involved in recreational activity, and "[t]here is nothing characteristically military about an employee who, after working-hours are done, goes off to spend a romantic weekend with a companion." *Id.* at 1050-51. Because Taber's activity was not part of the military's enterprise, he would have been unable to recover under standard workers' compensation law. *Id.* As a result, *Feres* did not apply, and Taber could recover under the FTCA. *Id.* (reversing district court entry of summary judgment and remanding for further proceedings).

Thus, under the Second Circuit's *Taber* standard, if Ms. Doe's injury would not be covered by workers' compensation, this Court has jurisdiction to hear her FTCA claims.

### 1. Ms. Doe Was a Student, Not an Employee.

Under *Taber v. Maine*, this Court is empowered to hear Ms. Doe's FTCA claims because New York workers' compensation does not cover her injury. Workers' compensation law applies only to employees, not to unemployed students. N.Y. Workers' Comp. Law § 2(4) (McKinney 2013). While at West Point, Ms. Doe was a student much like any other American college student. She applied to West Point so that she could receive an education and attain meaningful employment upon graduation. Am. Compl. ¶¶ 9, 11. She declared a major, participated in sports, and was involved in many extracurricular activities. *Id.* ¶¶ 13-17. Ms. Doe lived in a dormitory

and ate meals in a dining hall.[2] *Id.* Unemployed students such as Ms. Doe are not employees for the purpose of workers' compensation. N.Y. Workers' Comp. Law § 2(4) (McKinney 2013).

Under New York's workers' compensation law, employers are liable only for injuries to their employees, defined as individuals engaging in certain occupations. *Id.* Students and trainees are not eligible for workers' compensation unless they qualify as employees under the statutory definition. *See Heredia v. United States*, 887 F. Supp. 77 (S.D.N.Y. 1995) (that injured passenger was Marine Corps poolee[3] enrolled in Marine Corps' delayed entry program did not render him "employee" for purposes of Federal Employees' Compensation Act); *Santigate v. Linsalata*, 759 N.Y.S.2d 100 (App. Div. 2003) (student teacher in public high school was not "employee" under workers' compensation statute).

In New York workers' compensation cases, to determine whether an employer-employee relationship exists, courts consider "the nature of the work performed, the furnishing of equipment and supplies, the method of payment, the right to schedule and control the work and the right to discharge." *Tully v. Live Right Realty Corp.*, 827 N.Y.S.2d 362, 363 (App. Div. 2007). The "nature of the work performed" and "the method of payment" are the two most relevant factors in Ms. Doe's case.

Ms. Doe did not perform any work for the military while a student at West Point,

---

[2] On its own website, West Point refers to cadets as "students." *See, e.g.*, U.S. Military Academy, About West Point, *available at* http://www.westpoint.edu/About/SitePages/Home.aspx (last visited October 16, 2013) ("Through the Senior Capstone experience, students draw upon and apply knowledge in their chosen majors as well as knowledge gained throughout the course of their studies.").

[3] A "poolee" is a member of the Marines Corps Delayed Entry Program (DEP). DEP allows young men and women to enlist in the Marine Corps, even though they may not begin recruit training for up to a year. The poolees develop a sense of camaraderie through family nights, training events, and other activities facilitated by their Marine recruiter. Arguably, a poolee is in a very similar professional position to a West Point cadet. *See, e.g., Service Options*, available at http://www.marines.com/eligibility/service-options/enlisted (last visited October 16, 2013).

however. *See* Am. Compl. She merely followed her academic pursuits and engaged in physical training. *Id*. Furthermore, because Ms. Doe was only a second-year cadet, she was farther removed from military employment. The Cadet Oath of Allegiance mandates that cadets repay the cost of their education if they drop out of West Point after the beginning of their third year, indicating that the cadets may become service members at this point, but not before.[4] *Id*. ¶ 76.

The "method of payment" factor further establishes that Ms. Doe was not an employee of the military. Compensation decisions uniformly exclude from the definition of "employee" workers who neither receive nor expect to receive pay for their services. Lex K. Larson, 3 Larson's Workers' Compensation § 65.01 (Matthew Bender, Rev. Ed.). Self-improvement or advancement, such as Ms. Doe's educational opportunities at West Point, do not constitute payment. *See Lance v. New Mexico Military Inst*., 70 N.M. 158 (1962) (army sergeant who volunteered to pilot coaches of military school to various locations, out of personal interest, was not employee of military school). Furthermore, one is not an employee if she receives no compensation "beyond reimbursement of expenses." Restatement (Third) of Emp't Law § 1.02 (2009). West Point did not pay Ms. Doe. *See* Am. Compl. ¶ 14. While the military covered the cost of her room, board, uniforms and books, Ms. Doe received no additional compensation beyond a small stipend for personal expenses. *Id*.

Because Ms. Doe performed no military work, nor received any compensation from West Point, she was not an employee for the purpose of receiving worker's compensation. Consequently, applying the standard set forth in *Taber*, the FTCA does not divest this Court of jurisdiction where Ms. Doe's injuries are not covered by workers' compensation law.

---

[4] *See* Greg Bishop, *Standing Ready to Play, If Allowed*, N.Y. Times, Oct. 1, 2013, at B13 ("The Capital Gazette … reported that *upperclassmen* cadets at Air Force were considered military personnel and would thus be subject to the same restrictions on travel" (emphasis added)).

### 2.   Ms. Doe Was Engaged in a "Frolic" at the Time of Her Assault.

Even assuming *arguendo* that Ms. Doe was an employee at the time of the assault, this Court still has jurisdiction over Ms. Doe's FTCA claims because Ms. Doe was engaged in a "frolic" at the time of the assault. Ms. Doe had left her dormitory after curfew with Mr. Smith and consumed some alcohol, violating several West Point rules. *Id.* ¶¶ 60-62. New York law establishes that employees who incur injuries while engaged in a "frolic" are not covered by workers' compensation law. *Bryan v. Bunis*, 203 N.Y.S. 634 (App. Div. 1924). Thus, even if Ms. Doe were an employee at the time of the assault, this Court can still adjudicate her claims.

New York's workers' compensation law requires employers to assume liability for their employees' "disability or death from injury arising out of and in the course of the employment." N.Y. Workers' Comp. Law § 2(4) (McKinney 2013); *see also Boles v. Dormer Giant, Inc*., 4 N.Y.3d 235, 238 (2005). Under the workers' compensation scheme, whether an activity is "within the course of employment" or purely personal depends upon whether the activity is both reasonable and sufficiently work related under the circumstances. *Knaub v. Realtime Bus. Sys. Inc*., 674 N.Y.S.2d 799 (App. Div. 1998). "[A]ctivities that are purely personal pursuits are not within the scope of employment and are not compensable under workers' compensation law." *Marotta v. Town & Country Elec., Inc*., 51 A.D.3d 1126, 1127 (N.Y. App. Div. 2008).

Similarly, New York law on *respondeat superior* establishes that, "An employee acts in the scope of his employment when he is doing something in furtherance of the duties he owes to his employer and where the employer is, or could be, exercising some control, directly or indirectly, over the employee's activities." *Hamm v. United States*, 439 F. Supp. 2d 262 (W.D.N.Y. 2006), *aff'd*, 483 F.3d 135 (2d Cir. 2007). An employer will be liable if his employee "was doing his master's work, no matter how irregularly, or with what disregard of instructions."

*Riviello v. Waldron*, 47 N.Y.2d 297, 302 (1979).

Respondeat superior law distinguishes between two scenarios — "detour" and "frolic" — to determine whether the employee was engaged in his master's work. An employee who is on a "detour," a minor deviation from his job, is deemed to be acting within the scope of employment. *Bryan v. Bunis*, 203 N.Y.S. 634 (App. Div. 1924) (chauffeur's half-mile diversion for lunch was detour, not frolic, because chauffeur was still carrying on master's business). On the other hand, an employee engaged in a "frolic," behavior that is not properly part of the employer's enterprise, does not act within the scope of employment. *Williams v. United States*, 183 F. App'x 125, 126 (2d Cir. 2006) (Army recruiter in car accident after night of drinking was on frolic because, under Vermont law of respondeat superior, his conduct "cannot be said to have been actuated by a purpose to serve his employer"); *see also Taber*, 67 F.3d at 1050-51 (Taber's actions were "classic frolic" because he was injured while visiting friend off-base, an activity not connected to his military employment).

Ms. Doe was engaged in a "frolic" at the time of her assault. Invited by Mr. Smith, Ms. Doe left her dormitory after curfew and went for a walk. Am. Compl. ¶ 60. Mr. Smith offered her alcohol, of which she consumed a small amount. *Id.* ¶ 61. West Point's rules forbid cadets from both leaving their dormitories after curfew and consuming alcohol on campus. *Id.* ¶ 60. Ms. Doe and Mr. Smith were in no way "doing the master's work," and their behavior fits the classic definition of "frolic." *See Riviello v. Waldron*, 47 N.Y.2d 297, 302 (1979); *see also D'Amico v. Christie*, 71 N.Y.2d 76, 88 (1987) (employee who injured plaintiffs while driving home from work intoxicated not acting within scope of employment). Furthermore, the Court of Appeals has repeatedly held that plaintiffs cannot recover for sexual assault under a theory of respondeat superior, because such conduct by definition cannot be in furtherance of the employer's

objectives. *N.X. v. Cabrini Med. Ctr.*, 97 N.Y.2d 247 (2002) (surgical resident's sexual assault of patient not in furtherance of business of hospital nor within scope of employment); *Judith M. v. Sisters of Charity Hosp.*, 93 N.Y.2d 932 (1999) (employee's alleged sexual abuse of patient constituted departure from his duties for solely personal motives, and thus could not support recovery under doctrine of respondeat superior).

Because Ms. Doe and Mr. Smith were not acting within the scope of their employment at the time of the rape, Ms. Doe could not recover under New York's workers' compensation law, the *Feres* bar does not apply, and this Court may hear her FTCA claims. *Taber*, 67 F.3d at 1050.

### B.  Ms. Doe's Rape Was Not Incident to Service.

The United States argues that *Feres* divests this Court of jurisdiction because Ms. Doe's rape was incident to military service. Defs.' Br. at 7. The Government is mistaken. Ms. Doe's rape was not incident to service under the five factor test elaborated by the Second Circuit in *Wake v. United States*.[5] 89 F.3d 53 (2d Cir. 1996). In particular, Ms. Doe's rape was not incident to her military service because at the time of the assault: 1) her status as a member of the military was at best questionable; 2) she was engaged in an activity that was unrelated to the military and which was not limited to military personnel; and 3) she was not enjoying a benefit that was conferred by her military service. *Id*. at 58. As a result, the *Feres* bar does not apply and this Court may exercise jurisdiction over Ms. Doe's FTCA claims.

### 1.  Ms. Doe's Status as a Member of the Military was Uncertain.

As Ms. Doe was a cadet at the time of the assault, her "status as a member of the military

---

[5] *Wake* was decided after *Taber*, but cannot overrule it, as one Second Circuit panel cannot overrule another. *See United States v. Moore*, 949 F.2d 68, 71 (2d Cir. 1991) ("prior opinions of a panel of this court are binding upon us in the absence of a change in the law by a higher authority or our own en banc proceeding"); *Finkel v. Stratton Corp.,* 962 F.2d 169, 174 (2d Cir.1992) (holding that "one panel of this court may not overrule the decision of a prior panel").

at the time of the incident" is at best questionable. At least one district court within the Second

Circuit has found that *Feres* does not bar service academy cadets from bringing FTCA claims.

*Fischer v. United States*, 451 F. Supp. 918 (E.D.N.Y. 1978) (*Feres* does not bar Air Force

Academy cadet's claims). Like the cadet plaintiff in *Fischer*, it is far from clear that Ms. Doe

satisfies the *Wake* factor of "status as a member of the military." *Wake*, 89 F.3d at 58.

The United States argues that cadets are members of the military for the purpose of the

*Feres* bar.[6] Defs.' Br. at 11. All except one of the cases cited by Defendants arose outside the

Second Circuit and thus were not subject to the interpretation of *Feres* set forth in *Taber v.

Maine*. In the one Second Circuit case, *Wake v. United States*, while the Second Circuit found

that an ROTC cadet was a member of the military, the Court emphasized the other four factors in

the "incident to service" test over the factor of military status. *Wake*, 89 F.3d at 59. The Court

stated that, "regardless of Wake's official military status," Wake was engaged in military activity

at the time of her injury. *Id*. Thus, whether or not Ms. Doe was a member of the military, her

rape was not "incident to service," because she does not satisfy the other *Wake* factors.

### 2.  Ms. Doe Was Engaged in an Activity Unrelated to Military Service.

Ms. Doe's activity at the time of her assault cannot plausibly satisfy the other factors in

the *Wake* "incident to service" test. At the time of her assault, Ms. Doe was going for a walk

after-hours and drinking with a friend. Am. Compl. ¶¶ 60-61. This activity is in no way related to

her membership in military service, nor is it an activity limited to military personnel. *Wake*, 89

F.3d at 58. Furthermore, Ms. Doe was not "enjoying a benefit conferred as a result of military

---

[6] The United States cites *Miller v. United States*, 42 F.3d 297, 301 (5th Cir. 1995); *Collins v. United States*, 642 F.2d 217, 218 (7th Cir. 1981); *Archer v. United States*, 217 F.2d 548, 552 (9th Cir. 1955); *Mentavlos v. Anderson*, 85 F. Supp. 2d 609, 622 (D.S.C. 2000); *Wake*, 89 F.3d at 58-59; *Morse v. West*, 975 F. Supp. 1379, 1382 (D. Colo. 1997), *aff'd*, 172 F.3d 63 (10th Cir. 1999) (unpublished table decision).

service." *Id*. Unlike the plaintiff in *Wake*, Ms. Doe's activity at the time of her injury was not

"necessitated by her desire to advance her military career." *Id.* at 59.

In other circuits, courts have recognized that injury suffered by service members when

off-duty and engaged in recreational activity is not "incident to service." *See Regan v. Starcraft*

*Marine, LLC*, 524 F.3d 627 (5th Cir. 2008) (injury not incident to military service for purposes

of *Feres* where service member off-duty on informal leave at time of incident, injury occurred at

military recreational facility forty-five miles from base, and service member engaged in purely

recreational activity); *Dreier v. United States*, 106 F.3d 844 (9th Cir. 1996) (where soldier fell

into on-base wastewater drainage channel after off-duty afternoon of relaxation and drinking,

injury not incident to military service for purpose of *Feres*); *Lutz v. Sec'y of Air Force*, 944 F.2d

1477, 1484 (9th Cir. 1991) (injury not "incident to service" when three subordinates had vendetta

against superior, broke into office, opened mail, and shared it so as to ruin her reputation).

The United States cannot avoid liability for Ms. Doe's injury merely by asserting that her

rape was "incident to service." Because Ms. Doe's injury does not satisfy the "incident to

service" test established by the Second Circuit, this Court has jurisdiction to hear her claims.

### C.  Military Discipline Concerns Do Not Oust This Court's Jurisdiction.

Concerns of judicial intrusion into military discipline do not preclude this Court from

exercising jurisdiction. *Cf.* Defs.' Br. at 11. However, in *Taber*, the Second Circuit explained that

while ordering injunctive relief could intrude upon military affairs, pure monetary relief under

the FTCA, such as that sought by Ms. Doe, does not. *Taber*, 67 F.3d at 1048. *See also United*

*States v. Johnson,* 481 U.S. 681, 700 (1987) (Scalia, J., dissenting, joined by Brennan, Marshall,

and Stevens, JJ.) (*Feres* doctrine not justified by deference to military decision-making, as such

deference is overcome when civilian brings FTCA claim against military tort-feasor and when

service member brings FTCA suit that is not "incident to service").

Furthermore, the Supreme Court has held that potential intrusion on military decision-making should not be used as a bar at the motion to dismiss phase. *See United States v. Stanley*, 483 U.S. 669, 682-83 (1987) ("A test for liability that depends on the extent to which particular suits would call into question military discipline and decisionmaking would itself require judicial inquiry into, and hence intrusion upon, military matters."). For these reasons, the military discipline rationale does not bar this Court from exercising jurisdiction over Ms. Doe's FTCA claims.

### D. The Discretionary Function Exception Does Not Preclude This Court from Hearing Ms. Doe's FTCA Claims.

The United States argues that even if *Feres* does not bar Ms. Doe's FTCA claims, the discretionary function exception divests this Court of its power to hear them. This assertion is incorrect. Defendants, in failing to implement an adequate sexual assault prevention and response program at West Point, violated mandatory Department of Defense directives.

It is Defendants who bear the burden of demonstrating that the discretionary function exception applies. *See, e.g.*, *King v. United States*, 491 F. Supp. 2d 286, 296 (D. Conn. 2007); *Cestonaro v. United States*, 211 F.3d 749, 756 n.5 (3d Cir. 2000); *Nat'l Union Fire Ins. v. United States*, 115 F.3d 1415, 1417 (9th Cir. 1997); 14 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 3658.1 (3d ed. 2010) (collecting cases). Defendants cannot insulate themselves from liability by merely stating in conclusory fashion that their conduct is discretionary and policy-based, as the United States has done here.

The Supreme Court has outlined a two-part test to determine whether the FTCA discretionary function exception applies. *United States v. Gaubert*, 499 U.S. 315 (1991). Defendants fail both parts of this test. First, the court must determine if the challenged conduct

"involved an element of judgment or choice," as the exception "covers only acts that are discretionary in nature." *Gaubert*, 499 U.S. at 322-23 (citations omitted); *see Berkovitz v. United States*, 486 U.S. 531, 536 (1988). Thus, if an "employee violates [a] mandatory regulation, there will be no shelter from liability because there is no room for choice and the action will be contrary to policy." *Gaubert*, 499 U.S. at 316. It is furthermore well established that a federal employee's conduct fails the first prong of *Gaubert* not only when it violates federal law or regulations, but also when it violates the internally established policies and directives of a federal agency. *See Gaubert*, 499 U.S. at 332; *see also Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474-77 (2d Cir. 2006) (considering whether prison official violated Bureau of Prisons Program Statement); *Bagner v. United States*, 428 F. Supp. 2d 101, 110-13 (N.D.N.Y. 2006) (holding United States had no discretion to violate Army Corps Of Engineers manual).

The United States fails to satisfy the first prong of the *Gaubert* test. It alleges that the decisions made by Defendants and other West Point officials concerning sexual assault policy were not "controlled by mandatory statutes or regulations." Defs.' Br. at 18. This argument is fundamentally incorrect. The directives issued by the Sexual Assault Prevention and Response (SAPR) Program of the Department of Defense are mandatory regulations promulgated pursuant to 10 U.S.C. § 113. *See* U.S. Dep't of Def. Dir. 6495.01, Sexual Assault Prevention and Response Program (21 Jan. 2012) [hereinafter DoDD 6495.01]; U.S. Dep't of Def. Instr. 6495.02, Sexual Assault Prevention and Response Program Procedures (28 Mar. 2013) [hereinafter DoDI 6495.02]. *See also* 32 C.F.R. § 103.5. These directives apply to the military service academies, just as they apply to other components of the military. *See* DoDD 6495.01 ("The Secretaries of the Military Departments *shall*: a. Establish departmental policies and procedures to implement the SAPR Program consistent with the provisions of this Directive and

Reference (c), to include the military academies within their cognizance." (emphasis added)). Defendants Hagenbeck and Rapp had no *discretion* whether to follow these mandatory directives and implement an adequate sexual assault prevention policy at a military service academy.

DoDD 6495.01 includes mandatory language that instructs Defendants how to implement the SAPR Program. The Directive states that "[c]ommand sexual assault awareness and prevention programs, as well as law enforcement and criminal justice procedures that enable persons to be held accountable for their actions, as appropriate, *shall* be established and supported by all commanders." *Id*. at 3 (emphasis added). Defendants violated this mandatory instruction by failing to punish perpetrators of sexual assault and failing to establish a program that would "enable persons to be held accountable for their actions." *Id.* The Directive further states that "[v]ictims of sexual assault *shall* be protected from coercion, retaliation, and reprisal," *id*. (emphasis added), and "[e]mergency care *shall* consist of emergency medical care and the offer of a sexual assault forensic examination (SAFE)," *id.* (emphasis added). Defendants created and tolerated a culture of gender violence at West Point in which cadets feared to report rapes and sexual assaults they experienced, Am. Compl. ¶¶ 71-73, in violation of Defendants' mandatory duty to protect Ms. Doe from coercion, retaliation, and reprisal. In addition, Defendants failed to ensure that victims received an offer of a sexual assault forensic examination. Am. Compl. ¶ 67. Ms. Doe received no offer of such an examination. *Id*. Defendants had no discretion to violate these mandatory directives.

Army Regulation 600-20 directed Defendants in their implementation of the Sexual Assault Review Board (SARB). U.S. Dep't of Army, Reg. 600-20, p. 102-103 (30 November 2009) [hereinafter AR 600-20]. Defendant Hagenbeck served as chair of this Board. AR 600-20 states, in mandatory language, that "the installation commander or designated representative *will*

chair the SARB and *will* … [i]mplement process improvements to ensure system accountability and an effective victim services program" and "ensure that the installation's multi-disciplinary sexual assault prevention and response service providers are receiving appropriate training and have the necessary resources to do the job." *Id*. at 102 (emphasis added). As chair of the SARB, Defendant Hagenbeck failed his mandatory obligations. Am. Compl. ¶¶ 35-45. He did not have discretion to follow or ignore this regulation.

The United States also fails the second prong of the *Gaubert* test, which requires the Court to determine whether Defendants' conduct is "based on considerations of public policy." *Berkovitz*, 486 U.S. at 537. This second prong is not met when an action is "not the kind of conduct that can be said to be grounded in the policy of the regulatory regime," even if relegated to the unbounded choice of an agent. *King*, 491 F. Supp. 2d at 297 (quoting *Gaubert*, 499 U.S. at 324-25); *Andrulonis v. United States*, 952 F.2d 652, 655 (2d Cir. 1991) ("There are obviously discretionary acts performed by a Government agent that are within the scope of his employment but not within the discretionary function exception because these acts cannot be said to be based on the purposes that the regulatory regime seeks to accomplish.").

Here, the United States has not even attempted to show that Defendants' flawed supervision and training decisions were meant to further any particular policy or policy objective. *See* Defs.' Br. at 18. Indeed, it cannot. Defendants' supervision and training decisions contravened DoD's stated policies and foreseeably led to constitutional violations. *Compare* Am. Compl. ¶¶ 35-45, *with* DoDD 6495.01 at 3, *and* AR 600-20 at 102.

In addition to failing both prongs of the *Gaubert* test, Defendants do not carry their burden of establishing that the discretionary function exemption applies to this case because the acts that form the basis of Ms. Doe's FTCA claims also give rise to causes of action that

sufficiently allege constitutional violations. It is a fundamental principle, repeatedly recognized by the courts, that federal agents lack discretion to violate the Constitution. *See Myers & Myers, Inc. v. U. S. Postal Serv.*, 527 F.2d 1252 (2d Cir. 1975); *see also Thames Shipyard & Repair Co. v. United States*, 350 F.3d 247, 254 (1st Cir. 2003) ("Courts have read the Supreme Court's discretionary function cases as denying protection to actions that are unauthorized because they are unconstitutional."); *Medina v. United States,* 259 F.3d 220, 225 (4th Cir. 2001); *El-Badrawi v. Dep't of Homeland Sec.*, 579 F. Supp. 2d 249, 275 (D. Conn. 2008) (denying motion to dismiss FTCA claims pursuant to discretionary function exemption because "[g]overnment agents never have the discretion to violate the Constitution"). The acts that form the basis of Ms. Doe's FTCA claims give rise to her *Bivens* causes of action, and thus the discretionary function exception does not apply.

### E.  Plaintiff's Negligent Supervision, Negligent Training, and Abuse of Process Claims Are Cognizable Under New York Law.

Defendants erroneously argue that this Court cannot adjudicate Ms. Doe's FTCA "negligent supervision and training … [claims] because those torts are not recognized under New York law." Defs.' Br. at 19. On the contrary, New York law provides that "[i]n instances where an employer cannot be held vicariously liable for its employee's torts, an employer can still be held liable under theories of negligent hiring, negligent retention, and negligent supervision." *Kenneth R. v. Roman Catholic Diocese of Brooklyn*, 229 A.D.2d 159 (N.Y. App. Div. 1997) (holding that plaintiffs stated negligent supervision claim against church whose priests sexually abused plaintiffs). That is, an employer can either be held liable under a theory of respondeat superior *or* negligent supervision and training. *Holland v. City of Poughkeepsie*, 90 A.D.3d 841 (N.Y. App. Div. 2011). Defendants do not contest that Ms. Doe adequately pled these claims. This Court has jurisdiction over Ms. Doe's claims based on the United States' negligent

supervision and training of cadets[7] and West Point staff members.

Moreover, Ms. Doe properly states an abuse of process claim. The United States contests only the first of this claim's "three essential elements [, which include] (1) regularly issued process, either civil or criminal, (2) an intent to do harm without excuse or justification, and (3) use of the process in a perverted manner to obtain a collateral objective." *Bright View Trading Co. v. Park*, No. 03 Civ. 2330 (HB), 2004 WL 2071976, at *6 (S.D.N.Y. Sept. 16, 2004); Defs.' Br. at 20. The "regularly issued process" of the first element is an action that "compel[s] performance or forbearance of prescribed act." *Bd. of Ed. of Farmingdale Union Free Sch. Dist. v. Farmingdale Classroom Teachers Ass'n, Local 1889, AFT AFL-CIO*, 38 N.Y.2d 397, 400 (1975) (issuance of harassing subpoenas states claim for abuse of process).

Contrary to the United States' arguments, Defs.' Br. at 16, Ms. Doe properly alleges that the process abused in the instant case was that of the United States' sexual assault complaint and reporting process. Am. Compl. ¶ 122. Like the subpoenas in *Farmingdale*, this process also compelled action, requiring cadets to participate in investigations, disclosures, and questioning. *Id.* ¶¶ 37, 70. The United States further used this reporting process and its authority over sexual assault victims to "conceal the true extent of the sexual violence at West Point, avoiding further investigation or review of their constitutionally deficient sexual assault policies … and attempting to maintain a favorable public image at West Point." *Id.* ¶ 123. Ms. Doe properly alleges the first element of abuse of process, and this claim should not be dismissed.

---

[7] In pleading these claims, Ms. Doe adheres to her contention that she was a student and not an employee. Negligent training and supervision claims are cognizable in the higher education context if the teacher or administrator voluntarily assumed a duty of care, *Heard v. City of New York*, 82 N.Y.2d 66, 71 (1993) (noting that "a duty may arise from negligent words or acts that induce reliance"), or when the injuries took place on the defendant's property, *see, e.g.*, *Guest v. Hansen*, No. 06 Civ. 0500 GLS/DRH, 2007 WL 4561104 (N.D.N.Y. Dec. 18, 2007) (recognizing that negligent supervision could be cognizable in college setting when defendant maintains dangerous conditions, like intoxicated guests, on its property).

## II.   THIS COURT HAS JURISDICTION OVER PLAINTIFF'S CONTRACT CLAIM UNDER THE LITTLE TUCKER ACT.

The United States contends that this Court does not have jurisdiction to consider Ms. Doe's claim for relief pursuant to the Little Tucker Act, 28 U.S.C. § 1346(a)(2). Defs.' Br. at 26. This is incorrect. Under the Little Tucker Act, the United States waives sovereign immunity for claims founded upon an express or implied contract with the United States. *See United States v. Testan*, 424 U.S. 392, 398 (1976); 28 U.S.C. §§ 1491(a)(1), 1346(a)(2); *see also United States v. Mitchell*, 463 U.S. 206, 212 (1983) ("the Tucker Act constitutes a waiver of sovereign immunity"). The only issues in dispute between the parties with regard to Ms. Doe's Little Tucker Act claim are the existence of consideration to support the contract and whether Ms. Doe's contractual claims are governed by statute such that they are not subject to enforcement through the Little Tucker Act.[8] Defs.' Br. 27-28. Ms. Doe has pleaded the elements necessary to show that she had a valid and judicially enforceable contract with the United States. Am. Compl. ¶¶ 102-04. Furthermore, and contrary to the assertion of the United States, Defs.' Br. at 27, a breach of contract is sufficient to establish jurisdiction under the Little Tucker Act; no additional money-mandating provision is required. *See, e.g.*, *Stovall v. United States*, 71 Fed. Cl. 696, 700 (2006). Accordingly, this Court has jurisdiction to adjudicate Ms. Doe's Little Tucker Act claim.[9]

### A.  The Oath of Allegiance Is a Valid Contract That the United States Breached.

Ms. Doe bases her Little Tucker Act claim on the Oath of Allegiance ("Contract"), a recoupment and educational contract that included all the traditional elements of a contract. *See*

---

[8] The government does not dispute that this Court has concurrent jurisdiction with the Court of Federal Claims over Ms. Doe's Little Tucker Act claim, on which she seeks damages of less than $10,000. Am. Compl. ¶ 108; 28 U.S.C. § 1346(a)(2).

[9] Defendants do not contend that *Feres* bars Plaintiff's Little Tucker Act claim.

*Express Indus. & Terminal Corp. v. New York State Dept. of Transp.*, 715 N.E.2d 1050, 1053

(N.Y. 1999) ("a binding contract [requires] … manifestation of mutual assent" for which "courts

look to the basic elements of the offer and the acceptance"); *see also Register.com, Inc. v. Verio,*

*Inc.*, 356 F.3d 393 (2d Cir. 2004) ("To form a valid contract under New York law, there must be

an offer, acceptance, consideration, mutual assent and intent to be bound.") (internal quotation

omitted). Ms. Doe entered into her contract with the United States "when she accepted West

Point's offer of admission … on June 30, 2008." Am. Compl. ¶ 11; *see also* Decl. of Christopher

Connolly, Defs.' Br. Ex. A. This Contract "committed Ms. Doe to serving in the Army for eight

years, including five on active duty. In consideration for this promise of service, Ms. Doe was to

receive her tuition, room, and board from West Point without charge." Am. Compl. ¶ 11; *see*

*also id.* ¶ 102. In the event that Ms. Doe failed to complete her service obligation, she would

have been required to "reimburse the United States" for the proportionate "ratio [of] the total

cost of advanced education." Contract § II(f), ECF No. 17-1; Am. Compl. ¶¶ 76, 103.

Defendants do not contest the existence of an offer, acceptance, or mutual assent. Defs.' Br. at

26-29. The only dispute between the parties concerns whether Ms. Doe has pled valid

consideration sufficient to survive a motion to dismiss. She has.

Ms. Doe adequately pled consideration because "[o]n its face, the [Contract] appears to

make reference to something that might well qualify as consideration." *Startech, Inc. v. VSA*

*Arts*, 126 F. Supp. 2d 234 (S.D.N.Y. 2000) (court should be "[m]indful of its duty to draw every

conceivable inference in favor of Plaintiff at this preliminary stage" and decline to dismiss claim

if contract could be interpreted to contain consideration). Valid consideration may "consist either

in some right, interest, profit, or benefit accruing to one party, or some forbearance, detriment,

loss, or responsibility given, suffered, or undertaken by the other." *Rector, Etc., of St. Mark's*

*Church v. Teed*, 120 N.Y. 583, 586 (1890) (internal quotation marks omitted).

The United States mistakenly contends that no consideration existed because the Contract "merely confirms Plaintiff's agreement to serve in the Army … [and] says nothing about the education benefits cadets are to receive." Defs.' Br. at 27. The Contract in fact promised that the United States would provide Ms. Doe with an "advanced education" as well as "the total cost of advanced education" in return for Ms. Doe's promise of military service. Contract at § II(f)-(g), ECF No. 17-1. Ms. Doe therefore "entered into this contract with a reasonable expectation of receiving educational benefits, tuition, room, and board from West Point in exchange for her promise of military service." Am. Compl. ¶ 102. Because the details of consideration are factual questions to be resolved at summary judgment unless "it is clear from the face of the pleading and the terms of the contract that a promise is gratuitous," *Startech*, 126 F. Supp. 2d at 236, the Court should deny the motion to dismiss on this ground.

The United States also argues that Ms. Doe failed to state a contract claim, Defs.' Br. at 28, but the United States nowhere disputes that it breached the implied covenant of good faith and fair dealing. "Implicit in all contracts is a covenant of good faith and fair dealing in the course of contract performance." *Dalton v. Educ. Testing Serv.*, 87 N.Y.2d 384, 389 (1995) (citation omitted). The covenant of good faith and fair dealing encompasses "any promises which a reasonable person in the position of the promisee would be justified in understanding were included," *id.* (citation omitted), including the obligation that "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract," *id.* (citation omitted).

Ms. Doe alleges that when she entered into the Contract with the United States, she reasonably expected to receive a proper education and financial assistance with her educational

expenses. Am. Compl. ¶¶ 102-07. The United States, however, acted in bad faith by creating an oppressive educational environment that was dangerous for women and sexual assault victims. *Id.* The United States' actions undermined Ms. Doe's safety and prevented her from receiving an adequate education as promised by the Contract. *Id.* Defendant does not contest that Ms. Doe adequately stated a breach of this implied covenant, and this Court has jurisdiction to decide Ms. Doe's claim on the merits.

### B.   The Contract Is a Recoupment and Educational Contract Governing Rights Not Established by Statute.

The Little Tucker Act grants this Court jurisdiction over Ms. Doe's contract claim despite the United States' assertions that cadets are federal appointees whose terms of employment are governed by statute rather than by contract. Defs.' Br. at 26-28. Ms. Doe's Tucker Act claim is based on contract provisions that are not mandated by statute, and courts have held nonstatutory contract provisions to be enforceable in similar cases. *See, e.g.*, *DeCrane v. United States*, 231 Ct. Cl. 951, 952 (1982) ("unequivocal[ly]" holding the court had jurisdiction to hear claims that United States breached plaintiffs' enlistment contracts by failing to provide promised training). Therefore, this Court retains jurisdiction to hear Ms. Doe's Little Tucker Act claims.

### 1.   The Provisions in the Contract Are Not Governed by Statutory Right.

The United States misstates the law when it argues that this Court is categorically barred from exercising Little Tucker Act jurisdiction over all military contract claims. Defs.' Br. at 27. The United States relies on inapposite cases involving claims for military pay and allowances, which are not at issue in this case. This Court has jurisdiction to hear service members' Little Tucker Act claims when their contracts do not involve military benefits or pay. *See, e.g.*, *DeCrane*, 231 Ct. Cl. at 951-52 (categorically rejecting "the government's argument that [courts]

have no jurisdiction over a suit claiming that the government breached an enlistment contract because it failed to provide the training it allegedly promised the serviceman he would receive").

Ms. Doe's claim is not governed by statutory right. Rather, 10 U.S.C. § 2005, which governs the power of the Secretary of the Army to enter into contracts concerning educational expenses and reimbursements, "provides that [t]he Secretary concerned *may* require, as a condition to the Secretary providing advanced education assistance to any person, that such person enter into a written agreement with the Secretary." *Id.* § 2005(a) (emphasis added). The legislative history demonstrates that this permissive statutory language "merely *authorizes* the Secretaries of the military departments … to enter contracts of the described kind and allows those *contracts to be enforced in the usual way.*" S. Rep. No. 96-850, at 9 (1980) (emphasis added). That is, when the United States and a cadet enter into a contract, "[t]he rights and obligations regarding an obligation to serve on active duty would then be determined under … the *contracts.*" *Id.* (emphasis added). Congress intended that 10 U.S.C. § 2005 would permit the armed forces to enter into enforceable educational and recoupment contracts with cadets, but that the contracting parties, not Congress by statute, would determine the scope of their rights and obligations. Thus, the Contract at issue in this case is subject to enforcement on its own terms, and not pursuant to "statutory right." *Bell v. United States*, 366 U.S. 393, 401 (1961).

Courts have enforced service members' contract claims based on promises of military education and training because these enlistment contracts do not involve military pay, retirement, or health benefits mandated by statute. For example, in *Grulke v. United States*, 228 Ct. Cl. 720, 722 (1981), the Court of Claims concluded that it had Tucker Act jurisdiction based on an enlistment contract that promised a service member specialty training. Because "[t]he plaintiff [was] not claiming any right to payment for military services rendered which would be governed

by statute or regulation, but for actual, compensatory, special and punitive damage for breach of contract," the Court of Claims' jurisdiction was appropriate. *Id.* at 722.

Similarly, in *DeCrane*, the Court of Claims held that it had jurisdiction over former service members' contract claims against the Army. 231 Ct. Cl. at 953. The plaintiffs signed reenlistment contracts that promised technical training, and the Court of Claims "rejected the government's argument that we have no jurisdiction over a suit claiming that the government breached an enlistment contract because it failed to provide the training it allegedly promised the serviceman he would receive." *Id.*; *see also id.* at 954 ("[I]t is high time that the government ended this fulsome endeavor and recognized that we have jurisdiction over these cases."). The Federal Circuit has forcefully confirmed the holdings of *Grulke* and *DeCrane*, emphasizing that "cases [that] do not involve military pay or retirement benefits … are not in conflict with established Supreme Court case law that military pay and pay-related benefits cannot ever be a matter of contract, but must be governed exclusively by statutes and regulations."[10] *Schism v. United States*, 316 F.3d 1259, 1275 (Fed. Cir. 2002); *see also Showalter v. Dep't of Army*, No. 01-1419, 2002 WL 77232 (Fed. Cir. Jan. 18, 2002) (Little Tucker Act jurisdiction over

---

[10] The United States makes the boilerplate argument that this Court lacks jurisdiction because Ms. Doe's claims "sound in tort." Defs.' Br. at 28-29. In *DeCrane*, the Court of Claims admonished the United States for advancing the identical argument, explaining that "[t]he government does not even recognize the unequivocal jurisdictional rulings in those cases [establishing jurisdiction over training and educational contracts]." 231 Ct. Cl. at 952. Like the plaintiffs in *DeCrane*, Ms. Doe alleges that the United States induced her into entering the Contract and then deprived her of her education and training. Am. Compl. ¶ 107. Because Plaintiff's Contract does not involve military pay, this Court has "unequivocal" jurisdiction. *DeCrane*, 231 Ct. Cl. at 952.

Even assuming, *arguendo*, that Ms. Doe "uses terminology appropriate for a tort claim," *Awad v. United States*, 301 F.3d 1367, 1372-74 (Fed. Cir. 2002), this Court retains jurisdiction because "[i]t is well established that where a tort claim stems from a breach of contract, the cause of action is ultimately one arising in contract, and thus is properly within the exclusive jurisdiction of the Court." *Id.* (plaintiff's tort claims arose "primarily from a contractual undertaking" and were within Court of Claims' Tucker Act jurisdiction).

"transportation" claims against Army proper in case involving recoupment contract unrelated to military employment and pay).

This Court may exercise Little Tucker Act jurisdiction over Ms. Doe's claim. As in *Grulke* and *DeCrane*, the United States' promise to provide Ms. Doe with advanced military training, education, and financial assistance was part of a bargained-for recruiting effort, and this Court may "enforce[] contract claims based on enlistment agreements specifying non-pay benefits promised in writing to recruits." *Schism*, 316 F.3d at 1275.

### 2. The United States Frequently Invokes Courts' Jurisdiction to Enforce Educational and Recoupment Contracts against Cadets.

The United States enforces the Contract's recoupment provisions against cadets. It would be fundamentally unfair for this Court to be divested of jurisdiction to hear Ms. Doe's claims pursuant to the same Contract. "Parties cannot accept benefits under a contract fairly made and at the same time question its validity." *Marshall v. Pittsford Cent. Sch. Dist.*, 100 A.D.3d 1498 (N.Y. App. Div. 2012) (internal citations and quotation marks omitted).

The United States regularly uses the courts' jurisdiction over military enlistment contracts to recoup tuition costs from former cadets. *See, e.g.*, *United States v. China*, CIV-A No. 3:05-3037, 2007 WL 775615 (D.S.C. March 18, 2007) (United States claimed officer breached her ROTC "Cadet Contract" by failing to maintain a 3.0 GPA in military science courses and former ROTC officer ordered to repay Army $32,000); *United States v. Chrzanowski*, 358 F. Supp. 2d 693 (N.D. Ill. 2005) (holding that United States stated contract claim for breach of "cadet contract" against former ROTC officer who withdrew from program); *O'Rourke v. Dep't of Air Force*, No. 3:04 Civ. 7228, 2005 WL 3088611 (N.D. Ohio May 31, 2005) (ordering repayment to Air Force upon United States claim that former officer breached her "scholarship agreement" by developing diabetes and becoming medically disqualified from service); *United*

29

*States v. Roetenberg*, No. Civ.A. 01–6247, 2002 WL 32351113 (E.D. Pa. Aug. 2, 2002) (ordering former ROTC participant to repay $80,000 after general discharge, upon United States claim for breach of her "ROTC contract"). The United States cannot repeatedly sue to enforce its educational contracts and then repudiate its own contractual obligations in the instant litigation. This Court should reject the United States' efforts to evade its contractual obligations to Ms. Doe.

### C.  Money-Mandating Provisions Are Not Required for the Court to Exercise Jurisdiction over Plaintiff's Little Tucker Act Claim.

Contrary to the United States' contention, Defs.' Br. at 27, "[t]here is no generic requirement under the Tucker Act that contracts must include specific language indicating that damages will be paid upon a breach." *Stovall v. United States*, 71 Fed. Cl. 696, 700 (Fed. Cl. 2006) (denying United States motion to dismiss Tucker Act claim on ground that plaintiff's contract with Farm Service Agency lacked money-mandating provision). A contract need not contain a money-mandating provision for a court to adjudicate a claim on the merits "because for the wide majority of contracts, this requirement is met by a simple presumption—that damages will be available upon a breach." *Id.*

That "damages are always the default remedy for breach of contract," *United States v. Winstar Corp.*, 518 U.S. 839, 885 (1996), is a settled principle, and it is a "presumption [that] extends to contracts with the government just as it does to contracts between private parties," *Speed v. United States*, 97 Fed. Cl. 58, 65 (2011); *see also D'Andrea Bros. LLC v. United States*, 96 Fed. Cl. 205, 215 (2010) (holding that "the ordinary presumption of the availability of money damages applie[d]" to plaintiff's research and development contract with Army); *Mastrolia v. United States*, 91 Fed. Cl. 369 (2010) (even absent express damages provision, "monetary damages are the default remedy for breach of contract under the Tucker Act").

Moreover, courts have consistently rejected "the government's view … [that] these basic principles of contract law lose their force when jurisdiction is predicated upon the Tucker Act." *Speed*, 97 Fed. Cl. at 65. The United States is incorrect that "a plaintiff bringing a Little Tucker Act claim must identify a … contractual provision providing for payment of money damages for a breach," Defs.' Br. at 26 (citing *Testan*, 424 U.S. at 392, and *United States v. Mitchell*, 463 U.S. 206 (1983)). The precedent cited by the United States "notably exclude[ed] contract claims from its subsequent iterations of the money-mandating requirement respecting Tucker Act jurisdiction." *Speed*, 97 Fed. Cl. at 66. *Testan* applied the "mandating compensation" requirement to federal statutes but distinguished claims that "rest … upon a contract." *Testan*, 424 U.S. at 400. Similarly, in *Mitchell*, the Supreme Court exempted contracts from the "mandating compensation" requirement, which apply only to "[a]cts of Congress and executive department regulations." 463 U.S. at 219. In fact, *Testan* and *Mitchell* "are consistent with this view" that a money-mandating provision is not required for Tucker Act jurisdiction over contract claims.[11] *Stovall*, 71 Fed. Cl. at 700. The absence of a money-mandating provision in the Contract does not divest this Court of jurisdiction to hear Ms. Doe's Little Tucker Act claim.[12]

---

[11] The government also relies on an unpublished Tenth Circuit case, *Gonzalez v. U.S. Air Force*, 88 F. App'x 371 (10th Cir. 2004), *see* Defs.' Br. at 27, which is of course not binding, even in that circuit. *Gonzalez*, 88 F. App'x at 372 n.* ("This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel."). In Tucker Act cases, this Court is bound by decisions of the Federal Circuit, which has "exclusive jurisdiction … of an appeal from a final decision of a district court of the United States … based, in whole or in part, on section 1346 of this title [including Little Tucker Act]." 28 U.S.C. § 1295(a)(2). Furthermore, in *Gonzalez*, the plaintiff based her Tucker Act claim on an implied contract that incorporated "Air Force regulations." *Gonzalez*, 88 F. App'x. at 377. Because the regulation lacked a money-mandating provision, no Tucker Act jurisdiction existed. *Id.* Here, Ms. Doe bases her Tucker Act claim on the express Contract, which is presumed to allow for damages in case of a breach.

[12] This Court's jurisdiction to hear Ms. Doe's Little Tucker Act claim is further confirmed by the fact that the United States does not contest that it contracted with Ms. Doe in its proprietary capacity. The United States waives sovereign immunity for proprietary contract cases. *See Awad*

## III.    THIS COURT HAS JURISDICTION OVER PLAINTIFF'S *BIVENS* CLAIMS

Defendants suggest that the *Feres* doctrine likewise bars this Court from hearing Ms.

Doe's constitutional claims. Defs.' Br. at 9. Defendants also contend that Ms. Doe failed to

properly plead supervisory liability for her constitutional injuries, Defs.' Br. at 22-24, and that

Defendants Hagenbeck and Rapp are entitled to qualified immunity, Defs.' Br. at 20.[13]

Defendants are mistaken. First, for the same reasons that *Feres* does not bar Ms. Doe's FTCA

claims, it does not impair this Court's ability to exercise jurisdiction over her constitutional

---

*v. United States*, 61 Fed. Cl. 281, 284 (Fed. Cl. 2004) (courts retain "jurisdiction over most proprietary contracts, but generally do[] not have jurisdiction over contracts the government makes in its sovereign capacity"). The Tucker Act is also a specific "waiver of immunity," and therefore "[i]f a claim falls within the terms of the Tucker Act, the United States has presumptively consented to suit." *United States v. Mitchell*, 463 U.S. at 212, 216. On the whole, sovereign contracts are a "narrow exception" to the normal state of affairs: that the United States consents to liability and thus grants courts jurisdiction to hear claims related to the contracts it forms. *Awad*, 61 Fed. Cl. at 284.

The contract entered into by Ms. Doe and the United States falls within the broad "proprietary realm," which "includes … any … agreement undertaken by the Federal government that has a private analogue, that is, categorically of the sort that can be executed among private entities and individuals." *Stovall*, 71 Fed. Cl. at 699. Ms. Doe's contract with the United States has private analogues in which an organization incentivizes a type of service (before or after graduation) with a promise to provide education or scholarship assistance. Athletic scholarship contracts are one example. *See, e.g.*, *Ross v. Creighton Univ.*, 957 F.2d 410 (7th Cir. 1992) (vacating dismissal of breach of contact action where plaintiff-athlete's "allegations fairly allege that [the private university] agreed, in exchange for [the plaintiff's] promise to play on its basketball team, to allow him an opportunity to participate, in a meaningful way, in the academic program of the University"); *Hall v. Nat'l Collegiate Athletic Ass'n*, 985 F. Supp. 782, 797-98 (N.D. Ill. 1997) (agreement between university and scholarship student-athlete was contract). That the contract between Ms. Doe and the United States involved the provision of military service does not distinguish this case from the athletic scholarship cases. "[It] is not sufficient to trigger the sovereign act defense" that a given contract relates to the actions of the military or foreign affairs. *Juda v. United States*, 6 Ct. Cl. 441, 454 (1984). While operating military and defense programs, "the United States customarily enters a multitude of valid contracts that are subject to court review." *Id.* Thus, while creating and possessing military force might be a sovereign program, the United States government's attempts to incentivize the service of Ms. Doe through the contract at issue is proprietary action.

[13] Defendants nowhere contest that Ms. Doe has properly pleaded that she suffered a deprivation of her Fifth Amendment rights when she was raped, nor that such a deprivation may be the basis of *Bivens* liability.

claims. Second, even under *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), Ms. Doe has stated a

sufficient claim that Defendants Hagenbeck and Rapp can be liable as supervisors and as

individual actors for depriving her of her clearly established constitutional rights.

Nor should this Court follow several recent decisions cited by Defendants in which courts

have dismissed *Bivens* claims arising from military sexual assault. *See* Defs.' Br. at 13-14 (citing

cases). Neither *Cioca v. Rumsfeld*, 720 F.3d 505 (4th Cir. 2013) nor *Klay v. Panetta*, 924 F.

Supp. 2d 8 (D.D.C. 2013), *appeal docketed*, No. 13-5081 (D.C. Cir. March 14, 2013), involved

cadets at a service academy, and both cases arose outside the Second Circuit, where the workers'

compensation analysis of *Taber v. Maine*, 67 F.3d 1029 (2d Cir. 1995) is inapplicable. Finally,

*Marquet v. Gates* did involve a cadet and arose in the Second Circuit, but in that case the

government's briefing failed to mention the *Taber* decision to Judge Carter, who never addressed

*Taber*'s workers' compensation analysis of the *Feres* doctrine. *See* No. 12 Civ. 3117

(ALC)(MHD) (S.D.N.Y. Sept. 11, 2013).[14]

### A. Defendants Hagenbeck and Rapp Are Liable As Supervisors for the Violations of Ms. Doe's Constitutional Rights.

Defendants assert that Ms. Doe has failed to plead sufficient facts regarding their

personal involvement in the deprivation of Ms. Doe's constitutional rights. Defendants are

wrong. Plaintiff's allegations go far beyond mere "knowledge and acquiescence" to

unconstitutional conduct, as Defendants' suggest. Defs.' Br. at 23. Specifically, Ms. Doe alleges

that the Defendants: (1) created and furthered customs and policies under which the

unconstitutional practices occurred, and (2) failed to train Robert Smith and other cadets, faculty,

---

[14] Defendants also incorrectly assert that declaratory relief is unavailable in *Bivens* actions. Defs.' Br. at 17. The "[a]vailability of federal equitable relief to remedy constitutional violations has been presumed by the courts." *Jensen v. Farrell Lines, Inc.*, 625 F.2d 379, 383-84 (2d Cir. 1980) (citing *Bivens* and explaining that the district "court correctly held that a cause of action existed for both declaratory and injunctive relief" for constitutional claims).

administrators, and staff about sexual assault, misogynistic cultural practices, and the hiring and admission of women.

Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics, 403 U.S. 388, 395-97 (1971), holds that federal officials may be liable for money damages for violations of individuals' constitutional rights. Supervisors are liable for constitutional harms committed by subordinates where the supervisors were personally involved in the deprivation. See Scott v. Fischer, 616 F.3d 100, 110 (2d Cir. 2010); Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995).

In Colon, the Second Circuit held that a supervisor is liable for constitutional torts committed by inferior officials if he "created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, … [or] was grossly negligent in supervising subordinates who committed the wrongful acts." 58 F.3d at 873. Subsequently, the Supreme Court clarified the standards for supervisory liability in Bivens cases. Ashcroft v. Iqbal, 556 U.S. 662 (2009). Since Iqbal, the Second Circuit and many district courts have held that the creation of a policy or custom continues to be a basis for claims against defendant-supervisors after Iqbal. See Scott, 616 F.3d at 110 ("[t]he personal involvement of a supervisory defendant may be shown by evidence that … the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom"); Diaz-Bernal v. Myers, 758 F. Supp. 2d 106, 130 (D. Conn. 2010); Bellamy v. Mount Vernon Hosp., 07 Civ. 1801, 2009 WL 1835939, at *6 (S.D.N.Y. June 26, 2009) (creation of policy or custom pursuant to which constitutional violation occurred "pass[es] Iqbal's muster"). Ms. Doe's pleadings satisfy the requirements of Scott because she alleges that Defendants Hagenbeck and Rapp actually created West Point's policies and customs regarding sexual assault and the treatment of women.

Defendants Hagenbeck and Rapp shared responsibility for West Point's sexual assault response policies and customs. Am. Compl. ¶ 34. Defendants implemented training and education programs on sexual assault and harassment. *Id.* ¶ 40. Defendants set policies for the punishment of cadet perpetrators of sexual assault and approved the mild punishments given to many such perpetrators. *Id.* ¶¶ 35-38. Defendants also condoned and contributed to a misogynistic culture at West Point that pervaded every aspect of campus life. *Id.* ¶¶ 22-32. Sexual aggression was manifested in cadets' marching chants as part of official team-building exercises, *id.* ¶¶ 25-27, and in everyday campus slang, *id.* ¶¶ 28-29. These policies and customs communicated to Robert Smith and other male cadets that they were at liberty to harass and assault their female peers without risk of punishment, *id.* ¶ 92, and caused Smith to rape Ms. Doe.

Defendants' failure to train Robert Smith is also a form of personal involvement that is sufficient for supervisory liability after *Iqbal*. Like the creation of a policy or custom, "a failure to train can be an active violation on the part of a supervisor who has willfully chosen to allow the harm resulting from a lack of training." *Diaz-Bernal*, 758 F. Supp. 2d at 132 (denying motion to dismiss *Bivens* claims against supervisory immigration officials, in suit challenging conduct of large-scale immigration raid). Defendants' personal involvement in the deprivation of Ms. Doe's constitutional rights "can be shown by nonfeasance as well as misfeasance." *D'Olimpio v. Crisafi*, 718 F. Supp. 2d 340, 347 (S.D.N.Y. 2010). In the instant case, defendants' willful failure to train Robert Smith and other male cadets amounted to an "active violation" of Ms. Doe's constitutional rights. *Diaz-Bernal*, 758 F. Supp. 2d at 132.

Defendants knew from Department of Defense studies that West Point cadets were suffering an increasing number of sexual assaults and episodes of unwanted sexual conduct. Am.

Compl. ¶¶ 48-49. Yet in 2009-10, the year the assault occurred, Defendants' sexual assault training for first- and second-year cadets consisted of just four hours of "Respect" training, only some of which pertained directly to sexual assault. *Id*. ¶ 41. The trainings themselves communicated that sexual assault prevention was a woman's responsibility in the face of natural and inevitable sexual aggression from her male peers. *Id*. ¶ 43. The content of the training programs reinforced West Point's culture of sexual aggression and misogyny, which the Defendants created. *Id*. ¶¶ 22-32. By this inadequate training, Defendants Hagenbeck and Rapp caused Cadet Robert Smith to believe that he could commit sexual assault without consequences and thereby violated Ms. Doe's Fifth Amendment rights.

It is not unreasonable, as Defendants suggest, that Ms. Doe's complaints make similar allegations against both defendants. Defs.' Br. at 24-25. As the superintendent and commandant of cadets, respectively, Defendants shared responsibility for West Point's sexual assault policies, and both participated in the creation of those policies and customs. It is natural that Ms. Doe's complaint would contain overlapping allegations against Defendants Hagenbeck and Rapp, as they occupied similar positions of authority vis-à-vis West Point's sexual assault response programs. The cases cited by Defendants for the proposition that complaints should not make similar claims against multiple defendants involve more defendants than the two in the instant case. *See Arar v. Ashcroft*, 585 F.3d 559 (2d Cir. 2009) (eighteen defendants, including Attorney General and Secretary of Homeland Security); *Atuahene v. City of Hartford*, 10 Fed. App'x 33 (2d Cir. 2001) (five named defendants and multiple unnamed defendants). Ms. Doe's allegations are sufficient to permit this court to draw "the reasonable inference" that Defendants Hagenbeck and Rapp are liable for the injuries suffered by Plaintiff. *Iqbal*, 556 U.S. at 678. At this stage of the litigation, Ms. Doe does not have full and detailed information about the respective roles of

each individual defendant in the constitutional violation she suffered. Nevertheless, Ms. Doe has pleaded sufficient facts to state a plausible claim for relief and "unlock the doors of discovery" regarding Defendants' serious misconduct. *Id.* at 679.

Defendants are not, as they suggest, entitled to qualified immunity on Ms. Doe's supervisory liability claims. *See* Defs.' Br. at 25-26. Qualified immunity is designed to "strike[] a balance between compensating those who have been injured by official conduct and protecting government's ability to perform its traditional functions." *Wyatt v. Cole*, 504 U.S. 158, 167 (1992). Thus, qualified immunity is not available to government officials where, as here, the plaintiff has sufficiently alleged a violation of a constitutional right, and where that right was "clearly established" at the time of the alleged misconduct. *See Pearson v. Callahan*, 555 U.S. 223, 231 (2009). The Second Circuit has explained that "[a] right is clearly established if (1) the law is defined with reasonable clarity, (2) the Supreme Court or the Second Circuit has recognized the right, and (3) a reasonable defendant [would] have understood from the existing law that [his] conduct was unlawful." *Anderson v. Recore*, 317 F.3d 194, 197 (2d Cir. 2003) (alterations in original). In addition, the Second Circuit has held that "both the law allegedly violated by the subordinate and the supervisory liability doctrine under which the plaintiff seeks to hold the supervisor liable must be clearly established." *Poe v. Leonard*, 282 F.3d 123, 126 (2d Cir. 2002).

It is clearly established that a sexual assault constitutes a deprivation of due process. Substantive due process includes a "right to bodily integrity free from unjustifiable government interference." *Lombardi v. Whitman*, 485 F.3d 73, 78–79 (2d Cir. 2007); *accord Ingraham v. Wright,* 430 U.S. 651, 673 (1977) (Due Process Clause protects "right to be free from … unjustified intrusions on personal security"); *see also Pabon v. Wright*, 459 F.3d 241, 253 (2d

Cir. 2006) (describing the right to bodily integrity). Many courts have recognized sexual assault as a violation of the right to bodily integrity that "shocks the conscience." *See, e.g.*, *United States v. Lanier*, 520 U.S. 259 (1997); *United States v. Giordano*, 442 F.3d 30, 47 (2d Cir. 2006); *Jones v. Wellham*, 104 F.3d 620, 628 (4th Cir. 1997); *Doe v. Taylor Ind. Sch. Dist.*, 15 F.3d 443 (5th Cir. 1994); *Romero v. City of New York*, 839 F. Supp. 2d 588, 626 (E.D.N.Y. 2012). In *Giordano* in 2006, then-Judge Sotomayor concluded that a mayor who had sexually abused several girls could be held criminally liable under 18 U.S.C. § 242 for depriving the girls of their constitutional right to bodily integrity. 442 F.3d at 47. By 2010, when Ms. Doe was raped, Defendants reasonably should have known that the many cadets raped at West Point had been deprived of a constitutional right to bodily integrity.

Furthermore, supervisory liability under the *Colon* theories that Plaintiff has set forth was clearly established when the assault took place in May 2010. The *Colon* grounds were clearly established in the Second Circuit for fifteen years before the assault. *See Colon*, 58 F.3d at 873. During that period, courts in the Second Circuit routinely denied qualified immunity to defendants who created policies under which constitutional violations occurred, *see, e.g.*, *Brock v. Wright*, 315 F.3d 158 (2d Cir. 2003) (vacating in part order granting summary judgment for supervisory defendant and finding that supervisory liability may lie "where unconstitutional acts are the result of a policy promulgated by the defendant"), and to defendants who failed to train or supervise subordinates who went on to commit constitutional torts, *see, e.g.*, *Poe v. Leonard*, 282 F.3d 123, 140 (2d Cir. 2002).

While *Iqbal* may have clarified some of the other *Colon* grounds for liability after 2009, even the broadest readings of *Iqbal* in the Second Circuit acknowledge that supervisors clearly remain liable for the consequences of the policies that they create. *See Bellamy v. Mount Vernon*

*Hosp.*, 2009 WL 1835939, at *6. Defendants Hagenbeck and Rapp were on notice that they would be liable for the constitutional injuries that they inflicted on Ms. Doe through the policies and trainings that they created at West Point.

### B.   Defendants Hagenbeck and Rapp Are Liable for Creating the Danger that Mr. Smith Would Rape Ms. Doe and for Failing to Protect Her.

Defendants Hagenbeck and Rapp are also personally liable for violations of Ms. Doe's due process rights under the Second Circuit's state-created danger rule. "State-created danger" liability exists where government "officials communicate to a private person that he or she will not be arrested, punished, or otherwise interfered with while engaging in misconduct that is likely to endanger the life, liberty or property of others." *Pena v. DePrisco*, 432 F.3d 98, 111 (2d Cir. 2005) (holding that police officers' implicit sanction of alcohol abuse by fellow officer violated pedestrians' substantive due process rights); *see also Okin v. Village of Cornwall-On-Hudson Police Dep't*, 577 F.3d 415, 432 (2d Cir. 2009) (reversing grant of summary judgment on *Bivens* claims against police officers whose conduct implicitly sanctioned domestic violence against plaintiff); *Dwares v. City of New York*, 985 F.2d 94, 96-97 (2d Cir. 1993) (reversing dismissal of § 1983 claims against police officers whose refusal to protect plaintiff made him more vulnerable to assault). Officials need not communicate their approval explicitly. Liability exists where officials only implicitly condone the perpetrator's behavior and indicate to him that he would not be disciplined for his conduct. *Pena*, 432 F.3d at 112.

Defendants' actions in condoning sexual assault at West Point are analogous to the conduct of the defendants in *Okin*, which concerned a substantive due process claim by a domestic violence survivor whose repeated calls to police never resulted in an arrest of her abusive partner. *Okin*, 577 F.3d at 427. The Second Circuit held that police department officials could be held liable for the plaintiff's injuries because their actions "plainly transmitted the

message that what [her abusive partner] did was permissible." *Id.* at 430. "The implied message of [the officers'] conduct" led directly to the additional violence suffered by the plaintiff in *Okin*. Like the *Okin* police officers, Defendants Hagenback and Rapp were well aware of the high rates of sexual assaults committed by West Point cadets each year. Am. Compl. ¶¶ 36, 48-50. Yet they continued to issue grossly inadequate punishments for sexual assault and sexual harassment and tolerate and promote misogynistic culture. *Id.* ¶¶ 37-38. This communicated to male cadets, including Robert Smith, that they could "sexually assault their female colleagues with near impunity." *Id*. ¶ 39. West Point's sexual assault training, which was overseen by the Defendants, also communicated that sexual assault prevention was the responsibility of women, and that men could make sexually aggressive advances to female cadets with no consequences. *Id*. ¶¶ 43, 45. Defendants Hagenbeck and Rapp thus created the danger that Smith would — as he did on the night of May 8, 2010, *id*. ¶ 62 — violently rape and assault Ms. Doe, in violation of her Fifth Amendment rights.

*Bivens* liability under a state-created danger theory was clearly established at the time of the assault. In 2008, two years before Mr. Smith raped Ms. Doe, the Second Circuit concluded that police officers were not entitled to qualified immunity for their failure to respond to previous incidents of domestic abuse. *Okin*, 577 F.3d at 434-437. The court held that *Dwares* and *Pena* gave sufficient notice of the rule that a government official "can violate a person's due process rights by affirmatively creating or increasing the risk of private violence against that person." *Id.* at 434. "The prohibition on official sanction of intentional violence applies" to the conduct of Defendants Hagenbeck and Rapp no less than it did to the defendants in *Okin*, *Pena*, and *Dwares*. *Okin*, 577 F.3d at 435. *See also Hope v. Pelzer*, 536 U.S. 730, 741 (2002) ("[O]fficials can still be on notice that their conduct violates established law even in novel factual

circumstances.").

Defendants are also personally liable for failing to protect Ms. Doe because their relationship with her involved "affirmative duties of care and protection." *See DeShaney v. Winnebago Cty. Dept. of Soc. Services*, 489 U.S. 189, 195-96 (1989). Such a duty arises when government officials "restrict the individual's freedom in some manner." *Lombardi v. Whitman*, 485 F.3d 73, 79 n.3 (2d Cir. 2007). Defendants restricted Ms. Doe's freedom, as well as that of other West Point cadets, by preventing her from leaving campus except in limited circumstances and with permission. *See* Am. Compl. ¶ 53. Unlike ordinary schoolchildren, who are under the primary protection of their parents, *see Crispim v. Athanson*, 275 F. Supp. 2d 240, 246-47 (D. Conn. 2003) (no constitutional duty to protect schoolchildren whose parents bear primary responsibility for their care), West Point assumes responsibility for the needs of its cadets, including education, room and board. *Id.* ¶ 11. Under those circumstances, Defendants had a special constitutional duty to protect Ms. Doe and other female cadets from assault by their fellow cadets. *See Pagano by Pagano v. Massapequa Pub. Sch.*, 714 F. Supp. 641, 643 (E.D.N.Y. 1989) (defendants' failure to stop student-on-student assaults could violate constitution under special relationship theory). Defendants breached their special duty of protection towards Ms. Doe by failing to punish perpetrators of assault, *see id.* ¶¶ 33-50, and cultivating a misogynistic and violent culture among West Point cadets, *see id.* ¶¶ 22-32.

Defendants were on notice that they had a constitutional duty to protect Ms. Doe. The Supreme Court recognized in 1989 that state officials may have "affirmative duties of care and protection with respect to particular individuals." *DeShaney*, 489 U.S. at 198. In the Second Circuit, it has long been clear that government officials will be liable for constitutional violations suffered by those in their charge. *See Lombardi*, 485 F.3d at 79 n.3 (describing special

relationships arising when government restricts individual's freedom); *Doe v. N.Y.C. Dep't of Soc. Servs.*, 649 F.2d 134, 141 (2d Cir. 1981) (holding that state is liable under Due Process Clause for abuse suffered by child in foster care, and emphasizing custodial nature of foster care placement). Defendants Hagenbeck and Rapp knew that Ms. Doe, as a cadet, was subject to strict military discipline that restrained her movement and limited her ability to escape from the hostile environment she found at West Point. Am. Compl. ¶ 53. On that basis, Defendants should have known that their willful failure to protect Ms. Doe and other female cadets from sexual assault would rise to the level of a constitutional violation.

As set out above, Ms. Doe has properly pleaded *Bivens* allegations against Defendants Hagenbeck and Rapp. Defendants were personally involved in misconduct that deprived Ms. Doe of her Fifth Amendment rights, and Defendants were on notice at the time of the rape that they would be liable for their misconduct. This Court has jurisdiction to hear Ms. Doe's claims of constitutional violation.[15]

---

[15] Defendants incorrectly suggest that Ms. Doe has other avenues of relief available to her, including remedies under the Uniform Code of Military Justice, Administrative Procedure Act, and the Army Board for Correction of Military Records. *See* Defs.' Br. at 16. None of those avenues offer Ms. Doe relief for the brutal rape she endured as a result of Defendants' policies, customs, and failure to train or supervise their subordinates.

## **CONCLUSION**

For the foregoing reasons, Ms. Doe respectfully requests that this Court deny the

Defendants' motion to dismiss.

                                           Respectfully submitted,

                                                /s/

                                          Michael Wishnie, MW1952
                                          Veterans Legal Services Clinic
                                          Jerome N. Frank Legal Services Org.
                                          Yale Law School
                                          P.O. Box 209090
                                        New Haven, CT  06520-9090
                                          Tel.: (203) 436-4780
                                          Fax: (203) 432-1426

On the brief:
Chelsea Kelly, Law Student Intern
Jessica Marsden, Law Student Intern
Virginia McCalmont, Law Student Intern
Lisa Wang, Law Student Intern

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on October 16, 2013, a copy of the foregoing Plaintiff's

Memorandum of Law in Opposition to Motion to Dismiss the Amended Complaint was filed

electronically. Notice of this filing was sent by email to all parties by operation of the Court's

electronic filing system. Parties may access this filing through the Court's CM/ECF System.


By:     ____/s/_____
        Michael J. Wishnie