DcgQdoeC

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  JANE DOE

4              Plaintiff

5        v.                          13 CV 2802 (AKH)

6  1,2,3, UNITED STATES OF
   AMERICA, LT. GEN. FRANKLIN LEE
7  HAGENBECK, BRIG. GEN. WILLIAM
   E. RAPP,
8
              Defendants
9
   ------------------------------x
10                                New York, N.Y.
                                  December 16, 2013
11                                3:00 p.m.

12 Before:

13              HON. ALVIN K. HELLERSTEIN

14                                District Judge

15                    APPEARANCES

16 JEROME N. FRANK LEGAL SERVICES ORGANIZATION
        Attorneys for Plaintiff
17 MICHAEL WISHNIE
   CHELSEA KELLY
18 JESSICA MARSDEN
   LISA WANG
19 MARGARET MIDDLETON

20 UNITED STATES ATTORNEYS OFFICE
   SOUTHERN DISTRICT OF NEW YORK
21      Attorney for Defendant
   CHRISTOPHER CONNOLLY

22

23

24

25

DcgQdoeC

```
 1              (In open court; case called)
 2              THE COURT:  We have some preliminary matters to take
 3    care of in the Houston case.  So I have signed the orders
 4    admitting students to argue, and I will file that.  Margaret
 5    Middleton?
 6              MS. MIDDLETON:  Yes, your Honor.
 7              THE COURT:  Are you Ms. Middleton?
 8              MS. MIDDLETON:  I am.
 9              THE COURT:  You would like to be a member of this
10    Court.  You have an outstanding record.  You clerked for Janet
11    Hall, my colleague, who is a wonderful lady and a wonderful
12    wife and mother, and a wonderful judge.  You must have had an
13    extraordinary time.
14              MS. MIDDLETON:  I did, your Honor.
15              THE COURT:  Give her my regards.
16              MS. MIDDLETON:  I will.
17              THE COURT:  You are being proposed by --
18              MS. MIDDLETON:  Professor Wishnie.
19              THE COURT:  Mr. Wishnie, how are you?
20              MR. WISHNIE:  I'm fine.  How are you, Judge?
21              THE COURT:  You vouch for Ms. Middleton?
22              MR. WISHNIE:  I do, your Honor.
23              THE COURT:  You think she is an extraordinary person?
24              MR. WISHNIE:  Very much so.
25              THE COURT:  All right.
```

DcgQdoeC

1          Take the oath of office.

2          I, state your name.

3          MS. MIDDLETON:  I, Margaret Middleton.

4          THE COURT:  Do solemnly swear or affirm.

5          MS. MIDDLETON:  Do solemnly swear or affirm.

6          THE COURT:  Which one?

7          MS. MIDDLETON:  I'm going to affirm, your Honor.

8          THE COURT:  Do solemnly affirm as an attorney or

9     counselor of this court.

10          MS. MIDDLETON:  Do solemnly affirm as an attorney or

11     counselor of this court.

12          THE COURT:  That I will conduct myself.

13          MS. MIDDLETON:  That I will conduct myself.

14          THE COURT:  Uprightly and according to the law.

15          MS. MIDDLETON:  Uprightly and according to the law.

16          THE COURT:  And I will support and defend the

17     Constitution of the United States.

18          MS. MIDDLETON:  And I will support and defend the

19     Constitution of the United States.

20          THE COURT:  I am going to return this back to you.

21     You will sign it, and I will sign it, and you will be admitted

22     upon your payment of the fee to the clerk.  You don't have to

23     worry about that now. you can argue.

24          MS. MIDDLETON:  I signed it, but --

25          THE COURT:  You have given your credentials to the

1    clerk's office.

2           MS. MIDDLETON:  Your Honor, they said that they

3    couldn't process it until you had signed it because I didn't

4    have a certificate from the State of New York.

5           THE COURT:  OK.

6           MS. MIDDLETON:  Thank you, your Honor.

7           THE COURT:  You're welcome.

8           Any other preliminaries?

9           MR. WISHNIE:  Nothing from us, your Honor.

10          THE COURT:  Call the case.  Jane Doe is represented by

11   Michael Wishnie.

12          MR. WISHNIE:  Yes, your Honor.

13          THE COURT:  Chelma Kelly.

14          MR. WISHNIE:  That's Chelsea Kelly, your Honor.

15          THE COURT:  Chelma?

16          MS. KELLY:  Chelsea Kelly.

17          THE COURT:  Ms. Kelly.  And Jessica Marsden.

18          MS. MARSDEN:  Yes, your Honor.

19          THE COURT:  Of the Jerome N. Frank Legal Services

20   Organization.

21          And the United States is represented by Christopher

22   Connolly.

23          MR. CONNOLLY:  Yes.  Good afternoon, your Honor.

24          THE COURT:  Without colleagues?

25          MR. CONNOLLY:  Yes, your Honor.

DcgQdoeC

| | |
|---|---|
| 1 | THE COURT:  Naked, as it were. |
| 2 | And Lisa Wang and Margaret Middleton, as it were. |
| 3 | MS. MIDDLETON:  Yes, your Honor. |
| 4 | THE COURT:  So, just another preliminary.  I have been |
| 5 | thinking more about this.  If the motion is granted, the case |
| 6 | is over, I am not going to change the status of the Jane Doe |
| 7 | quality of the case.  But if I deny the motion, and the case |
| 8 | goes on, I do think it is important that the public be aware of |
| 9 | all that is going on and whatever artificialities that might be |
| 10 | introduced because of the Jane Doe plaintiff could possibly |
| 11 | complicate the case, probably would complicate the case. |
| 12 | I feel quite strongly that the case should be entirely |
| 13 | in the public view.  If you disagree with that, Mr. Wishnie, |
| 14 | you are going to have to make a motion, and then I would write |
| 15 | something.  But I do think there has been publicity to this in |
| 16 | the past; that we are not really hiding anything; and that to |
| 17 | the extent we are, or people think we are, it takes away from |
| 18 | the case. |
| 19 | So that's my view, and I wanted you to know it. |
| 20 | MR. WISHNIE:  Thank you, your Honor.  Of course we |
| 21 | very much do hope the case goes forward; and if it does, we |
| 22 | will consult with our client.  And if she so directs, we will |
| 23 | make the appropriate motion. |
| 24 | THE COURT:  I will tell you what, a week -- if I deny |
| 25 | the motion, it may not happen today, but a week after I -- if I |

1  deny the motion, a week after that denial, I would like a

2  letter from you telling me what you think, if you would like to

3  brief the issues any more, you can ask me for some time to do

4  that, and I will give it to you.

5          MR. WISHNIE:  Thank you, your Honor.

6          THE COURT:  All right.  It's the government motion.

7  So, Mr. Connolly, I'm ready to hear you.

8          MR. CONNOLLY:  Thank you, your Honor.  Good afternoon.

9          As set forth in the government's briefs in this

10  matter --

11          THE COURT:  Why don't you take the podium?  It would

12  be easier to hear you.

13          MR. CONNOLLY:  Certainly.

14          As set forth in the government's briefs in this

15  matter, plaintiffs amended complaint should be dismissed in its

16  entirety.  In this lawsuit, plaintiff is challenging the

17  policies and procedures of the Department of Defense with

18  respect to the training, investigation and punishment of sexual

19  assault.  Clear and unbroken Supreme Court precedent, the Feres

20  doctrine, precludes these types of claims under both the

21  Federal Tort Claims Act and under Bivens.

22          Plaintiffs attempt to style her claims as a contract

23  claim pursuant to the Little Tucker Act, also fails.

24          THE COURT:  I'll tell you where I would like you to

25  focus.

DcgQdoeC

1          MR. CONNOLLY:  Certainly, your Honor.

2          THE COURT:  Equal protection.  Can there be one law

3     and one set of procedures for men, and another law and another

4     set of procedures for women, and whether or not the Feres

5     doctrine controls all aspects of that kind of punishment.

6          MR. CONNOLLY:  Yes, your Honor.

7          THE COURT:  Let me give you my preliminary views to

8     make it easier for you to argue.

9          I think when you talk about the dignity of an

10    individual in the military and what might be considered stern,

11    even arbitrary conduct on the part of superiors, you are coming

12    into a place where the disciplinary methods and procedures of

13    the military chain of command come into play.  And both

14    experience and the law instructs judges to stay away for

15    constitutional reasons and for important policy reasons.

16         The growth of the equal protection clause as it

17    relates to women is of more recent vintage.  It's not been well

18    defined, I submit, in the context of the military.  It lends

19    itself to examination and perhaps judicial examination.

20         And simply as I put it, can there be one law and one

21    set of policies governing men and a different law and different

22    set of policies regarding women without an articulable basis to

23    distinguish between them.

24         MR. CONNOLLY:  Your Honor, I think to pull back and

25    place that within the context of Feres and the case law on

1  Feres, with respect to plaintiff's Bivens claims on equal

2  protection or any of the other Bivens issues that she raises,

3  to allow those claims to go forward would be to call into

4  question the military decision-making with respect to

5  Department of Defense policies concerning prevention,

6  investigation, and punishment of sexual assault.

7          So, while your Honor may be correct that there are

8  equal protection issues of interest raised by this type of

9  claim, those claims are nonetheless precisely the types of

10  claims that are barred by Feres and its progeny.

11          THE COURT:  Suppose the commandant of West Point

12  issued a rule that women have to clean men's rooms and men's

13  bathrooms and women's rooms and bathrooms as well.  Men are not

14  naturally inclined to do that kind of work.  It's domestic work

15  and there is no such rule requiring men to do it.  Would that

16  be a lawful rule?

17          MR. CONNOLLY:  That would be a rule that could not be

18  challenged through a Bivens action of the type that we have

19  here.

20          THE COURT:  So, without a remedy, there is no right.

21          MR. CONNOLLY:  There would be not a --

22          THE COURT:  What would be the remedy?

23          MR. CONNOLLY:  There are military -- there is a

24  military chain of command, and I -- forgive me, your Honor, I

25  wouldn't know precisely in the scenario that your Honor sets

1     forth what a cadet who feels aggrieved by that type of rule,

2     what remedy he or she would have, but those are precisely the

3     types of decision that are entrusted to the military

4     leadership, and, more importantly, that cannot be challenged

5     through a Bivens action.

6              THE COURT:  I don't know what the chain of command up

7     above the commandant of West Point.

8              MR. CONNOLLY:  Pardon me, your Honor?

9              THE COURT:  I don't know what chain of command would

10     exist.  I guess it would exist to the Secretary of Defense.

11              MR. CONNOLLY:  My understanding, yes, is that beyond

12     the leadership at West Point would be the leadership of the

13     Department of Defense.  But what the fair --

14              THE COURT:  That would be the secretary?

15              MR. CONNOLLY:  Pardon me, your Honor?

16              THE COURT:  That would be the secretary.

17              MR. CONNOLLY:  Yes, your Honor.

18              THE COURT:  Or maybe the general of the Army or maybe

19     the Joint Chief; but that's not a command position.  Certainly

20     the president.  But nobody has done anything.  Nobody does

21     anything.  It exists and has existed.  What do you say?

22              MR. CONNOLLY:  Pardon me, your Honor.

23              THE COURT:  What's the remedy?

24              MR. CONNOLLY:  Well, the policy could be challenged

25     through those military channels.  If the policy was not changed

1    as result of those challenges, I would hesitate to suggest any

2    other type of judicial remedy that might be available, but for

3    a cadet who feels aggrieved by those policies, Feres and the

4    line of Supreme Court cases and cases in this circuit that

5    follow from Feres teach that a Bivens claim or an FTCA claim

6    challenging that policy are challenges that are not available.

7            THE COURT:  Leave out the FTCA.  That would mean a

8    tort.

9            MR. CONNOLLY:  Correct.

10           THE COURT:  So, how could there be a situation where

11   the equal protection clause to the Constitution is violated and

12   there is no remedy.

13           MR. CONNOLLY:  I'm not saying that there would be no

14   remedy, your Honor.  The question is whether there would be a

15   Bivens remedy.

16           THE COURT:  A judicial remedy.

17           MR. CONNOLLY:  A judicial remedy, specifically a

18   Bivens remedy, and there would not be.

19           THE COURT:  Bivens declares a judicial remedy.

20           MR. CONNOLLY:  So long as what we're talking about is

21   an allegation of injury sustained incident to military service,

22   then the Feres bar would apply to a Bivens claim that

23   challenged that type of policy.

24           THE COURT:  OK.  That's your whole point?  Thank you,

25   Mr. Connolly.

1          MR. CONNOLLY:  Thank you, your Honor.  Would you like

2     me to continue or --

3          THE COURT:  I'm not sure you have anything more to

4     say.  I mean, I agree with you on the other aspects of the

5     Fifth Amendment, and I don't really see a Tucker Act claim

6     except that it's redundant of the Equal Protection argument.  I

7     don't really see a Federal Tort Claims Act case, but I am

8     seriously bothered by the equal protection argument.

9          How could you have a situation -- and I'll take the

10     complaint as alleged to be true -- where cadets can go around

11     and could claim in cadence the degradation of the women?  It's

12     kind of simple.

13          How could you have a situation where it's claimed that

14     over 50 percent of the women in military are raped?  How could

15     you have a situation where it's alleged that a woman is

16     intimidated and in fear of lodging a complaint about a rape?

17          MR. CONNOLLY:  I understand the nature of the

18     allegations that plaintiff is making here, and the disturbing

19     nature of some of those allegations, but for the purposes of

20     this lawsuit and for the purposes of her Bivens claim, which is

21     a claim that the individual defendants named here implemented

22     and oversaw deficient policies and procedures to address

23     precisely the types of issues that you're talking about, those

24     are precluded by Bivens -- excuse me -- by the Feres doctrine.

25     Those are the types of military decisions and the type of

1  military decision-making that is entrusted to the military

2  establishment.

3  THE COURT:  So the military establishment listened and

4  countenanced cadences like "I wish that all the ladies were

5  bricks in a pile, and if I were a mason, I'd lay them all in

6  style" or "I wish that all the ladies were holes in the road,

7  and I was a dump truck, I'd fill them with my load."

8  What is the message that is set by the commandant who

9  listens and knows of these cadences?

10  MR. CONNOLLY:  That message that may be sent and the

11  actions that the commandant or other officials at West Point or

12  within the Department of Defense take with respect to these

13  types of allegations are properly within the military sphere.

14  And if a Bivens claim --

15  THE COURT:  And they do nothing about it?

16  MR. CONNOLLY:  A Bivens claim of the nature that the

17  plaintiff is bringing here, the injuries that she alleges from

18  the policies and procedures that were implemented is barred by

19  the Feres doctrine because it would require this Court to

20  second-guess military decisions and to, in effect, investigate

21  and look into precisely the type of military decision-making

22  that Feres and its progeny has said fall within --

23  THE COURT:  Mr. Connolly, I disagree.  I do not think

24  a judge ought to get involved in military decision-making, but

25  is it not proper for the judiciary to instruct the military

1   that you are to prevent cadets from acting in such a way that

2   there is one law for women and another law for men?

3           MR. CONNOLLY:  Respectfully, your Honor, under Feres

4   and the other cases that are cited in our brief, it would be

5   wrong for the Court to consider the appropriateness or

6   inappropriateness of the policies and procedures that the

7   Department of Defense has put in place to deal with the types

8   of sexual harassment and sexual assault claims that the

9   plaintiff raises in her amended complaint.

10          THE COURT:  OK.  I think we're repeating it.  Let me

11  here what plaintiffs have to say.

12          MR. CONNOLLY:  Thank you, your Honor.

13          MS. KELLY:  Good afternoon, your Honor.

14          THE COURT:  Good afternoon, Ms. Kelly.

15          MS. KELLY:  I will be arguing the FTCA and Bivens

16  claims, and my colleague Jess Marsden, will be arguing the

17  Little Tucker Act claim.

18          Your Honor there, is an epidemic of sexual assault at

19  West Point.  Because of the policies enacted by defendant,

20  countless students, including Jane Doe, have been raped,

21  assaulted or otherwise harassed while attending the academy.

22  If these assaults occurred at any other university in the

23  country, there would be no question as to the Court's

24  jurisdiction.  But because West Point is a military academy--

25          THE COURT:  I don't know.  It has to be under color of

1    law, otherwise I wouldn't have jurisdiction.

2            MS. KELLY:  Your Honor, our point is that other

3    civilian universities have other remedies such as Title Nine.

4    However, West Point and other military academies do not have

5    such remedies, and, therefore, FTCA, Bivens and Little Tucker

6    Act are the only remedies that are available to our plaintiffs.

7            Your Honor, the main point that defendants rely upon

8    is the fact that courts are precluded from intruding upon the

9    military decision-making sphere, and we would like to point out

10   that in recent years, the Supreme Court has moved away from the

11   military discipline arguments.

12           We cite in our briefs *United States v. Stanley*, which

13   was decided after the *Shearer* case defendants cite.  And in

14   *Stanley*, the court said that a test of reliability that depends

15   on the extent to which particular suits would call into

16   question military decision-making would itself require judicial

17   inquiry into military decision-making

18           THE COURT:  Say that again.

19           MS. KELLY:  A test for liability that depends on the

20   extent to which particular suits would call into question.

21           THE COURT:  Particular what?

22           MS. KELLY:  Particular suits, lawsuits, would call in

23   to question military decision-making would itself intrude upon

24   military decision-making.

25           THE COURT:  Right.  That's exactly Mr. Connolly's

1    point.

2         MS. KELLY:  Your Honor, the point is that the Supreme

3    Court believed that an incident to service test is a much more

4    objective and clear test for deciding liability with regard to

5    whether the Feres doctrine should apply, and not a test where

6    how much a case would or would not intrude upon military

7    decision-making.

8         THE COURT:  Incident to service is harder for you than

9    intrusion upon military decision-making.

10         MS. KELLY:  Pardon me, your Honor?

11         THE COURT:  This case involving a rape in the basement

12    of a West Point building has very little to do with military

13    decision-making and a lot to do with incident disservice.  I

14    think you are arguing a rule that is not very helpful to you.

15         MS. KELLY:  Your Honor, we would agree with you that

16    it is much more relevant to the incident to service test than

17    it is --

18         THE COURT:  So why bring it up to me?

19         MS. KELLY:  We believe under both *Taber v. Maine* is a

20    Second Circuit case and *Wake v. The United States* --

21         THE COURT:  What's the case?

22         MS. KELLY:  *Taber v. Maine* is a Second Circuit case.

23    I can get the facts for you here, your Honor.

24         THE COURT:  And the other case?

25         MS. KELLY:  The other case is *Wake v. United States*.

1          THE COURT:  Go ahead.

2          MS. KELLY:  Your Honor, under *Taber v. Maine*, service

3    members may recover under the FTCA when their injuries would

4    not be covered under workers' compensation law.  Ms. Doe's

5    injuries would clearly not be covered under workers'

6    compensation law for two reasons.  First of all, she was a

7    cadet of the academy; she was not an employee.  Secondly, even

8    if she was an employee, which we submit to you she was not --

9          THE COURT:  She's a member of the military.

10         MS. KELLY:  Your Honor, we believe that there is a

11   large distinction between being a student at the military

12   academy and being an employee of the military.  At the time of

13   the assault, Ms. Doe was only a sophomore at the academy, and

14   when you are a sophomore, if you are to leave the academy for

15   any reason, you are not required to repay the military for the

16   cost of your education, whereas when you are a junior at the

17   academy, you are required to repay.

18         THE COURT:  She was subject to military discipline.

19   She was subject to the orders of upper classmen and others who

20   are in a superior position of her.  I can't see that

21   distinction.  I know it's drawn, but it seems to me a false

22   one.

23         MS. KELLY:  Your Honor, we would point you towards New

24   York Workers' Compensation laws which look at a variety of

25   factors as to whether an employer and employee relationship --

DcgQdoeC

1        THE COURT:  That has to do all with the Federal Tort

2   Claims Act which I think as enacted there is no causation to

3   show that -- I am interested in equal protection.  Give me

4   argument based on equal protection.

5        MS. KELLY:  Well, your Honor, we certainly agree with

6   the points that you made on equal protection that the policies

7   created by defendants clearly distinguish between female and

8   male cadets.  They put female cadets at a very high risk of

9   sexual assault and sexual harassment, and they clearly fostered

10  and created an environment that was misogynistic and views with

11  sexual aggression which made it very difficult for female

12  cadets to complete their education at West Point.

13       THE COURT:  Suppose the commandant said, "You know, I

14  want these policies.  They show toughness.  They show

15  aggressiveness.  Maybe these are male characteristics, but I

16  want these characteristics of all my cadets."  Let's say he was

17  mistaken, but that's his rationale.  Should the courts say

18  that's a phony rationale?  That's an impermissible rationale?

19  It's an impermissible rule?

20       MS. KELLY:  Yes, your Honor.  I don't believe there

21  could be any rationale that is predicated upon causing the

22  Constitution violation of an individual.  It is clear and

23  established that a sexual assault does constitute a deprivation

24  of due process within the circuit.  And a policy that increases

25  the risks that female cadets face of experiencing sexual

1  assault is clearly in violation of equal protection.

2         THE COURT:  Tell me about Feres.

3         MS. KELLY:  Sure, your Honor.  We believe that the

4  most informative case on this point is *Taber v. Maine*.

5         THE COURT:  That's a Second Circuit.  Stay with Feres.

6  Feres is United States Supreme Court.  What happened in that

7  case?

8         MS. KELLY:  So, in the Feres case, there were several

9  plaintiffs, and essentially they sued under the Federal Tort

10 Claims Act for injuries that they had incurred during their

11 service.  The Supreme Court went through and --

12        THE COURT:  How did they get the injuries?

13        MS. KELLY:  Your Honor, I would have to double-check

14 on the exact nature of the injuries, but I know that it was

15 throughout the course of their service in the military.  The

16 main distinction that --

17        THE COURT:  It was incident to their service?

18        MS. KELLY:  It was incident to their service, yes.

19 Your Honor, the main distinction that the court makes is that

20 they looked at *Brooks v. The United States* which was a case

21 that the Supreme Court decided earlier, and they determined

22 that *Brooks v. The United States* was not going to be overruled

23 because in that case the injuries that gave rise to

24 plaintiff's -- excuse me -- the experiences that gave rise to

25 plaintiff's injuries were not incident to service in those

1  cases, but they drew the distinction between Brooks and Feres.

2         But the main point in the Feres case is that in

3  deciding not to overrule Brooks, the Supreme Court basically

4  made the law so that Feres is not a blanket ban on all cases

5  brought by military service members against the military, and

6  that is something that the government has sought to persuade

7  courts that it is, which it is not.

8         THE COURT:  I don't understand.

9         MS. KELLY:  In other words, your Honor, for years the

10  government has sought to use Feres as a bar on all cases

11  brought by military service members against the military when

12  that is not what the language of the Feres doctrine says.

13         THE COURT:  So, when a liberal commentator like Erwin

14  Shemerinski says there is no law or ability to sue under

15  Bivens, he's wrong.

16         MS. KELLY:  There is no longer an ability for a

17  service member to sue under --

18         THE COURT:  That is correct.

19         MS. KELLY:  Yes.  I believe he is incorrect, your

20  Honor.  That is not what the Feres doctrine says.  The Feres

21  doctrine makes it very clear that it is only injuries that are

22  incident to service that are barred by the Feres doctrine.

23         THE COURT:  How can you say this is not incident to

24  service?  She got her injury at West Point.  She was at a

25  building at West Point.  She was tired taking examinations that

were required of an under classman at West Point.  She was

allegedly raped by another cadet.

MS. KELLY:  Your Honor, the Feres doctrine looks at

whether the activity which gave rise to the assault was

incident to service or in furtherance of military objectives.

At the time of Ms. Doe's assault, she had left her

dormitory with a classmate.  She was not doing anything in

furtherance of military objective.  She was not participating

in a military operation or a training.  She was clearly

enjoying recreational activities.  And when the assault

occurred, she was clearly not doing anything that was in

furtherance of military objectives.

THE COURT:  Is a recreational activity on a base

incident to service?

MS. KELLY:  Not necessarily, your Honor.  We cite two

cases:  One by the Fifth Circuit and one by the Ninth Circuit,

in which both of those plaintiffs were engaging in recreational

activity that was on a military base.  When they were injured,

they were able to sue under the FTCA without a Feres bar.

THE COURT:  What kinds of injuries were they?  What

were the activities?

MS. KELLY:  In *Regan v. Starcraft Marine*, your Honor,

which is the Ninth Circuit case -- excuse me -- a Fifth Circuit

case, a military service member was on informal leave and at a

military recreational facility, and he was physically boating

DcgQdoeC

with a friend and enjoying some alcoholic beverages, and there
was a some kind of a malfunction on the boat, and he was
injured gravely.

THE COURT:  That doesn't really strike me.

MS. KELLY:  Your Honor, in *Dreyer v. The United
States*, which is a Ninth Circuit case, a solider fell into a
drainage channel which was located on his base and he was also
injured, and at that moment he was off duty and enjoying
recreational activity, and the court deemed that he was not
barred by Feres.

THE COURT:  Was he under military discipline?

MS. KELLY:  Yes.  Both plaintiffs were subject to
military discipline.

THE COURT:  So, Justice Jackson writes in Feres:  A
common fact under laying the three cases is that each claimant
while on active duty, and not on furlough, sustained injury due
to negligence of others in the armed forces."

That's this case.  Plaintiff was on active duty as a
cadet in West Point.  Neither she nor her rapist were on
furlough.  She sustained injury due not to negligence but to
the fault of others in the armed forces.  It's Feres.

MS. KELLY:  Your Honor, I am not sure it's necessarily
true that she was on active duty at the time.  The assault
occurred on a Saturday evening when she was on recreational --

THE COURT:  Soldiers are on active duty seven days a

DcgQdoeC

week.  She's a cadet.  She can't leave the base except with

permission.  She is always subject to military discipline while

she's on the base and sometimes off the base.

MS. KELLY:  The Second Circuit that most closely goes

into all of the incident to service test factors is *Wake v. The*

*United States*.  And that is a 2002 case.  We believe that

under -- basically, all the circuits have developed their own

kind of analysis of the incident to service test, and under the

Wake factors established by the Second Circuit, we believe that

Ms. Doe's case is not incident to service.

THE COURT:  What were the facts of Wake?

MS. KELLY:  The fact of Wake was that Karen Wake was

an ROTC cadet, and she was riding in a military vehicle on the

way to a pre-commissioning physical at a military hospital, and

on the way to the physical, she got into a car accident and was

severely injured.  The Court ruled that Feres did apply in that

case because she was engaged in an activity that was related to

the military and she was enjoying a benefit that was conferred

by her military service.

THE COURT:  Well, doesn't that really apply to the

plaintiff here?

MS. KELLY:  No.  I believe that our case is very

distinguishable from the Wake case in that Karen Wake, as I

mentioned, she was riding in a military vehicle.  She was on

her way to a pre-commissioning physical, as opposed to the

DcgQdoeC

1    facts of our case, in which Ms. Doe was not engaged in any

2    activity that was related to the objectives of the military.

3             THE COURT:  She was taking exams.  It was exam week at

4    West Point.

5             MS. KELLY:  Your Honor, she was clearly breaking many

6    West Point rules at the time of the assault.  She left her

7    dormitory after Taps, which is the curfew.  She was drinking

8    alcohol, which was clearly prohibited by West Point.

9             THE COURT:  After an Ambien.

10            MS. KELLY:  Excuse me?

11            THE COURT:  After she took an Ambien.

12            MS. KELLY:  That's correct, your Honor.  Clearly, none

13   of those things are in furtherance of military objectives at

14   the time.

15            THE COURT:  That's not the case.

16            MS. KELLY:  Well, that is the text, your Honor, in the

17   sense that it is incident to military service, it is something

18   that derives -- the text incident to military service --

19            THE COURT:  She was in the week of tests.  West Point

20   is very serious about its tests and the academic standing of

21   its cadets.  You cannot say that she was not involved in a

22   service-related activity.  You cannot say that she was looking

23   to derive a military benefit from performance on the tests.

24   You cannot say she was not subject to military discipline.  You

25   cannot say she was off the base.  None of these things exist.

1    Why isn't Feres the doctrine, it's United States

2    Supreme Court.  Don't tell me about Second Circuit, even though

3    the judges want me to follow what they do.  It's United States

4    Supreme Court, Feres.

5    MS. KELLY:  Of course, your Honor.

6    THE COURT:  How do I get around it if I want to rule

7    for you?  How do I get around Feres?

8    MS. KELLY:  Your Honor, under the test that you

9    yourself state, there is no way any military service member

10    could ever bring suit under the FTCA.

11    THE COURT:  Precisely.  That's what Mr. Connolly says.

12    MS. KELLY:  Your Honor, that's clearly not what was

13    intended by the Supreme when they wrote the Feres opinion.

14    THE COURT:  Why not?

15    MS. KELLY:  They clearly did not overrule *Brooks v.*

16    *United States*, which was a case that came before, and that

17    case, the facts of the case were that the attack that

18    Mr. Brooks suffered was not incident to military service.  By

19    choosing not to overrule Brooks, the Supreme Court made it very

20    clear that their intent was not to bar all suits against the

21    military by service members, but, rather to create a test that

22    looks very much like a federal and state workers' compensation

23    test.  And we believe that that is why --

24    THE COURT:  Justice Jackson distinguished Brooks,

25    didn't he?

1        MS. KELLY:  Yes, on the basis of the fact that Brooks

2    was not incident to service.

3        THE COURT:  Not incident to service.

4        MS. KELLY:  That's correct.  And Feres was incident to

5    service.

6        THE COURT:  That's a big difference.

7        MS. KELLY:  Yes, but the whole question is what does

8    incident to service mean?  That is what all of these cases turn

9    upon, and that is what we believe this case in addition turns

10   upon.

11       THE COURT:  Justice Jackson writes:  The actual

12   holding in the Brooks case can support liability here; that is,

13   in Feres, only by ignoring the vital distinction therein

14   stated.  The injury to Brooks did not arise out of or in the

15   course of military duty.  Brooks was on furlough, driving on

16   the highway, under compulsion of no orders or duty.  He had no

17   military mission.  A government owned and operated vehicle

18   collided with him.  Brooks's father, riding in the same car,

19   recovered for his injuries, and the government did not further

20   contest the judgment but contended that there could be no

21   liability to the sons solely because the sons were in the Army.

22       The Court rejected the contention primarily because

23   Brooks' relationship while on leave was not analogous to that

24   of a soldier injured while performing duties under the rulings.

25   Brooks is not this case.

DcgQdoeC

1        MS. KELLY:  Certainly, your Honor, the Supreme Court

2   did not mean to only bar cases that --

3        THE COURT:  Ms. Kelly, how do I get out of the force

4   of Feres?

5        MS. KELLY:  Your Honor, we --

6        THE COURT:  That is your challenge.

7        MS. KELLY:  We believe that *Taber v. Maine*, once

8   again, is the seminal case on this point.  We believe that it

9   does give a very thorough legal explication of what Feres was

10  intended to do.

11       Essentially what *Taber v. Maine*, the Second Circuit

12  case does, is it goes back and looks at the language of the

13  FTCA, Congress's intent and then the language of the Feres

14  doctrine when the Supreme Court decided the case.  In *Taber

15  v.Maine*, the Second Circuit stated that the text of Feres

16  derives from federal and state workers' compensation law.  The

17  scope of employment test is essentially the same as an incident

18  to service test.  Therefore, the test should be whether or not

19  an employee's injury would be covered by workers' compensation

20  law.  We believe in this case it is very clear that Ms. Doe's

21  injuries would not be covered by workers' compensation law; and

22  that if the military had an analogue to workers' compensation

23  law, they clearly would not have to pay for Ms. Doe's injuries

24  under that analogue.

25       THE COURT:  These are the facts of Taber, an opinion

1    by Judge Calabrisi falls back on an opinion in 1968 of the

2    celebrated Judge Henry Furman.  Robert S. Maine, a Navy

3    serviceman on active duty in the U.S. Naval ship repair

4    facility in Guam went on liberty after having completed a

5    grueling 24-hour-duty shift.  While on liberty, he was free to

6    leave the base as he pleased and travel up to 50 miles away.

7    He could be recalled for duty at any time.

8         Then he decided to have a good time.  By noon he was

9    relaxing at an on-base beach party and drinking beer with Navy

10   friends.  Later that afternoon, he purchased two six packs of

11   beer at the base PX with his Navy comrade and returned with her

12   to his barracks to drink several more cans.

13        At dinner time, Maine accompanied friends to the

14   enlisted men's club where he consumed two cocktails with his

15   meal.  After dinner, he attended a barracks party in the room

16   of a superior officer with several other superior officers

17   present.  There Main drank three or four more beers.  When he

18   returned to left to his own barracks at about 11:00 p.m., two

19   others noticed that he was drunk.

20        At 11:30 p.m. Maine had difficulty sleeping and

21   decided to drive off base to get something to eat.  Feeling

22   tired, he aborted his snack mission and tried to return to

23   base.  On the way back, he caused the accident that injured

24   Taber.  Taber

25        was an enlisted seabee, a construction worker in the

1  United States Navy and was stationed at Camp Covington, Guam.

2  He was also on liberty under the same freedom to travel off

3  base.

4          Around 2:00 p.m. on Saturday, Taber and a girlfriend,

5  planning to spend the weekend together off base, had dinner,

6  drinks and other kinds of activities.

7          At midnight, shortly before they left the house where

8  they were, as fate would have it, they never got there.  While

9  they were driving on the public roadway toward their

10  designation, Maine crashed into them injuring Taber severely.

11  That was the Federal Tort Claims Act based on a driving

12  accident while both men were at liberty off base.

13          Judge Calabrisi held that under the doctrine of

14  respondeat superior, the United States was liable under the

15  Tort Claims Act.

16          MS. KELLY:  Your Honor, what we believe is so

17  significant about Taber is not necessarily the facts of the

18  case and how they correlate to the facts of our case, but

19  rather the thorough explication of the Feres doctrine that

20  Judge Calabrisi goes into and the test that the Second Circuit

21  sets up regarding when to apply fairness related to FTCA

22  claims.

23          THE COURT:  Forget Taber.  You're not persuading me on

24  the basis of Taber.

25          MS. KELLY:  Well, in that case, your Honor, I believe

DcgQdoeC

that the case you should focus on is *Wake v. The United States,*
which basically explores the incident to service test within
the Second Circuit.  That was a 2002 case, the facts of which I
have gone into a little bit, the one about Karen Wake in a
military vehicle on the way to a pre-commissioning physical.

The test that the Second Circuit sets up in this case
looks at four factors in particular.  Two of those factors are
whether the plaintiff was engaged in activity that was
unrelated to the military and which was or was not limited to
military personnel.

THE COURT:  Who writes this?  Judge Altimari:  Wake
contends that the Feres doctrine does not apply to her claims
because as a member of the Naval ROTC and as an enlisted
inactive member of the Navy reserves, she lacked an official
military status at the time of the accident.

While this Court has never squarely addressed the
official status as ROTC member, a number of courts have found
that cadets in military academies may be barred by Feres from
bringing a tort claim if injured incident to military service
regardless of their official military status.  And cites cases.

We agree, and conclude, that wake was acting in a
military capacity at the time of the accident, despite the fact
that her only official act of military affiliation at the time
was that as a member of the Naval ROTC.

Wake doesn't help you.  Your Honor, we believe that

1    the test that Wake sets up is very important; namely, that it

2    doesn't focus so much on the fact that she was a member of the

3    ROTC, but rather on the activity that she was engaged in at the

4    time of the assault.  We believe this is very analogous to the

5    frolic and detour cases that we cite in our brief, which

6    harkens back to whether workers' compensation would apply to

7    the injury at hand.

8         We believe that the facts that we allege very clearly

9    establish that Ms. Doe was engaged in a frolic at the time of

10   the assault, and, therefore, would not be covered under

11   workers' compensation law, and that under the Taber test, she

12   therefore should not be barred by the Feres doctrine.

13        THE COURT:  Anything else to tell me?

14        MS. KELLY:  That is all from me, your Honor, but if

15   you would like, my colleague Jess Marsden can speak to the

16   Little Tucker Act claim.

17        MS. MARSDEN:  Your Honor, I would like to try to

18   persuade you but the Little Tucker Act claim which Feres does

19   not bar should not be dismissed.  I believe your Honor

20   suggested earlier that this claim may only be derivative of her

21   tort and Bivens claims.  However, the Federal Circuit precedent

22   on this issue is clear that where there is a contractual

23   relationship between the U.S. and the plaintiff, even injuries

24   that might also sound in tort can nonetheless be brought

25   pursuant to this court's Little Tucker Act jurisdiction.

1    THE COURT:  What was the breach of contract?

2    MS. MARSDEN:  The breach of contract was the breach of

3 the implied duty of good faith and fair dealing when the

4 government acted in bad faith, despite the full knowledge of

5 the epidemic of sexual assault that existed at West Point.

6    THE COURT:  So every failed candidate in West Point

7 who flunks out will now bring a lawsuit.

8    MS. MARSDEN:  No, your Honor.  The duty of good faith

9 and fair dealing covers only a plaintiff's reasonable

10 expectations regarding the contract and also requires --

11    THE COURT:  Everybody will allege that.

12    MS. MARSDEN:  Certainly, your Honor, but we believe

13 that unlike the other potential future suits, Ms. Doe has

14 clearly established that the government did defeat her

15 reasonable expectations.

16    THE COURT:  By what?

17    MS. MARSDEN:  That she expected a safe educational

18 environment in which she could prepare pursuant to the contract

19 to serve on active duty for eight years.

20    THE COURT:  Every one will claim that we had to march

21 too much and went through too much physical activity; we were

22 not allowed sickness; that the superior officer got in our way,

23 etc., etc. and every claim of a flunked-out person will come to

24 court.  So we will now review the academic exertions of the

25 faculty.  Is that what you want me to do?

DcgQdoeC

1      MS. MARSDEN:  Your Honor, I don't believe such

2  plaintiffs would be able to allege that the head of West Point

3  acted in bad faith by implementing an aggressive physical

4  education program nor that they should not --

5      THE COURT:  You don't have sufficient appreciation for

6  the imagination of lawyers.

7      MS. MARSDEN:  Your Honor, even so, I believe that in

8  this case, Ms. Doe has pled sufficient facts to demonstrate bad

9  faith on the part of West Point's leaders.

10      THE COURT:  So you want me to go right back into

11  Feres.

12      MS. MARSDEN:  No, your Honor.

13      THE COURT:  So I can examine this in a contract claim

14  but not in a constitutional claim.  That's what you're saying.

15      MS. MARSDEN:  Yes, your Honor.  And, in fact, the

16  Supreme Court in 1980 in a case called --

17      THE COURT:  A contract is more important than the

18  Constitution?

19      MS. MARSDEN:  Pardon?

20      THE COURT:  The right of contract is more important

21  than the constitutional rights of free speech, equal

22  protection.

23      MS. MARSDEN:  Whichever of these claims is more

24  important, Feres has never been held to bar a Little Tucker Act

25  claim.  So, to the extent Ms. Doe has available a contract

1    remedy for her injuries, then this suit should be allowed to go

2    forward.

3              THE COURT:  Thank you.

4              MS. MARSDEN:  Your Honor, I have one more thing.

5              THE COURT:  OK.

6              MS. MARSDEN:  In reviewing the complaint in

7    preparation for this hearing, we noticed one error.  In

8    paragraph 36, which makes reference to a DOD report, the

9    amended complaint states that 51 percent of female cadets

10   reported sexual assault, that should say sexual harassment.

11   The same report found that approximately 10 percent of female

12   cadets reported experiencing sexual assault.  Thank you.

13             THE COURT:  Thank you.

14             Anything more, Mr. Connolly?

15             MR. CONNOLLY:  Your Honor, very briefly, if I may.

16             I wanted to briefly address one of the issues that you

17   raised when I was previously at the podium with respect to the

18   types of remedies that might be available to a cadet who

19   believes that he or she is injured by policies.

20             In light of the Feres doctrine, which, as we argue,

21   plainly bars FTCA and Givens claims of the type that plaintiff

22   has brought, on page 16 of our opening brief, we do actually

23   mention one of the types of remedies available.  Article 138 of

24   the Uniform Code of Military Justice provides that a service

25   member who is aggrieved by her commander can complain up the

1    chain of command and an investigation would be required.  It

2    provides for redress for any instances in which a service

3    member feels wronged by the chain of command, and that includes

4    constitutional complaints.

5            Cadets can also complain to the inspector general, and

6    if they were retaliated against due to those complaints, they

7    also have further redress; for example, criminal prosecution

8    under the Whistleblower Protection Act.

9            Briefly, your Honor, as your Honor has stated

10   plainly--

11           THE COURT:  Wouldn't that interfere with military

12   discipline, if there was such a complaint?

13           MR. CONNOLLY:  To the inspector general?  Well, if

14   there were retaliatory incidents, I suppose that there would be

15   some sort of an investigation on the part of the inspector

16   general.  But, clearly, Article 138 of the Uniform Code of

17   Military Justice contemplates relief for a cadet through the

18   chain of command.  And as the cases set forth in both of the

19   government's briefs make clear, FTCA and Bivens' remedies are

20   plainly not available.  As your Honor has indicated, it's clear

21   that the plaintiff's injuries were sustained incident to

22   service.  In that respect, I would point out that the injuries

23   that form the basis for her claims here are not the injuries

24   allegedly suffered as a result of the sexual assault, but,

25   rather, the injuries suffered as a result of the policies and

1   procedures implemented by the leadership at West Point.

2           THE COURT:  Yes.  She alleges -- she is not suing her

3   rapist.

4           MR. CONNOLLY:  Correct, your Honor.

5           THE COURT:  She is suing the military leadership at

6   West Point, and she alleges that they created a sexually

7   harassing set of policies and programs to the extent that women

8   are subjected to a degrading and hostile environment that robs

9   them of their right to equal protection.

10          They are not saying that life was bananas and cream.

11  What they want is the same set of tough standards as applies to

12  the men -- no more; no less.  And they allege that a set of

13  policies that degrades women; that exploits women; that

14  promotes sexually aggressive conduct to women, even by people

15  with whom they serve, takes away their right to equal

16  protection.

17          It's not stated, but it's implicit, that there cannot

18  be proper loyal service to the military if there is one law for

19  men and another law for women.  Accomplishment of the mission

20  requires a coordination among all members and the mutual

21  respect within the chain of command.  And if notwithstanding

22  excellent performance, competent dedication to the mission,

23  women can be exploited and degraded, their equal protection is

24  robbed.  That's the sense of the allegations.

25          At this point in time, I have to accept as true

1  everything alleged in the complaint and the fair inferences

2  that are raised by the allegations of the complaint.  And this

3  is how I read the complaint.  I have to ask if Feres was

4  intended to have that reach to immunize a commandant against

5  judicial review of clear constitutional violations.  Women's

6  right to equal protection is well-founded in the Constitution.

7  It is the express ruling of Supreme Court decisions, and it has

8  to be respected and enforced as any law is.  The fact that

9  there be internal means of redress, which according to the

10  experience alleged in the complaint was not effective and not

11  present, indicates that there is no remedy unless the Court is

12  willing to act.

13      I served three years in the United States Army in the

14  judge advocate corps.  I considered this some of my most

15  meaningful years, and I very much believe in the mission of the

16  United States military forces to protect our country and to

17  protect our rights as citizens, but it cannot be done on the

18  backs of women.  They are entitled to the same respect, the

19  same dignity and same equal rights as men.  It is on this

20  setting I have to write.

21      Feres is a powerful case.  It expresses an important

22  wisdom, which I respect and which I believe, but at the same

23  time it is the Constitution that we have to enforce, and that's

24  part of my job in this.  Decision reserved.

25      Off the record.

DcgQdoeC

1          (Discussion off the record)

2          THE COURT:  I was commenting on the record what would

3   be the appellate rights of the parties.  If I rule in favor of

4   the government, the plaintiff clearly is the aggrieved party

5   from the final decision or it would seem that way and has the

6   right of appeal.

7          If I ruled by denying the motion, the government might

8   have an appeal in relationship to immunities depending how I

9   rule and depending on other circumstances.

10          In any event, it is not something I am prepared to

11  make a ruling on right now.  So I suggest that if my decision

12  is such that the government wishes to appeal, that should be

13  the basis of the separate motion brought after my decision.

14          Thank you very much.

15          (Adjourned)

16

17

18

19

20

21

22

23

24

25